James Jardine (1647)
Justin Toth (8438)
**RAY QUINNEY & NEBEKER P.C.**
36 South State Street, Suite 1400
Salt Lake City, UT 84111
(801) 532-1500
jjardine@rqn.com
jtoth@rqn.com

Christopher M. Curran (*pro hac vice forthcoming*)
J. Frank Hogue (*pro hac vice forthcoming*)
David E. Bond (*pro hac vice forthcoming*)
Claire L. Leonard (*pro hac vice forthcoming*)
**WHITE & CASE** LLP
701 Thirteenth Street, NW
Washington, DC 20005
Telephone:  (202) 626-3600
ccurran@whitecase.com
fhogue@whitecase.com
dbond@whitecase.com
claire.leonard@whitecase.com

*Attorneys for Corsicana Mattress Company, Elite
Comfort Solutions, Inc., Future Foam, Inc., FXI
Holdings, Inc., Leggett & Platt, Inc., Serta
Simmons Bedding, LLC, Tempur Sealy
International, Inc., and Brooklyn Bedding, Inc.*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH – NORTHERN DIVISION

| | |
|---|---|
| CVB INC.,<br><br>Plaintiff,<br><br>v.<br><br>CORSICANA MATTRESS COMPANY, ELITE COMFORT SOLUTIONS, INC., FUTURE FOAM, INC., FXI HOLDINGS, INC., LEGGETT & PLATT, INC., SERTA SIMMONS BEDDING, LLC, TEMPUR SEALY INTERNATIONAL, INC., AND BROOKLYN BEDDING, INC.,<br><br>Defendants. | **DEFENDANTS' CORRECTED MOTION TO DISMISS THE COMPLAINT FOR FAILURE TO STATE A CLAIM**<br><br>Oral Argument Requested<br><br>Case No. 1:20-cv-00144-DBB<br><br>Judge David B. Barlow |

## TABLE OF CONTENTS

Page

RELIEF SOUGHT AND GROUNDS FOR MOTION .................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ..............................................................1

INTRODUCTION ........................................................................................................................1

STATEMENT OF THE FACTS AS ALLEGED ........................................................................4

ARGUMENT ...............................................................................................................................8

I. The Complaint Fails to State a Claim Because the First Amendment Protects
   Defendants' Petitioning Activity ....................................................................................8

   A. The Antitrust Claims Should Be Dismissed Because Defendants'
      Successful Petitioning Is Immune Under the *Noerr-Pennington*
      Doctrine.............................................................................................................. 10

      1. The Alleged Misrepresentations Do Not Undermine Defendants'
         Petitioning Success ..................................................................................... 16

      2. *Noerr-Pennington* Protects the Alleged Public Relations
         Campaign ..................................................................................................... 20

      3. Allegations of Anticompetitive Intent Are Irrelevant Because
         Defendants' Petitioning Was Not "Objectively Baseless" ........... 22

   B. The Lanham Act and Utah Common-Law Claims Should Be Dismissed
      Because Defendants' Successful Petitioning Is Protected by Petition
      Clause Immunity................................................................................................ 22

II. Plaintiff's Non-Antitrust Claims Should Be Dismissed on the Additional Ground
    that the Complaint Fails to Allege Necessary Elements ........................................23

CONCLUSION..........................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Aircapital Cablevision, Inc. v. Starlink Commc'ns Grp., Inc.*,
    634 F. Supp. 316 (D. Kan. 1986) ....................................................................2, 20

*Apex Exps. v. United States*,
    777 F.3d 1373 (Fed. Cir. 2015)............................................................................22

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)................................................................................................8

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..............................................................................3, 4, 8, 22

*C.R. Eng. v. Swift Transp. Co.*,
    437 P.3d 343 (Utah 2019).....................................................................................24

*Cheminor Drugs, Ltd. v. Ethyl Corp.*,
    168 F.3d 119 (3d Cir. 1999)....................................................................... *passim*

*Coll v. First Am. Title Ins. Co.*,
    642 F.3d 876 (10th Cir. 2011) ..............................................................................10

*CSMN Invs., LLC v. Cordillera Metro. Dist.*,
    956 F.3d 1276 (10th Cir. 2020) .............................................................2, 8, 9, 23

*E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*,
    365 U.S. 127 (1961)...........................................................................2, 10, 11, 21

*GF Gaming Corp. v. City of Black Hawk*,
    405 F.3d 876 (10th Cir. 2005) ..........................................................................8, 22

*Hallco Envtl. v. Comanche County Bd. of County Comm'rs*,
    No. 97-6083, 1998 U.S. App. LEXIS 12596 (10th Cir. June 10, 1998)
    (unpublished) .............................................................................................2, 16, 20

*Harvey v. Ute Indian Tribe of the Uintah & Ouray Reservation*,
    416 P.3d 401 (Utah 2017)...............................................................................24, 25

*Hydro-Tech Corp. v. Sundstrand Corp.*,
    673 F.2d 1171 (10th Cir. 1982) ........................................................................8, 11

*Intermountain Stroke Ctr., Inc. v. Intermountain Health Care, Inc.*,
    638 F. App'x 778 (10th Cir. 2016) (unpublished) ................................................23

*Jacob v. Bezzant,*
    212 P.3d 535 (Utah 2009) ....................................................................25

*Khalik v. United Air Lines,*
    671 F.3d 1188 (10th Cir. 2012) ..............................................................8

*Lde Corp. v. Dyno Nobel,*
    No. 04-cv-0137, 2005 U.S. Dist. LEXIS 60985 (D. Wyo. Sept. 13, 2005)............................12

*Music Center S.N.C. Di Luciano Pisoni & C. v. Prestini*
    *Musical Instruments Corp.,*
    874 F. Supp. 543 (E.D.N.Y. 1995) .....................................................4, 12, 15, 19

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.,*
    572 U.S. 545 (2014)..............................................................................9

*Paradigm Alliance, Inc. v. Celeritas Techs., LLC,*
    659 F. Supp. 2d 1167 (D. Kan. 2009) ...................................................24

*Pratt v. Nelson,*
    164 P.3d 366 (Utah 2007)...................................................................25

*Professional Real Estate Investors, Inc. v. Columbia Pictures Industries,*
    508 U.S. 49 (1993)...................................................................... *passim*

*SCO Grp., Inc. v. IBM,*
    879 F.3d 1062 (10th Cir. 2018) ..........................................................24

*Sunrise Pharm., Inc. v. Vision Pharma, LLC,*
    Civ. A. No. 2:17-cv-04074, 2018 U.S. Dist. LEXIS 103647 (D.N.J. June 20,
    2018) (unpublished) ........................................................................2, 20

*Telestar, Inc. v. MCI Comms. Corp.,*
    Nos. 90-4125, 90-4128, 1991 U.S. App. LEXIS 24433 (10th Cir. Oct. 9,
    1991) (unpublished) ............................................................................11

*United Mine Workers v. Pennington,*
    381 U.S. 657 (1965)...........................................................................2, 10

*Winzler v. Toyota Motor Sales U.S.A., Inc.,*
    681 F.3d 1208 (10th Cir. 2012) ..............................................................4

## CONSTITUTIONAL PROVISIONS, STATUTES AND RULES

U.S. Const. Amendment I............................................................................8

19 U.S.C. § 1516a .....................................................................................20

19 U.S.C. § 1673a(b) ...............................................................................................................11

19 U.S.C. § 1673a(b)(1) .........................................................................................................14

28 U.S.C. § 1581(c) ...............................................................................................................20

Tariff Act of 1930, 19 U.S.C. §§ 1673-1683g (2018) ............................................................1

Fed. R. Civ. P. 12(b)(6)................................................................................................1, 8, 10, 22

## RELIEF SOUGHT AND GROUNDS FOR MOTION

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and Local Civil Rule 7-1, Defendants, by their undersigned attorneys, hereby move this Court to dismiss with prejudice all claims in Plaintiff CVB Inc.'s Complaint (ECF No. 2) for failure to state a claim upon which relief can be granted. As set forth more fully below, Defendants' petitioning of the U.S. Department of Commerce ("Commerce") and the U.S. International Trade Commission ("ITC") is protected by *Noerr-Pennington* and Petition Clause immunity. This motion is based on the arguments and authorities set forth below, the Exhibits attached hereto, and on any further materials or arguments the Court deems proper.

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiff, a seller of mattresses imported from China and other foreign countries, brings this action based on Defendants' conduct in connection with their filing of two antidumping petitions with Commerce and the ITC. All of Plaintiff's claims are foreclosed by the venerable *Noerr-Pennington* doctrine, which immunizes such activity from antitrust and other civil claims. Plaintiff's Complaint must be dismissed in its entirety and with prejudice.

## INTRODUCTION

The statutory right of U.S. domestic industries to petition the government for relief from unfair dumping by foreign manufacturers has been an integral part of U.S. international trade law for nearly a century. *See, e.g.*, Tariff Act of 1930, 19 U.S.C. §§ 1673-1683g (2018); Compl. ¶ 152. Plaintiff's claims here center on two antidumping petitions that Defendants filed with Commerce and the ITC under those U.S. international trade laws. In those petitions, Defendants alleged that mattresses imported from certain foreign countries were being sold at less than fair value in the United States, causing material injury to U.S. mattress manufacturers. Because Plaintiff's claims

are predicated on Defendants' petitioning activity, the claims run headlong into a doctrine tracing its origins to two U.S. Supreme Court cases — *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657 (1965) — establishing that antitrust claims and other civil claims may not be based on activity associated with petitioning the government.

While the eponymous *Noerr-Pennington* doctrine began in the context of immunizing the petitioning of the legislative branch from antitrust claims, it has expanded over the decades to immunize the petitioning of any government body, including federal agencies, from not just antitrust claims, but other statutory and tort claims as well. *See, e.g., CSMN Invs., LLC v. Cordillera Metro. Dist.*, 956 F.3d 1276, 1283 (10th Cir. 2020) (applying immunity beyond the legislative branch and outside the antitrust context). The doctrine also immunizes conduct incidental to petitioning activity, such as public communications associated with petitioning activity. *See, e.g., Hallco Envtl. v. Comanche County Bd. of County Comm'rs*, No. 97-6083, 1998 U.S. App. LEXIS 12596, at *16 (10th Cir. June 10, 1998) (unpublished) (finding *Noerr-Pennington* immunity encompassed "media campaigns"); *Aircapital Cablevision, Inc. v. Starlink Commc'ns Grp., Inc.*, 634 F. Supp. 316, 326 (D. Kan. 1986) (determining that "attendant publicity is protected by *Noerr-Pennington*"); *Sunrise Pharm., Inc. v. Vision Pharma, LLC*, No. 2:17-cv-04074, 2018 U.S. Dist. LEXIS 103647 (D.N.J. June 20, 2018) (unpublished) (applying *Noerr-Pennington* to press releases and dismissing antitrust, Lanham Act, and state-law claims).

So well established is the current scope of *Noerr-Pennington* (or Petition Clause) immunity that Plaintiff does not dispute its general applicability here. Instead, Plaintiff seeks to invoke an exception to such immunity, namely the "sham" exception. Plaintiff denominates the Complaint's first count as one for "sham petitioning," and defines Defendants' antidumping petitions as the

"First Sham Petition" and the "Second Sham Petition," as though such conclusory labeling carried some weight.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557, 564 (2007) (holding that "labels" and "legal conclusions" are not taken as true).

Under controlling law, Plaintiff's reliance on the "sham" exception is squarely foreclosed by the Complaint's own factual allegations.  In *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries*, 508 U.S. 49 (1993) ("*PRE*"), the Supreme Court held that the "sham" exception cannot apply if the petitioning in question was successful, and here the Complaint affirmatively alleges that Defendants' petitions have been successful.  *See, e.g.*, Compl. ¶ 213 (alleging, as to first petition, "Commerce found that Mattresses from China had been sold at less than fair value"); ¶ 234 (alleging, as to second petition, "the ITC provided notice of the institution of investigations and commencement of the preliminary phase").  While the Complaint alleges that Defendants' petitions contained exaggerations or misrepresentations and that Defendants had anticompetitive motives, such allegations are insufficient to plead the "sham" exception; *PRE* and its progeny are unequivocal that the "sham" exception cannot be invoked where, as here, the petitioning activity resulted in a favorable outcome.  *See, e.g.*, *PRE*, 508 U.S. at 60 & n.5; *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119 (3d Cir. 1999).

Plaintiff is plainly disappointed by the conduct and result of the antidumping proceedings. But Plaintiff and its supplier Healthcare participated in those proceedings and their grievances were heard there, and antidumping duties were nonetheless imposed.  Neither Plaintiff nor Healthcare has filed or pursued any appeal from those proceedings.  Instead, Plaintiff now lodges what is effectively a collateral attack.  The *Noerr-Pennington* doctrine precludes such a tactic.

This action is not the first by an importer of foreign goods asserting antitrust and other claims based on antidumping petitions.  In at least two prior such actions, courts have applied the

*Noerr-Pennington* doctrine to reject the claims. *See Cheminor*, 168 F.3d 119; *Music Center S.N.C. Di Luciano Pisoni & C. v. Prestini Musical Instruments Corp.*, 874 F. Supp. 543 (E.D.N.Y. 1995). The same result is required here.

**STATEMENT OF THE FACTS AS ALLEGED**

While Defendants dispute many of the allegations in the Complaint, Defendants accept all of the factual allegations as true for purposes of this Motion. *See Twombly*, 550 U.S. at 555. The Court may also consider Exhibits 1-7, orders and determinations by Commerce and the ITC in the antidumping proceedings, given the Complaint's extensive reliance on, and quotation from, those proceedings. Should the Court deem it necessary, Defendants hereby request judicial notice of Exhibits 1-7. *See Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1212-13 (10th Cir. 2012) (taking judicial notice of "[t]he contents of an administrative agency's publicly available files" attached as exhibits to defendant's motion to dismiss).

In September 2018, certain Defendants filed a petition (the "First Antidumping Petition") with Commerce and the ITC (together, the "Agencies") alleging that mattresses imported from the People's Republic of China "were being, or were likely to be, sold in the United States at less than fair market value," a practice known as "dumping." Compl. ¶ 173. The First Antidumping Petition alleged that Chinese suppliers, including Plaintiff's primary mattress supplier Healthcare Co., Ltd. ("Healthcare") (*id.* ¶ 174), were "injuring the U.S. mattress industry by selling mattresses at dumped prices that consistently undercut the prices of the domestic industry" (*id.* ¶176). The First Antidumping Petition alleged that the margin of dumping on mattresses from China "was as high as 1,700 percent" (*id.* ¶ 174) and "claimed that 'surging volumes' of dumped Chinese imports caused U.S. mattress manufacturers to cut jobs and to lose sales, profitability, production, and investments" (*id.* ¶ 176). To remedy the injury to U.S. mattress producers, the First Antidumping

Petition "requested that the Agencies investigate and impose duties on all such products." *Id.*
¶ 174.   According to the Complaint, Defendants supported the petition with allegedly false
statements, including "false values for the products identified," "skewed data,"
"misleading[] . . . calculations of [the] dumping margin,'" and incorrect information on domestic
manufacturers' "'available excess capacity' to supply demand.'" *Id.* ¶¶ 177-78, 182, 186, 192.
The Complaint also alleges Defendants inaccurately cited the imports as "the primary cause" of
job losses and factory closures in the domestic industry (*id.* ¶ 197) and as preventing Defendants
from "obtaining top listings and marketing their products on e-commerce sites" (*id.* ¶ 203).

     After receiving the First Antidumping Petition, the Agencies conducted an independent
investigation.   *Id.* ¶¶ 173-222.   In June 2019, Commerce issued a preliminary dumping
determination.  *See id.* ¶ 212.   Later, in October 2019, Commerce issued a final determination
confirming Defendants' allegation that mattresses produced by Chinese suppliers "had been sold
at less than fair value" in the United States (i.e., had been imported at dumped prices) and set
dumping margins at which duties would be collected on imports.  *Id.* ¶ 213.   Although Commerce
did not find that "'critical circumstances' existed with respect to Healthcare" (*id.* ¶ 214) to impose
"additional duties" "retroactively" (*id.* ¶ 170), Commerce confirmed that mattresses manufactured
by Healthcare "had been sold at less than fair value" and imposed duties prospectively at a margin
of 57.03% (*id.* ¶ 213).   The ITC separately "conduct[ed] the final phase of [its] investigation"
(*id.* ¶ 167) and, in December 2019, "issued its final report" (*id.* ¶ 216) which "found that the U.S.
mattress industry had been materially injured by Chinese suppliers' dumping practices" (*id.* ¶ 217).
The result of the First Antidumping Petition at the Agencies was thus clear:   "These decisions
concluded that dumping had occurred and that Defendants were materially injured." *Id.* ¶ 190.

In March 2020, certain Defendants filed a second petition with the Agencies (the "Second Antidumping Petition"), alleging that mattresses were being dumped in the United States by foreign suppliers in Cambodia, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam. *Id.* ¶¶ 230-32. According to the Complaint, the Second Antidumping Petition "exaggerated and manipulated the calculation of a dumping margin" and misstated mattress manufacturing costs and import data. *Id.* ¶ 236; *see also id.* ¶¶ 240, 248. The Complaint alleges that Defendants falsely alleged in the Second Antidumping Petition that foreign dumping "caused the loss of 'thousands of jobs'" (*id.* ¶ 267) and the closure of "'more than 40'" U.S. mattress factories (*id.* ¶ 269), and that the foreign producers "were acting as a front for Chinese manufacturers trying to evade the steep tariffs imposed as a result of the [First Antidumping Petition]" (*id.* ¶ 249).

Based on Defendants' Second Antidumping Petition, the Agencies conducted additional investigations. *See* Compl. ¶¶ 234, 270. In April 2020, the ITC "provided notice of the institution of investigations and commencement of the preliminary phase of antidumping and countervailing duty investigation" based on the Second Antidumping Petition. *Id.* ¶ 234. A month later, after its own independent investigation, in May 2020, the ITC "issued its preliminary determination" (*id.* ¶ 270), which concluded that "there is a reasonable indication" that the U.S. mattress industry "is materially injured or is threatened with material injury" due to the imports of mattresses "sold at less than fair value in the United States" (*id.* ¶ 164). After Plaintiff filed the Complaint here, Commerce, following its own independent investigation, published an affirmative preliminary determination of dumping. *See, e.g.*, *Mattresses from Malaysia*, 85 Fed. Reg. 69,574 (Dep't of Com. Nov. 3, 2020) (prelim. affirm. Determination) (Exhibit 1).

Plaintiff and other parties participated in the First Antidumping Petition proceedings before the Agencies (Compl. ¶¶ 291, 303, 304) and continue to do so as to the Second Antidumping

Petition (*id.* ¶ 304).  Those parties' principal arguments were considered and rejected.  *See, e.g.*, Compl. ¶¶ 213, 219, 221; Ex. 1 at 1.

During the pendency of the investigations, Defendants allegedly "issue[d] press releases regarding the filing of the [First and Second Antidumping Petitions] that repeated the false, misleading, and/or inaccurate information contained therein . . . ."  *Id.* ¶ 272.  These public press releases included information about the petitions' alleged dumping margins (*id.* ¶ 274-75, 277), the duties that could be issued by the Agencies (*id.*), and the "job losses and factory closures being caused by the alleged dumping" (*id.* ¶ 279).  The International Sleep Products Association ("ISPA"), a trade association for the sleep products industry, also issued public press releases "repeat[ing] the false information" in the petitions, expressing support for the petitions, and discussing their possible effects on the industry's importing practices.  *Id.* ¶ 273; *see also id.* ¶ 278.

Based on the foregoing allegations, Plaintiff CVB alleges:  "Defendants conspired to cut off CVB's and other competitors' sources of supply by exploiting the legal process and filing repeated sham antidumping petitions against CVB's suppliers that contain numerous false statements and intentional omissions of material facts."  *Id.* ¶ 20.  Plaintiff further alleges: "Defendants wrongfully conspired to use the legal process to create uncertainty within affected U.S. markets and to cause immediate uncertainty about the availability of future supply, future prices, future costs, and potential liabilities, and to cause industry participants to incur legal fees to comply with the investigation."  *Id.* ¶ 21.  The Complaint asserts eight causes of action: sham petitioning, monopolization, monopoly leveraging, and conspiracy to monopolize in violation of the Sherman Act, 15 U.S.C. §§ 1, 2; violation of the Lanham Act, 15 U.S.C. § 1125(a); violation of the Utah Antitrust Act, Utah Code § 76-10-3109; and Utah common-law claims for intentional

interference with prospective economic advantage and defamation.  Plaintiff seeks treble damages, punitive damages, attorneys' fees, and other relief.  *See* Compl. at 68-69 (Prayer for Relief).

## ARGUMENT

To avoid dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012).  While well-pleaded factual allegations are accepted as true, "labels and conclusions," "formulaic recitation[s]," "conclusory allegation[s]," "naked assertion[s]," "legal conclusions," "threadbare recitals," "bare assertions," and "bald allegations" are not accepted as true.  *Twombly*, 550 U.S. at 555-57; *Iqbal*, 556 U.S. at 678, 680-81.  Further, courts disregard allegations of conduct protected by an immunity for purposes of evaluating whether a complaint has stated a claim.  *See, e.g., GF Gaming Corp. v. City of Black Hawk*, 405 F.3d 876, 883 (10th Cir. 2005) (dismissing antitrust claims under 12(b)(6) where the only allegations in support were barred by *Noerr-Pennington* immunity); *Hydro-Tech Corp. v. Sundstrand Corp.*, 673 F.2d 1171, 1177 & 1177 n.8 (10th Cir. 1982) (dismissing antitrust claims, even pre-*Twombly*, where plaintiff failed to plead "allegations of the specific activities, not protected under the *Noerr-Pennington* doctrine").

I.      **The Complaint Fails to State a Claim Because the First Amendment Protects Defendants' Petitioning Activity**

The First Amendment protects "the right of the people . . . to petition the Government for a redress of grievances."  U.S. Const. amend. I.  Accordingly, those who seek redress from the government are afforded immunity for their petitioning activities.  *See PRE*, 508 U.S. at 56.  In the antitrust context, this immunity is known as *Noerr-Pennington* immunity; outside of that context, it is sometimes referred to as "Petition Clause immunity."  *See CSMN*, 956 F.3d at 1283

8

(confirming that *Noerr-Pennington* immunity extends beyond the antitrust context, but then takes on the name "Petition Clause" immunity).  The Tenth Circuit has repeatedly recognized the full scope of *Noerr-Pennington*'s "broad immunity," for which the Supreme Court has carved out only a limited exception for "sham" petitioning.  *Id.* at 1282-83; *see also Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 556 (2014) ("We crafted the *Noerr-Pennington* doctrine— and carved out only a narrow exception for 'sham' litigation—to avoid chilling the exercise of the First Amendment right to petition the government for the redress of grievances.").

In *PRE*, the Supreme Court articulated a two-pronged test for the narrow sham-petitioning exception to *Noerr-Pennington* immunity.  508 U.S. at 60-61.  A plaintiff can successfully invoke the "sham" exception only where it alleges facts sufficient to plausibly suggest that the petitioning activity both:  (1) is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits"; and (2) "conceals an attempt to interfere *directly* with the business relationships of a competitor through the use of the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon" (*id.* at 60-61 (citations omitted)).  Critically, a court may not advance to the second prong to examine the petitioner's subjective motivation unless it first finds the challenged conduct is "objectively baseless" under the first prong.  *Id.* at 60; *see also CSMN*, 956 F.3d at 1284 ("[S]ubjective motivation matters only if the petitioning is objectively unreasonable.").

All of Plaintiff's claims here are premised on allegations of Defendants' petitioning of Commerce and the ITC (and incidental activities such as press releases) regarding imported mattresses that were sold at dumped prices that materially injured U.S. mattress manufacturers.  *See* Compl. ¶¶ 172-280.  As explained below, *Noerr-Pennington* or Petition Clause immunity fully

immunizes Defendants' alleged conduct.  As such, the Complaint fails to state a claim and should be dismissed in its entirety pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

### A. The Antitrust Claims Should Be Dismissed Because Defendants' Successful Petitioning Is Immune Under the *Noerr-Pennington* Doctrine

Generally, petitioning the government, either unilaterally or with others, is protected from antitrust scrutiny under the *Noerr-Pennington* doctrine.  *See Noerr*, 365 U.S. at 135-36 ("[N]o violation of the [Sherman] Act can be predicated upon mere attempts to influence the passage or enforcement of laws."); *Pennington*, 381 U.S. at 669-72 ("*Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose.").  The Sherman Act does not prohibit "persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly."  *PRE*, 508 U.S. at 56 (quoting *Noerr*, 365 U.S. at 136).  *Noerr-Pennington* immunity extends to petitioning all government agencies.  *See id.* at 510 ("[T]he right to petition extends to all departments of the Government," including "administrative agencies"); *Coll v. First Am. Title Ins. Co.*, 642 F.3d 876, 897 (10th Cir. 2011) (explaining that *Noerr-Pennington* immunity extends to attempts to influence the executive branch).

Here, Defendants' petitioning of the Agencies is immune from antitrust liability under *Noerr-Pennington*.  The Complaint acknowledges, as it must, that Defendants engaged in petitioning conduct when they urged Commerce and the ITC — literally through "petitions" — to initiate and conduct antidumping investigations of imported mattresses.  *See* Compl. ¶¶ 172-280. Specifically, the Complaint alleges that:  (1) Defendants filed two antidumping petitions with the Agencies alleging that dumping and resultant material injury were occurring from mattresses imported from China and various other countries (Compl. ¶¶ 173-78, 181-82, 230-32); (2) Defendants provided information to the Agencies to urge them to investigate the petitions'

allegations (*id.* ¶¶ 174-78, 181, 230-32, 241-45); (3) Defendants testified before and provided sworn statements to the Agencies in connection with the petitions (*id.* ¶¶ 193-94, 198, 200, 204-06, 254-55, 269); and (4) Defendants issued press releases and made public statements regarding the petitions (*id.* ¶¶ 251, 271-80).  These allegations reflect Defendants' collective efforts to influence the Agencies' action with respect to the antidumping petitions, as well as Defendants' activities incidental to that petitioning.

Defendants' conduct is quintessential petitioning activity protected by *Noerr-Pennington*. *See, e.g.*, *Noerr*, 365 U.S. at 138 (immunizing publicity campaign designed to solicit governmental action with respect to the enforcement of laws); *Telestar, Inc. v. MCI Comms. Corp.*, Nos. 90-4125, 90-4128, 1991 U.S. App. LEXIS 24433, at *3-4 (10th Cir. Oct. 9, 1991) (unpublished) (finding that advocacy efforts before an administrative agency were protected by *Noerr-Pennington*); *Hydro-Tech Corp.*, 673 F.2d at 1174 (petitioning adjudicative bodies is exempt from Sherman Act liability).  Indeed, the antidumping statute's standing requirement clearly contemplates that companies jointly prepare and file petitions.  *See* 19 U.S.C. § 1673a(b).  As such, *Noerr-Pennington* immunity applies.

Recognizing that Defendants' conduct is plainly petitioning and presumptively immune from suit, the Complaint attempts to invoke the narrow "sham" exception to otherwise broad immunity.  In particular, the Complaint colorfully alleges that Defendants "exploit[ed] the legal process" and used it as an "anticompetitive weapon" (*see* Compl. ¶¶ 20-21, 143, 151, 172, 298-306, 317, 323, 339, 344).  Such allegations do not undermine Defendants' immunity here.

Under the first prong of the "sham" exception, petitioning activity cannot be deprived of immunity unless it is "objectively baseless."  *PRE*, 508 U.S. at 51.  The "objectively baseless" standard sets a high bar for satisfying the first prong of *Noerr-Pennington*'s "sham" exception.

*See, e.g.*, *Lde Corp. v. Dyno Nobel*, No. 04-cv-0137, 2005 U.S. Dist. LEXIS 60985, at *24 (D. Wyo. Sept. 13, 2005) (describing the standard as a "high hurdle").  Litigation is not "objectively baseless" if a "litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome." *PRE*, 508 U.S. at 60.  By definition, successful petitioning (i.e., "elicit[ing] a favorable outcome") is not objectively baseless.  *Id.* at 60, 60 n.5 ("A winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham.").

These standards apply with full force in the context of petitioning Commerce and the ITC. *See, e.g.*, *Cheminor*, 168 F.3d at 124, 127 (immunizing defendant's filing of an antidumping petition with Commerce and the ITC under *Noerr-Pennington* and holding that defendant's petitioning was not a "sham" despite alleged misrepresentations); *Music Center*, 874 F. Supp. at 549 (holding that *Noerr-Pennington* protected defendant's antidumping petition, notwithstanding allegations of misrepresentations, because the petition was not objectively baseless).  In an antidumping proceeding, to have an objective basis to file a petition with the Agencies, "[a petitioner] must have had a reasonable belief that [foreign manufacturers were] dumping [products] in the United States at less than fair value, and that the dumping caused material injury or threat of material injury to the domestic market." *Cheminor*, 168 F.3d at 124.  A favorable outcome in a proceeding clearly demonstrates that it was "realistic[]" for the litigant to "expect success on the merits of the challenged [proceeding]," and therefore the petitioning was not objectively baseless. *PRE*, 508 U.S. at 60 n.5, 62-63; *see also Music Center*, 874 F. Supp. at 554 (finding an antidumping petition "not objectively baseless" where the agency found dumping, even though the ITC determined that such dumping did not materially injure a U.S. industry).

The allegations in the Complaint fall far short of what is required to invoke the "sham" exception.  Indeed, the allegations demonstrate that Defendants' antidumping petitions achieved a

favorable outcome at each critical phase of the antidumping proceedings. *See* Compl. ¶¶ 213, 216-217, 234, 270. These allegations negate any invocation of the "sham" exception.

As to the First Antidumping Petition, the Complaint alleges that the Agencies investigated Defendants' allegations and finally determined that mattresses imported from China were indeed being sold at dumped prices (*id.* ¶ 213), and that the dumping materially injured the U.S. mattress industry (*id.* ¶ 217). The Agencies' findings demonstrate that Defendants had a "reasonable belief" that dumped mattresses were materially injuring the U.S. industry. *See Cheminor*, 168 F.3d at 124.

As to the Second Antidumping Petition, the allegations in the Complaint again establish that Defendants' petition was successful, rendering the filing of the petition not "objectively baseless." In particular, the Complaint acknowledges (again, as it must) that in May 2020 the ITC issued a preliminary determination that Defendants had demonstrated that the domestic mattress industry was materially injured. *See* Compl. ¶ 270 (alleging that the ITC determined that Second Antidumping Petition "had met the Reasonable Indication Standard"); *id.* ¶ 164 (explaining and defining "Reasonable Indication Standard"). This alone demonstrates the ITC's determination that the Second Antidumping Petition had an "objective basis." Further, on November 3, 2020, subsequent to the filing of the Complaint, Commerce published its preliminary determination finding that foreign mattresses were being dumped in the United States at less than fair value. *See, e.g.*, Ex. 1 at 1-2; *Mattresses from the Socialist Republic of Vietnam*, 85 Fed. Reg. 69,591, 69,592 (Dep't of Com. Nov. 3, 2020) (prelim. affirm. determination) (Exhibit 2). The allegations of success with respect to the Second Antidumping Petition foreclose a finding that the petition had no likelihood of prevailing. *See Cheminor*, 168 F.3d at 121, 127 (petitioning not a "sham" where the Agencies had made preliminary determinations of dumping and material injury).

The demonstrable and acknowledged success of the petitions is not in any way undermined by the Complaint's allegations that the petitions contained misrepresentations. Although the Complaint alleges that Commerce found a lower margin on dumped imports from Plaintiff's primary supplier, Healthcare (Compl. ¶ 213), than the margin range alleged in the First Antidumping Petition (*id.* ¶¶ 174, 274), the affirmative finding of dumping demonstrates that the petition succeeded, that is, elicited a favorable outcome. Commerce agreed with Defendants' allegation that Chinese manufacturers were dumping mattresses in the United States at less than fair value and imposed duties on all such imports. *See* Compl. ¶ 213. For some manufacturers, Commerce imposed final duties of over 1,700%. *See Mattresses from the People's Republic of China*, 84 Fed. Reg. 56,761, 56,764 (Dep't of Com. Oct. 23, 2019) (final determination) (Exhibit 3). Commerce set a lower duty for Healthcare (57.03%) based on the weighted-average dumping margin (*see* Compl. ¶ 213), but also found that the dumping margins on some sales by Healthcare and another Chinese producer (Zinus) were high enough to "corroborate" the dumping margin of more than 1,700% alleged in the petition. *See* Ex. 3 at 3 ("We are able to corroborate the highest petition dumping margin . . . using transaction-specific dumping margins, weighted-average dumping margins calculated for Healthcare and Zinus, and Healthcare and Zinus normal values and U.S. prices.").

Furthermore, differences between alleged margins and those calculated by Commerce are an inherent part of the process, not an indication that the petition was a sham. First, the dumping margin alleged by Defendants in the petition was based on the statutory requirement that they provide "information reasonably available" to them; petitioners did not have access to Healthcare's or other foreign manufacturers' confidential margin information. *See* 19 U.S.C. § 1673a(b)(1). The Complaint contains no factual allegations that Defendants failed to provide information

reasonably available to them in the petition.  Second, the dumping margins alleged in the petition related generally to all Chinese manufacturers (because a dumping petition is not specific to any foreign manufacturer but relates to the subject product from a specified country or countries).  *See* Compl. ¶ 174.  Healthcare was only one such Chinese manufacturer.  *See id.* ¶¶ 174, 213.

For the same reasons, the allegation that Commerce found no "critical circumstances" to impose retroactive duties as to Healthcare individually does not undermine the petition's success.  *See* Compl. ¶ 214.  The Complaint alleges that Defendants' petition sought relief in the form of retroactive duties "on *all* mattresses imported from China" for "critical circumstances," not solely or specifically as to Healthcare.  *Id.* ¶ 187 (emphasis added).  While not alleged in the Complaint, Commerce decided that "critical circumstances" did, in fact, exist with respect to mattresses imported from numerous Chinese suppliers and, therefore, imposed duties retroactively on those imports.  *See* Ex. 3 at 2; *Mattresses from the People's Republic of China*, 84 Fed. Reg. 56,761 (Dep't of Com. Oct. 23, 2019), accompanying Issues and Decision Memorandum at cmt. 1, ACCESS Inv. No. A-570-092 (Exhibit 4).  Moreover, with respect to Healthcare, the Agencies still imposed significant duties (57.03%) prospectively (Compl. ¶ 213), even though they did not impose duties retroactively.  *See* Ex. 3 at 3-4; *see also Music Center*, 874 F. Supp. at 554 (determining that petitioning was not "objectively baseless" even though the agency did not agree with every argument advanced by petitioners).

As the Agencies have repeatedly agreed with Defendants that dumping was occurring and that it materially injured U.S. mattress manufacturers, the allegations demonstrate it was plainly realistic for Defendants to expect success on the merits.  *See Cheminor*, 168 F.3d at 124.  As such, Defendants' petitioning activity was not "objectively baseless" and, therefore, not a "sham."  *See PRE*, 508 U.S. at 60, 62-63.

**1.  The Alleged Misrepresentations Do Not Undermine Defendants' Petitioning Success**

The conclusory allegations that Defendants made purportedly "false," "misleading," "defamatory," and "deceptive" statements to the Agencies (*see* Compl. ¶¶ 143-44, 177-78, 181-82, 186, 188, 190, 192-93, 197, 203, 236, 240, 248-49, 252, 267, 269) and the public (*id.* ¶¶ 272-73 279) do not remedy the Complaint's failure to adequately allege that Defendants' petitioning was "objectively baseless."  Setting aside that those pejorative labels are unsupported by specific factual allegations, any alleged misrepresentations did not undermine the legitimacy or the outcomes of the antidumping proceedings.  *See Hallco*, 1998 U.S. App. LEXIS 12596, at *16-17 (holding that *Noerr-Pennington* immunity applied, despite alleged misrepresentations, because there was no indication that defendants' "use of the governmental process was not legitimate"); *Cheminor*, 168 F.3d at 123 ("While we do not condone misrepresentations in a judicial setting, neither will we deprive litigants of immunity derived from the First Amendment's right to petition the government if the alleged misrepresentations do not affect the core of the [litigant's] case."). When considering petitioning activity that includes alleged misrepresentations, courts perform the "objectively baseless" inquiry "without regard to those facts that [are] allege[dly] . . . misrepresented." *Cheminor*, 168 F.3d at 123.  "If the alleged misrepresented facts do not infect the core of [Defendants'] claim and the government's resulting actions, then the petition had an objective basis and will receive *Noerr-Pennington* immunity under the first step of *PRE*."  *Id.* at 123-24 (explaining that "not every misrepresentation is material to the question of whether a petition such as [defendant's] had an objective basis").

The Complaint alleges in conclusory fashion that there were "material" false statements and misrepresentations in the First and Second Antidumping Petitions relating to: the cost of mattresses and dumping margins (Compl. ¶¶ 177-78, 186, 235-36, 240, 247), import data (*id.*

16

¶ 248), the domestic manufacturers' "'available excess capacity' to supply demand" (*id.* ¶¶ 192-94, 225, 261-62), the dumping's effects on job loss and factory closures in the U.S. (*id.* ¶¶ 197, 267, 269), and the dumping's effect on Defendants' success on e-commerce websites (*id.* ¶ 203).

It is far from clear that the "misrepresentations" alleged in the Complaint are misrepresentations at all.  Rather, these statements, excerpted from the antidumping proceedings, appear to be corroborated by the independent determinations of the Agencies.  The Complaint contends that Defendants allegedly misrepresented costs to calculate a 1,700% dumping margin for the first petition.  Compl. ¶¶ 177-78, 186.  While not acknowledged in the Complaint, after receiving the first petition, but before initiating its investigation, Commerce issued a questionnaire to Defendants and, based on their response, concluded that the dumping allegations were accurate and adequate, as required under the statute.  *See Mattresses from the People's Republic of China*, Inv. No. A-570-092, Doc. No. 3761532-01, 6–10 (Dep't of Com. Oct. 9, 2018) (initiation checklist), ACCESS Inv. No. A-570-092 (Exhibit 5).  Later during its investigation, Commerce "corroborate[d] the highest petition dumping margin, to the extent practicable . . . using transaction-specific dumping margins, weighted-average dumping margins calculated for Healthcare" and another manufacturer.  Ex. 3 at 3.  On that basis, Commerce imposed final margins of over 1,700% for various Chinese manufacturers.  *See* Ex. 3 at 3.

For the Second Antidumping Petition, the Complaint also alleges Defendants misrepresented the dumping calculation to estimate a dumping margin of 1,008%.  Compl. ¶¶ 235-36, 240, 247.  Here, too, before initiating its investigation, Commerce issued a questionnaire to Defendants and, based on their response, concluded that the dumping allegations were accurate and adequate.  *See, e.g.*, *Mattresses from the Socialist Republic of Vietnam*, Inv. No. A-552-827, Doc. No. 3967192-01, 6–9 (Dep't of Com. Apr. 20, 2020) (initiation checklist), ACCESS Inv. No.

A-552-827 (Exhibit 6).  Recently, Commerce preliminarily determined that one of the foreign country's dumping margins (Vietnam) was as high as 989.90%.  *See* Ex. 2 at 2.

The Complaint also contends that Defendants "false[ly]" stated that dumped mattresses were the "primary cause" of job losses and factory closures (Compl. ¶ 197; *see also id.* ¶¶ 198, 200, 267, 269, 279) by pointing to other comments by Defendants allegedly revealing "other reasons" for the losses and closures.  *See id.* ¶¶ 199 ("the closure of a large customer's nearby distribution center"); ¶ 201 ("transportation, logistic and scheduling efficiencies"); ¶ 201 ("business decision predicated on . . . the best interest of our employees, customers and owners"); ¶ 201 ("[production] decline . . . for a variety of reasons"); ¶¶ 268-69 ("mergers and acquisitions"); ¶¶ 201, 269 ("strategic business decisions").  But these alleged "other reasons" do not foreclose a conclusion that the dumping of mattresses was the "primary cause" of job losses and factory closures generally.  As to excess capacity, the Complaint alleges that Defendants' failure to solicit Plaintiff's business (*id.* ¶¶ 225-26) and Defendants' statements concerning COVID-19-related business constraints (*id.* ¶¶ 262-66) suggest that Defendants misrepresented the availability of excess capacity.  None of these allegations, however, is inconsistent with Defendants' statements to the Agencies that they "had 'available excess capacity' to supply demand." *Id.* ¶¶ 192, 225.

Additionally, the Complaint also alleges that Defendants misrepresented import data (*id.* ¶ 248) and the effect of dumping on Defendants' success on e-commerce websites (*id.* ¶ 203). Those allegations are conclusory because they are simply alternative explanations, not factual support for the Complaint's allegations of affirmative misrepresentations. *See id.* ¶ 248 (alleging that Defendants' import data is not consistent with Plaintiff's own import figures); *id.* ¶ 211 (alleging that "[l]ow prices have less to do with the order of product offerings on e-commerce sites

than other factors").  At most, these are alleged factual disputes common in any adversarial context; they hardly sound in fraud.  *See Music Center*, 874 F. Supp. at 552 (suggesting that a plaintiff must satisfy Rule 9(b)'s requirement to plead fraud with particularity "to overcome presumption of *Noerr* immunity on basis of claim of fraud on prior tribunal" (citation omitted)).

Even taking these allegations as true, the alleged misrepresentations are not "material" because the Agencies' actions were not dependent upon the purportedly misrepresented information.  *See Cheminor*, 168 F.3d at 123-24.  Throughout the antidumping proceedings, both Commerce and the ITC have conducted their own independent investigations and relied on information from other industry stakeholders beyond Defendants.  *See, e.g.*, Compl. ¶¶ 158, 166.  Commerce has made preliminary determinations on the existence of dumping on the basis of information from other sources, including Plaintiff's supplier, Healthcare.  *Id.* ¶ 212; *see also* Ex. 2 at 1-4; Ex. 1 at 1-3.  The Complaint itself acknowledges that Commerce issued its preliminary determination on the First Antidumping Petition "after [Commerce] had the opportunity to review accurate information and data from other parties."  *See* Compl. ¶ 212; *see also id.* ¶¶ 291, 303-04.

The ITC likewise relies on information from other industry stakeholders in making a final determination on injury.  In making the final injury determination regarding the First Antidumping Petition, the ITC considered information and data provided by dozens of industry participants, including U.S. producers, U.S. importers, foreign producers, and U.S. purchasers.  *See Mattresses from China*, Inv. No. 731-TA-1424, 3–4, USITC Pub. 5000 (Dec. 2019) (Final) (Exhibit 7).  The ITC considered respondents' arguments but, through independent analysis, were "unpersuaded" by them.  Compl. ¶¶ 219 ("[W]e are unpersuaded by respondents' argument" regarding excess capacity), ¶ 221 ("We are also unpersuaded by respondents' arguments" regarding domestic industry's market entry); *see also id.* ¶¶ 218-20.  The conclusory allegation that the alleged

misrepresentations were the "but for" cause of the Agencies' final determinations (*id.* ¶¶ 191, 270) is unsupported by factual allegations. Thus, even assuming that Defendants made the alleged misrepresentations, those misrepresentations did not affect the legitimacy of the proceedings. *See Cheminor*, 168 F.3d at 126 (finding allegedly false statements not material because they "bear on only a small proportion of the numerous factors" the Agencies consider).

In attempting to cast doubt on the antidumping proceedings, Plaintiff seeks to re-litigate its grievances with the Agencies' determinations through a collateral attack on the trade proceedings in an improper forum. Neither Plaintiff nor any other interested party appealed the Agencies' final determinations on the First Antidumping Petition to the two Article III courts with exclusive jurisdiction to hear such appeals, that is, the United States Court of International Trade and the United States Court of Appeals for the Federal Circuit. *See* 28 U.S.C. § 1581(c); 19 U.S.C. § 1516a. Plaintiff's failure to utilize the proper procedures does not permit them to undermine the trade proceedings by seeking remedies from this Court.

## 2. *Noerr-Pennington* Protects the Alleged Public Relations Campaign

The allegations that Defendants engaged in a supposedly anticompetitive public relations strategy cannot save Plaintiff's Sherman Act and Utah Antitrust Act claims. *See* Compl. ¶¶ 272-73. *Noerr-Pennington* immunity encompasses press releases and public statements regarding proceedings that are not "objectively baseless." *See, e.g.*, *Hallco*, 1998 U.S. App. LEXIS 12596, at *16 (finding that *Noerr-Pennington* immunity protects "media campaigns"); *Sunrise Pharm.*, 2018 U.S. Dist. LEXIS 103647, at *6-7 (recognizing that *Noerr-Pennington* generally applies to "press releases unless the original petitioning conduct was baseless" and dismissing defamation claim (citations omitted)); *Aircapital*, 634 F. Supp. at 323-24 (holding that publicity, including

defendant's press release and public statements by defendant's representative, were "incidental to the lawsuit" and therefore protected by *Noerr-Pennington*).

The Complaint alleges that, in connection with the antidumping petitions, Defendants issued press releases and made public statements repeating the allegations in Defendants' antidumping petitions. *See* Compl. ¶ 272 (alleging that Defendants "issue[d] press releases regarding the filing of the First and Second Sham Petitions that repeated the false, misleading and/or inaccurate information contained therein to maintain supracompetitive prices, thwart innovation, and harm competition"); ¶¶ 273-79. Because the Complaint does not, and cannot, plausibly allege that the petitions were themselves "objectively baseless," the press releases and public statements reiterating those petitions enjoy *Noerr-Pennington* protection.

Although the Complaint alleges that Defendants' public relations campaign harmed Plaintiff (Compl. ¶¶ 271-72, 280), any claim for injury flowing from Defendants' public press releases is immunized by *Noerr-Pennington*. The Supreme Court has upheld immunity where "a publicity campaign 'was intended to and did in fact injure [competitors] in their relationships with the public and with their customers,' since such 'direct injury' was merely 'an incidental effect of the . . . campaign to influence governmental action.'" *PRE*, 508 U.S. at 57 (quoting *Noerr*, 365 U.S. at 143). Whenever a publicity campaign is utilized, "some direct injury upon the interests of the party against whom the campaign is directed" is "inevitable." *Noerr*, 365 U.S. at 143 ("And it seems equally inevitable that those conducting the campaign would be aware of, and possibly even pleased by, the prospect of such injury."). Here, even if the alleged publicity campaign purportedly injured Plaintiff, such harm was merely an incidental effect of the antidumping proceedings to which the campaign related. The remedial purpose of the antidumping regulatory scheme is to

level the playing field by causing the prices of imported products to reflect "fair" levels not injurious to U.S. producers. *See Apex Exps. v. United States*, 777 F.3d 1373, 1379 (Fed. Cir. 2015).

### 3. Allegations of Anticompetitive Intent Are Irrelevant Because Defendants' Petitioning Was Not "Objectively Baseless"

Finally, Plaintiff's allegations of anticompetitive intent are irrelevant. *See PRE*, 508 U.S. at 57 ("[A]n objectively reasonable effort to litigate cannot be sham regardless of subjective intent."); *GF Gaming Corp.*, 405 F.3d at 884 ("Even if defendants' sole motive for petitioning the [government] officials was to injure competition, the conduct would still be protected by the *Noerr-Pennington* doctrine."). Because the Complaint fails to plausibly allege that Defendants' successful petitioning activity was "objectively baseless" under the first prong of the sham-petitioning test, the allegations of Defendants' purpose or intent have no bearing on Defendants' immunity. *PRE*, 508 U.S. at 60. Even if the Complaint could satisfy the first prong (which it cannot), the Complaint lacks any specific factual allegations as to intent. Instead, the Complaint offers only conclusory allegations that Defendants filed the petitions for "anticompetitive purposes." Compl. ¶ 21; *see id.* ¶¶ 143-44, 172, 185, 223, 298, 314-15, 323, 328-30, 339. Such conclusory allegations, unsupported by factual material, are disregarded in evaluating a Rule 12(b)(6) motion. *See Twombly*, 550 U.S. at 555-57.

Because Defendants' successful petitioning of the Agencies is immune under *Noerr-Pennington*, and the Complaint does not allege facts plausibly suggesting Defendants' conduct was a "sham," the Sherman Act and Utah Antitrust Act claims should be dismissed.

### B. The Lanham Act and Utah Common-Law Claims Should Be Dismissed Because Defendants' Successful Petitioning Is Protected by Petition Clause Immunity

Plaintiff's Lanham Act claim, intentional interference with prospective economic advantage, and defamation claims fail for the same reason as the federal and state antitrust claims.

The conduct alleged in support of these claims constitutes petitioning, or activities incidental to petitioning, and is therefore entitled to Petition Clause immunity.

Applying *PRE*'s two-step test to Plaintiff's Lanham Act and Utah common-law claims results in the same conclusion as with Plaintiff's antitrust claims; namely, that Defendants are immune from suit because the factual allegations fail to suggest that Defendants' petitioning activity was a "sham." *See CSMN*, 956 F.3d at 1284 (adopting the *PRE* sham-petitioning test in non-antitrust contexts). Plaintiff's Lanham Act and Utah common-law claims are premised on the same allegations of supposedly "sham" petitioning as Plaintiff's antitrust claims. *See* Compl. ¶¶ 331-36, 342-53. The Complaint includes no additional allegations with respect to those claim. Indeed, those claims simply incorporate the same allegations as the antitrust claims. *See, e.g., id.* ¶ 332 (citing alleged "statements before Commerce and the ITC, press releases, and campaigning through ISPA and via other trade press" as basis for Lanham Act claim); ¶ 344(a)-(b) (citing alleged "statements to [Plaintiff's] customers and potential customers" and the Agencies as basis for intentional interference claim); ¶¶ 348-51 (citing alleged statements to the Agencies, press releases, and trade press publications as basis for defamation claim).

## II.   Plaintiff's Non-Antitrust Claims Should Be Dismissed on the Additional Ground that the Complaint Fails to Allege Necessary Elements

Beyond Petition Clause immunity, the Complaint also fails to allege the requisite elements to make out the non-antitrust claims. They should be dismissed on this basis as well.

The Complaint fails to state a Lanham Act claim because, it does not plausibly allege that Defendants made any "false or misleading" statements in connection with commercial advertising or promotion. *See Intermountain Stroke Ctr., Inc. v. Intermountain Health Care, Inc.*, 638 F. App'x 778, 784-85 (10th Cir. 2016) (unpublished) (citations omitted). To the contrary, the Complaint alleges that Defendants' allegedly false statements were made in connection with the

23

antidumping proceedings, not commercial advertising.  *See* Compl. ¶ 332.  The purportedly false statements in Defendants' "press releases[] and campaigning through ISPA and via other trade press" (*id.* ¶ 332; *see also id.* ¶ 333) likewise do not constitute commercial advertising regardless of any alleged harm (*id.* ¶¶ 335-36) because the press releases and public statements, as alleged, "[did] nothing more than give notice that [Defendants] had filed [petitions,] identifie[d] what [they] had alleged [in their petitions]," and reported the outcome of one of the petitions.  *Paradigm Alliance, Inc. v. Celeritas Techs., LLC*, 659 F. Supp. 2d 1167, 1197 (D. Kan. 2009) (dismissing claim because press release did not constitute commercial advertising); *see* Compl. ¶¶ 272-79.

Plaintiff's claim for intentional interference with prospective business relations is deficient because the Complaint alleges no facts plausibly suggesting that Defendants "intentionally interfered with the plaintiff's existing or potential economic relations . . . by improper means." *Harvey v. Ute Indian Tribe of the Uintah & Ouray Reservation*, 416 P.3d 401, 425 (Utah 2017) (citation omitted).  The Complaint's allegations related to this claim merely rehash Defendants' statements before the Agencies (Compl. ¶¶ 343-44), which were made in accordance with Defendants' statutory right, as interested parties, to file antidumping petitions based on the "reasonable belief" that dumping was occurring and injuring the domestic market.  *See Cheminor*, 168 F.3d at 124; *Harvey*, 416 P.3d at 425; *see also C.R. Eng. v. Swift Transp. Co.*, 437 P.3d 343, 353 (Utah 2019) ("[A] defendant should not be liable . . . where the interference was caused by the defendant's doing of an act which he had a legal right to do." (citation omitted)).  Plaintiff's alleged injury of lost sales for products the Agencies determined were being dumped into the United States market is too remote from the alleged interference with foreign manufacturers' import prices.  *See SCO Grp., Inc. v. IBM*, 879 F.3d 1062, 1082-83 (10th Cir. 2018) (finding that "alleged improper conduct . . . directed toward the *public* and the *market generally* . . . is not actionable under Utah

law"). Further, the Complaint does not allege that Defendants' alleged misstatements in the media campaign "violated an established standard of a trade or profession." *Harvey*, 416 P.3d at 425.

Finally, the defamation count also fails because the Complaint's factual allegations are insufficient to plead that Defendants' statements either before the Agencies or in the media campaign "were false" or were "about [Plaintiff]" at all. *Jacob v. Bezzant*, 212 P.3d 535, 543-44 (Utah 2009) (citation omitted). The Complaint's allegations do not support a finding that Defendants' statements were false or misleading. Further, the Complaint does not allege that any of the "false information and statements" referred to Plaintiff at all. *Id.* ¶ 349; *see also* ¶¶ 347-48, 350-53. *See Pratt v. Nelson*, 164 P.3d 366, 382 (Utah 2007) (requiring a plaintiff to show that the statements refer to them "by directly being named, or so intended from the extrinsic facts and circumstances"). Rather, the Complaint merely alleges that "Defendants' conduct has damaged CVB's reputation, and has caused injury to CVB." Compl. ¶ 352.

## CONCLUSION

For the foregoing reasons, the Complaint's claims should be dismissed in their entirety with prejudice.

                                              Respectfully submitted,

Dated:  December 11, 2020           /s/ Justin T. Toth
                                        James Jardine (1647)
                                        Justin Toth (8438)
                                        **RAY QUINNEY & NEBEKER P.C.**
                                        36 South State Street, Suite 1400
                                        Salt Lake City, UT 84111
                                        (801) 532-1500
                                        jjardine@rqn.com
                                        jtoth@rqn.com

Christopher M. Curran (*pro hac vice forthcoming*)
J. Frank Hogue (*pro hac vice forthcoming*)
David E. Bond (*pro hac vice forthcoming*)
Claire L. Leonard (*pro hac vice forthcoming*)

**WHITE & CASELLP**
701 Thirteenth Street, NW
Washington, DC 20005
Telephone:  (202) 626-3600
ccurran@whitecase.com
fhogue@whitecase.com
dbond@whitecase.com
claire.leonard@whitecase.com

*Attorneys for Corsicana Mattress Company, Elite Comfort Solutions, Inc., Future Foam, Inc., FXI Holdings, Inc., Leggett & Platt, Inc., Serta Simmons Bedding, LLC, Tempur Sealy International, Inc., and Brooklyn Bedding, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on December 11, 2020, a copy of the foregoing Defendants' Motion to Dismiss the Complaint for Failure to State a Claim was filed electronically with the Clerk of the Court using the CM/ECF system.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.


Jeffrey D. Steed
CVB, INC.
1525 W 2560 S
Logan, UT 84341
Telephone: (800) 517-7179
JeffSteed@maloufsleep.com

Wayne A. Mack
Sean P. McConnell
Sarah Kulik
DUANE MORRIS LLP
30 S. 17th St.
Philadelphia, PA 19103-1104
Telephone: (215) 979-1000
wamack@duanemorris.com
spmcconnell@duanemorris.com
sckulik@duanemorris.com


/s/ *Susan Seder*