## THE UNITED STATES DISTRICT COURT

## THE DISTRICT OF UTAH

| | |
|---|---|
| CVB, INC.,<br><br>      Plaintiff,<br><br>vs.<br><br>CORSICANA MATTRESS COMPANY, ELITE COMFORT SOLUTIONS, INC., FUTURE FOAM, INC., FXI HOLDINGS, INC., LEGGETT & PLATT, INC., SERTA SIMMONS BEDDING, LLC, TEMPUR SEALY INTERNATIONAL, INC., AND BROOKLYN BEDDING, INC.,<br><br>      Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING [72] DEFENDANTS' MOTION TO DISMISS**<br><br><br>Case No. 1:20-CV-00144-DBB<br><br>District Judge David Barlow |

Before the court is Defendants' Motion to Dismiss the Amended Complaint (Motion).[1]

Having considered the briefing, the record, and the relevant law, the court concludes the Motion

may be resolved without oral argument.[2] For the reasons discussed, the Motion is granted.

### BACKGROUND

As many of the allegations will be addressed in detail throughout this order, the court

provides a chronological and procedural summary of the allegations in the Amended Complaint.

CVB filed its original complaint against eight competitors on October 28, 2020.[3] The Defendants

moved to dismiss the complaint on December 11, 2020.[4] On September 15, 2021, the court

---

[1] ECF No. 72, filed December 29, 2021.

[2] *See* DUCivR 7-1(g).

[3] Complaint, ECF No. 2.

[4] *See* Defendants' Corrected Motion to Dismiss, ECF No. 36.

granted the motion to dismiss and permitted CVB to seek leave to file an amended complaint.[5]

CVB filed the Amended Complaint on December 15, 2021.[6]

A majority of the underlying claims center on two antidumping petitions filed by

Defendants before the Department of Commerce (Commerce) and the U.S. International Trade

Commission (ITC). CVB brings eight claims against Defendants: (1) Fraudulent Petitioning in

Violation of Section 1 of the Sherman Act; (2) Monopolization in Violation of Section 2 of the

Sherman Act; (3) Monopoly Leveraging in Violation of Section 2 of the Sherman Act; (4)

Conspiracy to Monopolize in Violation of Sections 1 & 2 of the Sherman Act; (5) Violation of

Section 43(a) of the Lanham Act; (6) Violation of the Utah Antitrust Act; (7) Intentional

Interference with Prospective Economic Advantage; and (8) Defamation.

Defendants filed the First Petition on September 18, 2018, alleging that mattress imports

from China were being sold, or were likely to be sold, at less than fair market value ("dumped"),

materially injuring the domestic industry.[7] The agencies made preliminary determinations on the

First Petition.[8] On October 19, 2019, Commerce issued its Final Determination finding that

mattresses from China had been sold, or were likely to be sold, at less than fair value.[9] On

---

[5] ECF No. 63.

[6] ECF No. 69.

[7] Amended Complaint at ¶ 172, ECF No. 69, filed December 15, 2021.

[8] *See, e.g.*, *id.* at ¶ 189.

[9] *Id.* at ¶ 214; *see also* Commerce First Petition Final Affirmative Determination, ECF No. 36-3. Defendants previously provided copies of the final determinations related to the Petitions. *See* Exhibits to Motion to Dismiss, ECF No. 36; Exhibits to Notice of Supplemental Authority, ECF No. 49. In the current motion, Defendants attached a copy of the ITC's Final Determination on the Second Petition. *See* ECF No. 72-3. CVB takes issue with the inclusion of some of the exhibits that were part of the underlying agency process, but it does not dispute the authenticity of the final determinations as attached to the pleadings. Opposition at 11. Because the final determinations from the ITC and Commerce are referenced in the Amended Complaint (and sometimes quoted, *see, e.g.*, Amended Complaint at ¶¶ 222, 225–26) and central to CVB's claim (whether the Petitions are subject to the "sham petition exception"), the court can consider them at the motion to dismiss stage. *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002).

December 9, 2019, the ITC issued its Final Determination concluding that the domestic mattress industry had been materially injured by imports from China.[10]

On March 31, 2020, Defendants filed the Second Petition alleging that mattress imports from seven countries were being dumped, materially injuring the domestic market.[11] The ITC and Commerce issued preliminary determinations.[12] Commerce issued its Final Determinations on March 25, 2021, concluding that mattresses from the relevant countries had been sold, or were likely to be sold, at less than fair value.[13] On or about May 10, 2021, the ITC issued its Final Determination concluding that the domestic industry was materially injured by imports from the relevant countries.[14] Also on or about May 10, 2021, Commerce amended its Final Affirmative Determination as to mattresses from Cambodia, still finding dumping but correcting "two ministerial errors in the final estimated weighted-average dumping margin."[15]

In addition to claims based on the two foregoing petitions, the Amended Complaint further alleges that the Defendants conspired to make false and misleading public statements to disrupt competition and engaged in anticompetitive conduct that was unrelated to the filing of the two petitions including issuing press releases, engaged in price fixing, interfered with CVB's business relationships, and falsely advertised products as "Made in America."[16] During the pendency of this litigation, CVB filed a complaint with the United States Court of International Trade seeking judicial review of the ITC's Final Determination on the Second Petition.[17]

---

[10] Amended Complaint at ¶¶ 217–18; *see also* ITC First Petition Final Determination, ECF No. 36-7.

[11] Amended Complaint at ¶ 239.

[12] *See* Amended Complaint at ¶ 286; Commerce Preliminary Affirmative Determinations, ECF Nos. 36-1–36-2.

[13] *See* Commerce Final Affirmative Determinations, ECF Nos. 49-1–49-7.

[14] Amended Complaint at ¶ 274; *see also* ITC Second Petition Final Determination, ECF No. 72-3.

[15] Amended Final Affirmative Determination at 3, ECF No. 49-9.

[16] *See* Amended Complaint at ¶¶ 291–319.

[17] *See* Notice of Supplemental Authority, ECF No. 51.

## STANDARD

The court accepts "as true the well-pleaded ('that is, plausible, non-conclusory, and non-speculative') facts alleged in the complaint, unless they are controverted by sworn statements"[18] and views them in the light most favorable to the plaintiff.[19] To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[20] This standard requires a complaint to "permit the court to determine whether the allegations, if proven, will entitle the plaintiff to relief."[21] The factual allegations "must be enough to raise a right to relief above the speculative level."[22] Mere labels, conclusions, and formulaic recitations of the elements "will not do."[23]

Furthermore, CVB has made various allegations regarding fraud, which subject those claims to a heightened pleading standard. Federal Rule of Civil Procedure 9(b) requires that when alleging fraud or mistake, "a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Additionally, a plaintiff's complaint "must 'set forth the time, place and contents of the false representation, the identity of the party making the false statements and

---

[18] *XMission, L.C. v. Fluent LLC*, 955 F.3d 833, 836 (10th Cir. 2020) (quoting *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008)); *see also Shrader v. Biddinger*, 633 F.3d 1235, 1248 (10th Cir. 2011).

[19] *Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865, 878 (10th Cir. 2017).

[20] *VDARE Found. v. City of Colorado Springs*, 11 F.4th 1151, 1158 (10th Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).

[21] *David v. United States*, 849 Fed. App'x 726, 728 (10th Cir. 2021) (unpublished).

[22] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[23] *Id.*

the consequences thereof.'"[24] In short, Rule 9(b) requires that a complaint "set forth the 'who, what, when, where and how' of the alleged fraud."[25]

## ANALYSIS

### I.    DEFENDANTS ARE ENTITLED TO IMMUNITY ON CVB'S CLAIMS BASED ON PETITIONING ACTIVITY.

CVB brings six claims against Defendants related to violations of the Sherman Act, Lanham Act, and Utah Antitrust Act.[26] The majority of these claims are based on the Petitions filed before Commerce and the ITC.

### A.  History of Noerr-Pennington Immunity and the Sham Exception

The First Amendment protects many rights, including the right to petition the government.[27] The Supreme Court recognizes this as "one of 'the most precious of the liberties safeguarded by the Bill of Rights.'"[28] The Supreme Court has determined that the "same philosophy" regarding the right to petition the government applies to petitions to administrative agencies and to courts.[29] From that right, the Supreme Court has found immunity that protects those seeking redress from liability for petitioning activities.[30] This immunity was developed specifically in antitrust cases and is referred to as *Noerr-Pennington* immunity.[31] However, this

---

[24] *Heavy Petroleum Partners, LLC v. Atkins*, 457 Fed. App'x 735, 742–43 (10th Cir. 2012) (unpublished) (quoting *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246 (10th Cir. 1997)).

[25] *United States ex rel. Lacy v. New Horizons, Inc.*, 348 Fed. App'x 421, 424 (10th Cir. 2009) (unpublished) (quoting *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702 (10th Cir. 2006)).

[26] Amended Complaint at 64–74 (claims for relief one through six).

[27] U.S. Const. amend. I.

[28] *BE & K Constr. Co. v. N.L.R.B.*, 536 U.S. 516, 524 (2002) (quoting *Mine Workers v. Illinois Bar Ass'n*, 389 U.S. 217 (1967)).

[29] *California Motor Transp. Unlimited*, 404 U.S. 508, 510 (1972) ("The same philosophy governs the approach of citizens or groups of them to administrative agencies (which are both creatures of the legislature, and arms of the executive) and to courts, the third branch of Government. Certainly the right to petition extends to all departments of the Government.").

[30] *See CSMN Invs., LLC v. Cordillera Metro. Dist.*, 956 F.3d 1276, 1282 (10th Cir. 2020).

[31] *Id.*

immunity extends beyond the antitrust context and is known as "Petition Clause" immunity.[32] The Tenth Circuit has referred to both of these as "broad" immunities.[33]

The Supreme Court has "carved out only a narrow exception" to *Noerr-Pennington* immunity for "sham petitions."[34] The Supreme Court established a two-part test to determine if something is "sham petitioning."[35] The first step requires a showing that the petitioning activity is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits."[36] Second, the court must determine "whether the baseless lawsuit conceals 'an attempt to interfere *directly* with the business relationships of a competitor,' through the 'use of the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon.'"[37] As to the first step, the Supreme Court has stated that a "winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham."[38] If a party prevails on the first step, the court need not address the second step.[39]

The Amended Complaint contains numerous allegations that both the First and Second Petitions were successful.[40] The Amended Complaint summarizes the relevant processes. First, the ITC makes a preliminary determination using a reasonable indication standard that an industry is materially injured or is threatened with material injury by imports sold at less than fair value.[41] If the ITC makes this determination, Commerce then makes a preliminary determination

---

[32] *Id.* at 1283 ("In this circuit, this immunity extends beyond antitrust situations. But we refer to it as Petition Clause immunity, reserving the name, *Noerr-Pennington*, for antitrust cases." (citation omitted)).

[33] *Id.*

[34] *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 556 (2014).

[35] *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.* (*PREI*), 508 U.S. 49, 60–61 (1993).

[36] *Id.* at 60.

[37] *Id.* at 60–61 (cleaned up) (emphases in original) (citation omitted).

[38] *Id.* at 60 n.5.

[39] *See CSMN*, 956 F.3d at 1283 ("Under the first step, a court considers whether the petitioning has an objectively reasonable basis. If so, immunity applies.").

[40] Amended Complaint at ¶¶ 214, 218, 222, 225–27, 248, 286.

[41] *Id.* at ¶ 163.

regarding whether there is a reasonable basis to believe imports are being sold, or likely to be sold, at less than fair value.[42] It also makes findings of duties to be imposed.[43] If Commerce makes that determination, then the ITC conducts its last phase of the investigation to make a final determination whether the domestic industry is materially injured or threatened with material injury.[44] If the ITC makes such a finding, then Commerce issues an antidumping order.[45]

The Amended Complaint alleges that the Petitions were successful as to both the preliminary and the final determinations by both the ITC and Commerce.[46] As to the First Petition, CVB alleges that Commerce ultimately found that mattresses from "China had been sold at less than fair value" but at percentages lower than what was alleged in the First Petition.[47] And in a 393-page decision, the ITC found that the domestic mattress industry had been materially injured by the dumping of mattresses from China, as alleged in the First Petition.[48]

As to the Second Petition, the ITC issued its preliminary determination that the petition had met the reasonable indication standard.[49] Commerce issued final determinations that imports of mattresses as alleged in the Second Petition were being sold, or likely to be sold, at less than fair market value.[50] The ITC then issued a 512-page final determination as to the Second Petition

---

[42] *Id.* at ¶ 165.

[43] *Id.* at ¶¶ 168–69.

[44] *Id.* at ¶ 166.

[45] *Id.* at ¶ 167.

[46] *See id.* at ¶¶ 189, 286; Commerce Second Petition Preliminary Determinations, ECF Nos. 36-1–36-2 (referring to Malaysia and Vietnam).

[47] Amended Complaint at ¶ 214 (noting the percentage as to CVB's primary supplier was 57.03%, which was lower than what was alleged in the First Petition).

[48] *Id.* at ¶ 218; ITC First Petition Final Determination, ECF No. 36-7.

[49] Amended Complaint at ¶ 286.

[50] *See* Commerce Second Petition Final Affirmative Determinations, ECF Nos. 49-1–49-7.

concluding that the domestic industry had been materially injured by imports of mattresses as alleged in the Second Petition.[51]

As the Supreme Court has indicated, a successful outcome cannot be a sham. In discussing successful petitioning, it is important to note the complexity and thorough nature of the two ITC decisions CVB alleges were the result of fraudulent misrepresentations. The ITC issued a 393-page decision[52] on the First Petition and a 512-page decision on the Second Petition.[53] As to the First Petition, the ITC relied on data from twenty-eight firms "that accounted for most U.S. production of mattresses during 2018" and import statistics from forty-two firms "that accounted for most U.S. imports from China."[54] There are eight named defendants in this case. So, the ITC relied on data far beyond what could have been provided solely by the Defendants. It determined the import volume was significant and "increased significantly at the direct expense of the domestic industry."[55] The subject import volume increased from "3.8 million units in 2016 to 7.2 million units in 2017 and 8.4 million units in 2018."[56] In total there are at least seventy pages of tables and charts summarizing the results of the responses and showing the data relied on by the ITC in various categories.[57]

Similarly, as to the Second Petition, the ITC relied on domestic industry data from the "questionnaire responses from 53 domestic producers that accounted for the vast majority of domestic production of mattresses in 2019."[58] Again, this is data from many more entities than just the eight defendants named in this action. The ITC concluded that the subject import volume

---

[51] ITC Second Petition Final Determination, ECF No. 72-3.
[52] *See* ITC First Petition Final Determination.
[53] *See* ITC Second Petition Final Determination.
[54] ITC First Petition Final Determination at I-4.
[55] *Id.* at 25–26.
[56] *Id.* at 25.
[57] *See, e.g.*, *id.* at III-10–V-19.
[58] ITC Second Petition Final Determination at 3.

"increased from 5.5 million units in 2017 to 7.0 million units in 2018 and to 7.8 million units in 2019."[59] The amount "was 7.4 million in interim 2020, up from 5.3 million units in interim 2019."[60] The value of the subject imports in interim 2020 was over $692,000,000.[61] And there are at least two hundred pages of tables and charts summarizing the results of the responses and showing the data the ITC relied on.[62]

Based on CVB's own allegations, and the documents cited to and central to the Amended Complaint, both Petitions were successful. In both instances, Commerce determined that mattresses from the relevant countries were being sold or likely to be sold at less than fair market value. CVB does not argue that dumping did not occur, only that the margins were less than what was alleged in the Petitions.[63] And the ITC determined that the domestic industry had been materially injured by imports from the relevant countries. Therefore, the sham exception analysis fails at step one. CVB has not alleged sufficient facts to show that the Petitions were objectively baseless. The Defendants are entitled to *Noerr-Pennington* immunity.

CVB argues that the Supreme Court intends immunity only "when a party *completely* wins the underlying petition."[64] CVB argues that because the agencies rejected some of the Defendants' assertions in the Petitions, the Petitions cannot be deemed "successful."[65] CVB appears mostly to be referring to Commerce's final determinations about dumping margins and the ITC's conclusion that critical circumstances did not exist. As already noted, both agencies conducted their own investigations, and Commerce found dumping margins at various

---

[59] *Id.* at 37.

[60] *Id.*

[61] *Id.* at IV-6.

[62] *See, e.g.*, *id.* at II-4–VII-63, C-3–C-8, D-3–D-7, F-3–F-62, G-4–G-17.

[63] *See* Amended Complaint at ¶¶ 174, 177–83, 214, 244–48, 250–58, 264.

[64] Memorandum in Opposition (Opposition) at 11, ECF No. 74, filed January 26, 2022.

[65] Opposition at 12.

percentages, which often appear to be less than what Defendants alleged in the Petitions. However, CVB's claim that because the agencies did not accept every argument in the Petitions means the Petitions were not successful is unsupported. CVB cites no case that has so held, and the court is unaware of any.

CVB also cites to *CSMN*, but that case provides no support for CVB's position. There, the Tenth Circuit explicitly stated that even "unsuccessful suits can still have been objectively reasonable."[66] The test is not whether the petitioning activity was "successful." The test is whether the activity was objectively baseless, meaning "no reasonable litigant could realistically expect success on the merits."[67] So, while petitioning activity need not be "successful" to avoid being a sham,[68] the "success" of the petitioning activity is proof that the activity was not objectively baseless.

The Petitions alleged that dumping was occurring and was injuring the domestic industry.[69] That is the exact conclusion Commerce and the ITC reached for both Petitions.[70] Thus, the Petitions were not objectively baseless. The fact that the agencies did not adopt all of Defendants' allegations or arguments does not suggest the Petitions were baseless, but rather shows that the agencies conducted thorough and independent investigations to reach their final determinations.

---

[66] *CSMN*, 956 F.3d at 1284; *see also id.* at 1287 (determining the petitioning activity was objectively reasonable even though the party lost in state court).

[67] *PREI*, 508 U.S. at 60.

[68] *See BE & K*, 536 U.S. at 532 ("Second, even unsuccessful but reasonably based suits advance some First Amendment interests.").

[69] Amended Complaint at ¶¶ 172, 239.

[70] *See* Commerce Final Affirmative Determinations, ECF Nos. 36-3, 49-1–49-7; ITC Final Determinations, ECF Nos. 36-7, 72–3.

### B.  Proposed Fraud Exception to Noerr-Pennington Immunity

CVB asks the court to acknowledge and adopt a "fraudulent misrepresentation exception" to *Noerr-Pennington* immunity.[71] Such an exception has not been expressly adopted or rejected by either the Supreme Court[72] or the Tenth Circuit. But it is worth noting that there is already a procedure by which parties to an ITC investigation can seek relief for alleged grievances of misrepresentations to the agency. The Court of International Trade has recognized that "courts have explicitly found the ITC to have the authority to reconsider its final determinations."[73] That court continued that this finding is "particularly appropriate where after-discovered fraud is alleged."[74] The Federal Circuit has recognized that this authority also applies to Commerce's final determinations.[75] So, both agencies have authority to address alleged fraud that may have occurred before them. Seeking relief directly from Commerce or the ITC makes sense. After all, they are the agencies before whom the fraud allegedly occurred.

Yet, as CVB has noted, a number of courts across the country have engaged with the possibility of a fraud exception to *Noerr-Pennington* immunity under certain circumstances.[76]

---

[71] *See* Opposition at 7–10.

[72] The Supreme Court addressed the exception in a footnote only to say that it was not addressing whether or to what extent such an exception existed. *PREI*, 508 U.S. at 60 n.5 ("We need not decide here whether, and if so, to what extent *Noerr* permits the imposition of antitrust liability for a litigant's fraud or other misrepresentations.").

[73] *Elkem Metals Co. v. United States*, 193 F. Supp. 2d 1314, 1320 (Ct. Int'l Trade 2002).

[74] *Id.*

[75] *Home Products Int'l Inc. v. United States*, 633 F.3d 1369, 1377 (Fed. Cir. 2011) ("Thus, *Tokyo Kikai* established that Commerce has inherent authority to reopen a case to consider new evidence that its proceedings were tainted by fraud.") (referring to *Tokyo Kikai Seisakusho, Ltd. v. United States*, 529 F.3d 1352 (Fed. Cir. 2008)); *see also Ad Hoc Shrimp Trade Action Comm. v. United States*, 882 F. Supp. 2d 1377, 1380 (Ct. Int'l Trade 2013) (describing circumstances in which Commerce can exercise such authority).

[76] *See e.g.*, *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 842 (7th Cir. 2011) ("For this reason, a misrepresentation renders an adjudicative proceeding a sham only if the misrepresentation (1) was intentionally made, with knowledge of its falsity; and (2) was material, in the sense that it actually altered the outcome of the proceeding."); *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 124 (3rd Cir. 1999) ("In sum, a *material* misrepresentation that affects the very core of a litigant's [ ] case will preclude *Noerr-Pennington* immunity." (emphasis in original)); *In the Matter of Union Oil Co. of California (UNOCAL),* Docket No. 9305, 2004 WL 1632816, *21 (F.T.C. July 6, 2004) ("We merely recognize that deliberate misrepresentations that substantially affect

But there is no consistent approach to exactly what such an exception would look like.[77] CVB cites to four cases from other circuit courts that it alleges apply a fraudulent misrepresentation exception.[78] However, while those cases discuss an exception for fraud, none actually applied the exception to the facts of the cases before them.

CVB first cites to the Seventh Circuit's decision in *Alarm Detection Systems, Incorporated v. Village of Schaumburg*.[79] There, the Seventh Circuit stated that "[u]nder the *Noerr-Pennington* doctrine, individuals and corporations have the First Amendment right to petition lawmakers for favorable legislation (so long as their efforts are not a sham or fraudulent)."[80] The court did not elaborate further or apply any fraud exception in the matter before it.

Next, CVB cites to another Seventh Circuit decision, *Mercatus Group, LLC v. Lake Forest Hospital*.[81] There, the Seventh Circuit discussed the fraud exception in more detail and determined that "a misrepresentation renders an adjudicative proceeding a sham only if the misrepresentation (1) was intentionally made, with knowledge of its falsity; and (2) was material, in the sense that it actually altered the outcome of the proceeding."[82] It concluded that the "fraud exception closes a sizable loophole in the Supreme Court's definition of sham litigation…although successful petitioning activity may not, as a general matter be deemed a sham, the fraud exception can remove that immunity if success is achieved by means of

---

the outcome of a proceeding or so infect its core to deprive the proceeding of legitimacy may not, in appropriate circumstances, qualify for *Noerr-Pennington* protection.").

[77] *See id.*

[78] Opposition at 7.

[79] 930 F.3d 812 (7th Cir. 2019).

[80] *Id.* at 824.

[81] 641 F.3d 834 (7th Cir. 2011).

[82] *Id.* at 843.

intentional falsehoods."[83] The court also noted that the fraud exception "does not apply at all outside of adjudicative proceedings."[84] The court determined that the actions at issue were legislative not adjudicative.[85] As a result, the court did not apply the fraud exception and did not address the alleged misrepresentations.[86]

Third, CVB cites to the Ninth Circuit's decision in *Kottle v. Northwest Kidney Centers*.[87] There, the court noted that "in the context of a judicial proceeding, if the alleged anticompetitive behavior consists of making intentional misrepresentations to the court, litigation can be deemed a sham if 'a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy.'"[88] The issue before the court was whether alleged anticompetitive behavior directed at an administrative agency fell within the scope of the sham exception.[89] The court found that a fraud exception might apply if three conditions were met: (1) the advocacy was objectively baseless; (2) the defendant engaged in a pattern of petitions before the agency without regard to the merit of the petitions; or (3) the defendant's misrepresentations deprived the proceeding of its legitimacy.[90] The court affirmed dismissal since there were insufficient allegations under the heightened pleading standard to show that the proceeding was deprived of its legitimacy.[91]

---

[83] *Id.*

[84] *Id.* at 844.

[85] *Id.* at 844–47 ("Applying the factors we set out above, it is clear that the Village Board acted in a legislative capacity when it declined to approve the proposed Mercatus physician center.").

[86] *Id.* at 849; *see also U.S. Futures Exchange, L.L.C v. Bd. of Trade of the City of Chicago, Inc.*, 953 F.3d 955, 960–63 (7th Cir. 2020) (acknowledging the existence of the fraudulent misrepresentation exception but declining to apply it as the relevant actions were legislative not adjudicative).

[87] 146 F.3d 1056 (9th Cir. 1998).

[88] *Id.* at 1060 (citation omitted).

[89] *Id.* at 1061.

[90] *Id.* at 1063.

[91] *Id.* at 1063–64.

Lastly, CVB cites to the Eighth Circuit's decision in *Razorback Ready Mix Concrete Company v. Weaver*.[92] There, the court quoted from a district court opinion that concluded that if a defendant's resort to the courts "is accompanied or characterized by illegal and reprehensible practices such as perjury, fraud, conspiracy with or bribery of government decision makers, or misrepresentation, or is so clearly baseless as to amount to an abuse of process, that the *Noerr-Pennington* cloak of immunity provides no protection."[93] The court then determined that the defendants' actions there were "clearly within the ambit of First Amendment protection and of *Noerr-Pennington* immunity from the antitrust laws."[94]

In addition to the cases cited by CVB, there are various other authorities that have discussed and acknowledged the possibility of a fraud exception. For instance, the Federal Trade Commission provided a thorough history from an extensive list of cases that have addressed the exception and discussed policy reasons supporting the adoption of the exception in one form or another.[95] The Third Circuit also has discussed the potential for the exception in a case, like the one here, that involved dumping petitions to Commerce and the ITC.[96] And, as many courts that have discussed this exception have done, the court also notes the extensive discussion provided in a leading treatise supporting the existence of a fraud exception.[97]

None of the foregoing authorities are binding, but the court agrees that a fraud exception to *Noerr-Pennington* and Petition Clause immunity could be warranted under the right

---

[92] 761 F.2d 484 (8th Cir. 1985). This case was issued prior to the Supreme Court's *PREI* decision.

[93] *Id.* at 487.

[94] *Id.* at 488.

[95] *See UNOCAL*, 2004 WL 1632816 at *21 (summarizing the history of case law on this issue and recognizing "that deliberate misrepresentations that substantially affect the outcome of a proceeding or so infect its core to deprive the proceeding of legitimacy may not, in appropriate circumstances, qualify for *Noerr-Pennington* protection").

[96] *See Cheminor*, 168 F.3d at 123 (declining to "carve out a new exception" and concluding that it would not "deprive litigants of immunity deprived from the First Amendment's right to petition the government if the alleged misrepresentations do not affect the core of the litigant's (here, Ethyl's) case").

[97] *See* Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶ 203 (5th ed. 2020).

circumstances. After all, if a party clearly secures governmental action by fraud, it would be unjust to leave the aggrieved party with no recourse.[98] But any such exception would be limited and rare. The Supreme Court has recognized that the right to petition is "one of 'the most precious of the liberties safeguarded by the Bill of Rights.'"[99] The Tenth Circuit has concluded that the *Noerr-Pennington* and Petition Clause immunities are "broad."[100] And, the only exception actually recognized by the Supreme Court (the sham petition exception) is "narrow."[101] Accordingly, it is plain that any fraud-based exception to the immunity would itself be narrow.

But what does narrow mean in this context? As noted previously, many of the courts that have considered the possibility of a fraud exception have said little about it, often simply referencing it in passing without discussing precisely what it would entail.[102] Likely this has been the case because most of those courts found that the facts before them did not warrant application of a fraud exception. However, some of the cases that explored what the exception would involve said they would require that the fraud be intentional and "infect the core of the proceedings," "deprive the proceeding of legitimacy," alter the outcome, or showing that "the agency would not have acted the way it did but for the impropriety."[103]

---

[98] Though, as the court noted earlier, relief already is generally available before Commerce and the ITC.

[99] *BE & K*, 536 U.S. at 524 (quoting *Mine Workers v. Illinois Bar Ass'n.*, 389 U.S. 217 (1967)).

[100] *CSMN*, 956 F.3d at 1283.

[101] *Octane Fitness*, 572 U.S. at 556.

[102] *See, e.g.*, *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077 (8th Cir. 1999); *Whelan v. Abell*, 48 F.3d 1247 (D.C. Cir. 1995); *Potters Med. Ctr. v. City Hosp. Ass'n*, 800 F.2d 568 (6th Cir. 1986).

[103] *See Cheminor*, 168 F.3d at 123 (referring to affecting the core); *Baltimore Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394, 402 (4th Cir. 2001) ("Alleged frauds that 'do not infect the core' of a case will receive *Noerr-Pennington* immunity because regardless of the alleged fraud, the outcome would have been the same."); *UNOCAL*, 2004 WL 1632816, *18 (referring to "infecting the core" and "depriving the proceeding legitimacy"); *id.* at *16 (citing Areeda for the proposition that "the agency would not have acted the way it did by for the impropriety"); *Kottle v. Northwest Kidney Ctrs.*, 146 F.3d 1056, 1060 (9th Cir. 1998) (referring to depriving "the litigation of its legitimacy").

Whatever the practical application of the foregoing language, it is clear that simply alleging fraud will not do. Were this enough, the exception likely would swallow the rule: any losing party in an administrative proceeding could simply file a complaint, identify the statements with which they disagreed, claim that they were fraudulent, and then relitigate the matter in federal court. This would be inconsistent with "broad" petitioning immunities with only one "narrow" exception currently recognized by the Supreme Court and the Tenth Circuit.[104] Here, it also creates risk of undermining the actions of coordinate branches; in this case, the executive branch.

Accordingly, any such fraud allegations would have to clear a high bar. Having surveyed the case law, the court believes a plaintiff essentially would need to plead something like the following: (1) knowingly false statements or fraudulent conduct; (2) that changed the outcome of the proceedings. If a plaintiff can show that the defendant only obtained agency action by intentionally defrauding the agency, then the court may find that the proceedings were deprived of legitimacy and that the *Noerr-Pennington* and Petition Clause immunities are vitiated. This approach is similar to those adopted by a number of other courts that have recognized a fraud-based exception to these immunities.[105]

Of course, CVB's claim requesting application of the fraudulent misrepresentation exception, which sounds in fraud, would also have to meet Rule 9's heightened pleading

---

[104] Indeed, when the Supreme Court declined to decide whether fraud would remove *Noerr-Pennington* immunity, it referenced Federal Rule of Civil Procedure 60(b)(3), which permits the court to relieve a party from a final judgment where the prevailing party perpetuated a fraud. *PREI*, 508 U.S. at 61 n.6. The Tenth Circuit has found that relief under Rule 60(b)(3) "is an extraordinary remedy and may be granted only in exceptional circumstances." *Jackson v. Los Lunas Cmty. Program*, 880 F.3d 1176, 1191–92 (10th Cir. 2018).

[105] *See Cheminor*, 168 F.3d at 123 (referring to affecting the core); *Baltimore Scrap*, 237 F.3d at 402 ("Alleged frauds that 'do not infect the core' of a case will receive *Noerr-Pennington* immunity because regardless of the alleged fraud, the outcome would have been the same."); *UNOCAL*, 2004 WL 1632816 *21 (referring to infecting the core and depriving the proceeding legitimacy); *Kottle*, 146 F.3d at 1060 (referring to depriving "the litigation of its legitimacy").

standard. Under this standard, the Amended Complaint "must 'set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof.'"[106] And Rule 9(b) requires CVB to "set forth the 'who, what, when, where and how' of the alleged fraud."[107] CVB also would need to allege sufficient well-pleaded facts suggesting that the fraud changed the outcome of the proceedings.

To determine if a fraud exception could apply here, the court reviews the many fraud allegations in the Amended Complaint. Even accepting all of CVB's allegations as true, and considering all reasonable inferences in its favor, CVB has not alleged sufficient facts to make it plausible that the Defendants knowingly made false statements that changed the outcome of the proceedings before Commerce and the ITC.

### C. Alleged Misrepresentations Related to Commerce's Dumping Findings

CVB alleges that the Defendants alleged dumping margins as high as 1,700 percent in the First Petition.[108] CVB further alleges that Defendants "constructed fraudulent values for the products" in the First Petition.[109] The Amended Complaint acknowledged that Commerce found dumping, but at percentages less than what was alleged in the First Petition.[110] Commerce made a determination that thirty-eight entities engaged in dumping with the "estimated weighted-average dumping margin" ranging from 57.03 percent to 1,731.75 percent.[111] All but three of the entities had a margin of 162.76 percent: Healthcare Co., Ltd. had a dumping margin of 57.03

---

[106] *Heavy Petroleum Partners, LLC v. Atkins*, 457 Fed. App'x 735, 742–43 (10th Cir. 2012) (unpublished) (quoting *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997)).

[107] *United States ex rel. Lacy v. New Horizons, Inc.*, 348 Fed. App'x 421, 424 (10th Cir. 2009) (unpublished) (quoting *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702 (10th Cir. 2006)).

[108] Amended Complaint at ¶ 174.

[109] *Id.* at ¶¶ 177–78, 182.

[110] *Id.* at ¶ 214.

[111] Commerce First Petition Final Affirmative Determination at 3–4.

percent; Zinus Inc. had a dumping margin of 192.04 percent; and the "China-wide entity" had a dumping margin of 1,731.75 percent.[112]

As to the Second Petition, CVB also alleges Defendants "exaggerated and manipulated the calculation of a dumping margin" of up to 1,008 percent.[113] Commerce made determinations regarding imports from seven countries including Cambodia, Indonesia, Malaysia, Serbia, Thailand, Turkey, and Vietnam for a total of over twenty-five entities.[114] These percentages ranged from 2.2 percent to 763.28 percent.[115]

The Amended Complaint clearly alleges, and the Final Affirmative Determinations support, that Commerce conducted its own research and reached independent conclusions on dumping margins relevant to the "less than fair market value" inquiry.[116] Many, if not most, of these percentages were different from what had been alleged in the Petitions.[117]

Accordingly, it is clear that Commerce did not simply rely on Defendants' dumping allegations, but instead conducted its own investigation. That investigation entailed allowing time for parties to raise issues about the scope of the products in briefs or other written comments and certain interested parties then "commented on the scope of the investigation."[118] As to the Chinese entities, Commerce "verified the sales and factors of production reported by

---

[112] *Id.*

[113] Amended Complaint at ¶¶ 244–45, 247, 250–57.

[114] Commerce Second Petition Amended Final Affirmative Determination at 5–7, ECF No. 49-9. As noted, this is Commerce's amended determination, which amended the final affirmative determination as to mattresses from Cambodia and issued duty orders. *Id.* at 1, 3. Defendants also provided copies of the original affirmative determinations showing the dumping margins. *See* ECF Nos. 49-1–49-7.

[115] Commerce Second Petition Amended Final Affirmative Determination at 5–7.

[116] *See, e.g.*, Amended Complaint at ¶¶ 214, 248; *see also* Commerce First Petition Final Affirmative Determination at 3–4 (listing average dumping margins for various producers); Commerce Second Petition Final Affirmative Determinations (listing average dumping margins for various producers from multiple countries alleged in Second Petition).

[117] *See id.*

[118] *See, e.g.*, Commerce Second Petition Final Affirmative Determination (Cambodia) at 2, ECF No. 49-1.

Healthcare [CVB's primary supplier] and Zinus" and used "standard verification procedures, including an examination of relevant accounting and production records, and original source documents provided" by the two entities.[119] For five of the countries in the Second Petition, Commerce was unable to conduct on-site verification of the information but "took additional steps in lieu of an on-site verification to verify the information relied upon in making" its final determination.[120] As to the Malaysian entities, Commerce was not able to conduct verification.[121] As to the Thailand entities, Commerce could not conduct on-site verification, but "relied upon the information submitted on the record as facts available."[122]

In short, Commerce made its dumping margin determinations based upon its own investigations.[123] CVB has failed to state any well-pleaded facts making it plausible that Defendants' allegations actually changed the outcome of Commerce's proceedings and determinations. No matter what Defendants alleged about dumping margins, Commerce's investigations on the two Petitions found that over fifty companies (and country-wide entities) were engaged in dumping at rates from 2.2 to 1,731.75 percent. CVB does not even dispute, much less assert well-pleaded facts, that dumping was not occurring.[124] Instead, CVB essentially contends that the degree of dumping was not as severe as Defendants alleged. Even dumping to a lesser degree than the Petitions alleged obviously would still be dumping,[125] leaving unaffected

---

[119] Commerce First Petition Final Affirmative Determination at 2.

[120] *See* Commerce Final Affirmative Determinations, ECF Nos. 49-1–49-2, 49-4, 49-6–49-7 (referring to Cambodia, Indonesia, Serbia, Turkey, and Vietnam).

[121] Commerce Second Petition Final Affirmative Determination (Malaysia) at 1, ECF No. 49-3.

[122] Commerce Second Petition Final Affirmative Determination (Thailand) at 2, ECF No. 49-5.

[123] *See* Commerce Final Affirmative Determinations, ECF Nos. 36-3, 49-1–49-7, 49-9.

[124] In fact, CVB admits that its "primary supplier" was found to be dumping at 57.03%. Amended Complaint at ¶ 214.

[125] And it also obviously is evidence that Defendants' petitioning activity was not objectively baseless: Defendants alleged foreign companies were dumping inexpensive mattresses, which is precisely what Commerce found for over fifty companies.

Commerce's conclusion that "mattresses from [the subject countries] are being, or are likely to be, sold in the United States at less than fair value (LTFV)."[126] For these reasons, CVB has failed to state a claim for a fraud exception to *Noerr-Pennington* and Petition Clause immunity based on allegedly exaggerated dumping margins.

### D.  Alleged Misrepresentations to the ITC

Because CVB does not state a claim regarding the dumping of imported mattresses, it is left to argue that Defendants defrauded the ITC into finding that the domestic mattress industry was materially injured by the dumping. Material injury is defined by statute as "harm which is not inconsequential, immaterial, or unimportant."[127] It is important to note that "Congress has delegated this factual finding to the [ITC] because of the agency's institutional experience in resolving injury issues."[128]

In making its determinations, the ITC is to consider many factors including "the volume of subject imports, their effect on prices for the domestic like product, and their impact on domestic producers of the domestic like product, but only in the context of U.S. production operations."[129] It considers "all relevant economic factors that bear on the state of the industry in the United States," and no "single factor is dispositive."[130] Its evaluation requires that the "subject imports are more than a minimal or tangential cause of injury and that there is a sufficient causal, not merely a temporal, nexus between subject imports and material injury."[131] The ITC's standard does not require "that unfairly traded imports be the 'principal' cause of

---

[126] Commerce Final Affirmative Determinations, ECF Nos. 36-3, 49-1–49-7, 49-9.

[127] 19 U.S.C. § 1677(7)(A).

[128] ITC Second Petition Final Determination at 27 (citing *Mittal Steel Point Lisas Ltd. v. United States*, 542 F.3d 867, 873 (Fed. Cir. 2008) & *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350 (Fed. Cir. 2006)).

[129] ITC Second Petition Final Determination at 24; *see also* ITC First Petition Final Determination at 14; 19 U.S.C. § 1677(7)(B), (C).

[130] ITC Second Petition Final Determination at 25; *see also* ITC First Petition Final Determination at 14.

[131] ITC Second Petition Final Determination at 25; *see also* ITC First Petition Final Determination at 15.

injury or contemplate that injury from unfairly traded imports be weighed against other factors, such as nonsubject imports, which may be contributing to overall injury to an industry."[132] So, there is no single factor or evidence that is controlling, but the ITC considers the totality of the evidence to make its determination on injury.

CVB alleges Defendants made similar misrepresentations to the ITC in both Petitions and related investigations. Because the Amended Complaint contains numerous repeated arguments that are similar, the court addresses the misrepresentations grouped by theme.

  i.    Excess Capacity

CVB alleges "Defendants falsely stated that domestic manufacturers" had "available capacity" to supply demand during investigations for the First Petition.[133] First, CVB points to a statement from the Vice President of Defendant Leggett & Platt that he disagreed that the mattress industry "is not willing or capable to supply" mattresses and that "we know that there is more than enough packaging capacity."[134] Next, CVB alleges that "Defendants, through their counsel," represented that the domestic industry "has plenty of capacity to make [mattresses] if market price supports it."[135] As support that these statements were fraudulent, CVB alleges that the domestic manufacturers did not have "facilities, expertise, equipment, or other resources necessary" because the Defendants "had failed to purchase and install the necessary compression and rolling capacity."[136]

---

[132] ITC Second Petition Final Determination at 26; *see also* ITC First Petition Final Determination at 16.
[133] Amended Complaint at ¶ 190. It appears that the respondents to the First Petition made similar arguments that at least one domestic producer misreported its capacity to package mattresses. ITC First Petition Final Determination at 40 n.236. Parts of the determination are redacted, so the court cannot tell if the allegations are the same as those in the Amended Complaint. The ITC noted it was "unpersuaded" by the arguments. *Id.*; *see also id.* at 41 n.238.
[134] Amended Complaint at ¶ 191.
[135] *Id.* at ¶ 192.
[136] *Id.* at ¶ 193.

Similarly, CVB also alleges that the ITC was "unpersuaded" by arguments that the foreign imports increased to satisfy demands for mattresses "that the domestic industry was incapable of supplying due to a 'structural deficit.'"[137] According to CVB, the ITC's rejection of an opposing argument is evidence that the ITC accepted Defendants' false statements about excess capacity.

There is no basis for finding that these statements, even if they were inaccurate, changed the outcome of the proceedings. The ITC's report makes it clear that it did not believe that the U.S. producers had sufficient excess capacity to supply all current domestic needs. Indeed, the ITC explicitly stated that the U.S. producers' capacity "was a fraction of total U.S. apparent consumption."[138] The ITC instead found only that domestic industry "could have increased its capacity to produce [Mattresses In A Box] . . . by adding shifts of production workers and equipment, had it been economical to do so."[139] In other words, if the domestic producers were not being undercut by much less expensive foreign mattresses, they would have added more workers and equipment to make additional mattresses for the domestic market. The ITC report seemingly contradicts, rather than supports, CVB's claim that the ITC was tricked into believing false statements about domestic producers' capacity. Even if the statements CVB identifies about capacity were false, they could not have plausibly changed the outcome of the proceedings.

A few paragraphs later, CVB again alleges that "Defendants also made fraudulent statements regarding their excess capacity to produce Mattresses In A Box that could meet growing consumer demand."[140] CVB contends that the excess capacity statements are "contradicted by the fact that Defendants' products periodically failed to meet certain

---

[137] *Id.* at ¶ 225.

[138] ITC First Petition Final Determination at 42; *see also* Amended Complaint at ¶ 226 (quoting the ITC's report).

[139] ITC First Petition Final Determination at 42; *see also* Amended Complaint at ¶ 226 (quoting the ITC's report).

[140] Amended Complaint at ¶ 223.

flammability tests."[141] However, these statements are not in tension. Accepting as true CVB's allegation that some unidentified products from non-specified Defendants "periodically" failed flammability tests does not mean Defendants did not have capacity to produce more mattresses. This oblique flammability claim is insufficient to make it plausible that the statements about capacity were false.

CVB makes related allegations about the Second Petition. CVB alleges that "Defendants stated that the U.S. mattress industry 'has the geographic reach and capacity'" to supply mattresses and "have shorter lead times than importers."[142] To show this was fraudulent, CVB first points to a May 2020 announcement from Corsicana that it was experiencing delivery delays.[143] Similarly, in September 2020, Corsicana announced a price increase due to supply chain issues.[144] CVB also alleges that Leggett & Platt announced a price increase in June 2020 due to short supply.[145] However, the announcements about delays and price increases do not suggest that earlier statements about capacity or lead times were false. Indeed, May to September 2020 was at the heart of the COVID-19 pandemic and various shutdowns that affected supply chains around the world. In fact, the ITC noted that forty-three of the responding producers (beyond just the Defendants) reported that they experienced changes in relation to "their supply chain arrangements, production, employment, and sales relating to mattresses" as a result of COVID-19 or government actions taken to contain the spread of COVID-19.[146] These allegations do not make it plausible that the above statements were fraudulent or impacted the outcome of the final determination.

---

[141] *Id.* at ¶ 224.
[142] *Id.* at ¶ 272.
[143] *Id.* at ¶ 277.
[144] *Id.* at ¶ 278.
[145] *Id.* at ¶ 279.
[146] ITC Second Petition Final Determination at III-15.

CVB also alleges that Serta Simmons and Tempur Sealy "are experiencing delays of two to three weeks, or more."[147] There is no indication of time linking this statement to the determination of the ITC. In fact, the allegation reads as though those two entities are currently experiencing delays, which would not impact the court's analysis or be relevant to the specific time period of the ITC's investigation. And, again, that two of the Defendants are or were experiencing delays at some undefined time for some unspecific duration says nothing useful about the entire "U.S. mattress industry."

As additional support that Defendants did not have capacity and "lied" about production delays, CVB refers to, but does not supply, a Statement of Interest filed by the Department of Justice on April 22, 2020.[148] CVB asserts that the statement asked the ITC to consider certain outcomes that "could potentially affect the supply of mattresses needed in hospitals" due to the COVID-19 pandemic.[149] CVB alleges this statement "establishes that the Department of Justice recognized the lack of domestic mattress production and that Defendants falsely claimed that excess capacity existed."[150] First, neither the Amended Complaint nor CVB's briefing acknowledges that the Department of Justice withdrew the Statement only eight days after it was filed.[151] Second, CVB's allegation that this somehow shows the Department of Justice recognized the "lack of domestic mattress production" or that Defendants had made a false claim is entirely unsupported. The Statement was made at the beginning of the COVID-19 pandemic. There is no factual support or reasonable inference that it pertained to anything other than that. This does nothing to show fraud by Defendants.

---

[147] Amended Complaint at ¶ 280.
[148] *Id.* at ¶ 281.
[149] *Id.*
[150] *Id.* at ¶ 282.
[151] Notice of Withdrawal, ECF No. 72-2.

ii.  Job Loss, Factory Closures, and Overall Impacts on Domestic Industry

CVB also alleges that Defendants made fraudulent statements related to job loss, business closures, and overall impacts of dumping on the domestic industry. For example, CVB alleges that two Defendants made fraudulent statements at the dumping hearings that were allegedly contradicted by other public statements. First, CVB points to testimony by the President of Tempur Sealy that attributed the closure of a plant in Minnesota to "lower volumes due to Chinese imports."[152] As evidence of the "fraud" of this statement, CVB alleges that Tempur Sealy earlier announced it closed the plant as a "business decision…driven by the closure of a large customer's nearby distribution center."[153] These partial quotations may be in tension: the terse quotes are obviously part of longer statements that are not included in the Amended Complaint, so the remainder of the statements and their context are unknown. In any event, there are no allegations, nor support in the ITC determination, that the statement about the reason for the closure of one plant would have caused the ITC's determination about material injury to the domestic industry to change.[154]

Next, CVB points to an alleged discrepancy between hearing testimony by the Vice President of Defendant Corsicana and a company press release about the closure of a plant in Alabama.[155] CVB alleges the Vice President testified the plant closed because "there just wasn't enough value to efficiently and profitably run the facility."[156] CVB then alleges that Corsicana earlier had announced the closure "was a business decision…deemed to be in the best interest" of the employees since production at the plant "had been in decline for a variety of reasons."[157]

---

[152] Amended Complaint at ¶ 195.
[153] *Id.* at ¶ 196.
[154] As previously described, the ITC relied on data supplied by more than just the eight Defendants in both Petitions.
[155] Amended Complaint at ¶¶ 197–98.
[156] *Id.* at ¶ 197.
[157] *Id.* at ¶ 198.

These two statements do not appear contradictory. That the facility could not be "profitably run" is not undermined by a statement that it "had been in decline for a variety of reasons." Accordingly, these two statements taken together do not make it plausible that the hearing testimony was false.

CVB then alleges additional fraudulent statements regarding other injuries to the domestic industry.[158] CVB cites to testimony from the Vice President of Leggett & Platt who testified that "Chinese imports limited our ability to invest back into our operations and forced us to reduce our head count in 2018."[159] As support for the statement's falsity, CVB alleges that "Leggett & Platt Co. informed employees" that it was eliminating jobs at a specific facility "confirming that the workforce production was about the firm's fashion bed and home furniture businesses."[160] CVB also alleges an article in *Furniture Today* reported the closing of the facility was "the result of the company's decision to 'exit product categories that are no longer strategic to its longtime focus.'"[161] Once again, there is no apparent conflict between these statements. The statement about why one specific facility was closed is not inconsistent with reducing headcount and limiting investments more broadly based on dumped mattresses.

CVB further alleges that the ITC relied on the foregoing "false information" from Leggett & Platt and quotes the ITC report as stating that "sixteen of 28 responding domestic producers reported that subject imports had negative effects on their investment."[162] However, the quoted excerpt from the ITC does not reference any statement from Leggett & Platt and instead specifically refers to reports made by six other businesses (Brooklyn Bedding, Simmons,

---

[158] *Id.* at ¶¶ 218–22.
[159] *Id.* at ¶ 219.
[160] *Id.* at ¶ 220.
[161] *Id.*
[162] *Id.* at ¶ 222.

Tempur Sealey, Kolcraft, Corsicana, and ECS).[163] While Leggett & Platt apparently was one of the sixteen out of twenty-eight domestic producers reporting "that subject imports had negative effects on their investment," that and the various quotes from other companies do nothing to show that the earlier Leggett & Platt statements were false.

Furthermore, CVB simply has not provided sufficient well-pleaded facts to make it plausible that the complained of testimony was false. The ITC report excerpt quoted by CVB includes the following from the six specifically identified companies: Brooklyn Bedding ("subject imports adversely impacted the returns on its investment"); Serta Simmons ("much of the capital and production equipment . . . remains unused due to increased volumes of subject imports"); Tempur Sealey ("did not achieve its anticipated sales . . . due to low-priced subject import competition"); Kolcraft ("did not achieve the expected returns"); Corsicana ("investments in roll-packing equipment . . . . were 'barely used'"); and ECS ("investments to expand its capacity to meet growing demand for foam mattresses remained underutilized").[164] Not only does the Amended Complaint fail to explain how these excerpts constitute "false information from Leggett & Platt," it also fails to plead facts suggesting that they are false at all.

CVB also alleges that the Second Petition claimed that the manufacturers in the new countries were "acting as a front for Chinese manufacturers" trying to evade tariffs from the First Petition.[165] CVB alleges that is not true, and "many foreign Mattress manufacturers in many of these countries have been making Mattresses for decades with no ties to China."[166] This is a conclusory statement with no factual support. More importantly, there are insufficient well-pleaded facts that this claim was material to the ITC's decision about whether the domestic

---

[163] *Id.*

[164] *Id.*

[165] *Id.* at ¶ 259.

[166] *Id.* at ¶ 260.

industry was materially injured by dumping from the relevant countries. There is nothing to show that this allegedly fraudulent claim affected the legitimacy of the ITC's determination because these facts do not appear relevant to the inquiry of whether the imports from the noted countries caused material injury to the domestic industry.

As further examples of alleged fraud about the harm to Defendants, CVB discusses statements from two Defendants. CVB first points to a statement by Defendant Corsicana that it was "positioned to benefit from our existing capacity and our investments in products such as rolled mattresses" but instead it was "closing plants and losing sales because of the continued influx of unfairly low-priced imports."[167] Additionally, Defendant ECS is alleged to have claimed that "purchasers were able to get lower prices because importers kept bringing in and stockpiling large volumes of low-priced" imported mattresses, and it "had to reverse course as imports from these seven countries flooded the US market."[168]

As support that the statements by Corsicana and ECS were false, CVB points to statements made by two different Defendants, Tempur Sealy and Leggett & Platt, in their earnings calls.[169] But a statement by one Defendant about its own business obviously does not show falsity in a statement made by another Defendant about its separate business. CVB's point appears to be that some of the Defendants used more optimistic language in earnings calls than other Defendants did before the ITC. Even if CVB were contrasting statements between the same defendant, this would be insufficient to show fraud. Furthermore, there are insufficient facts showing that the two sets of statements are referring to the same time period.

---

[167] *Id.* at ¶ 265.

[168] *Id.* at ¶ 266.

[169] *Compare id.* at ¶¶ 265–66 (referring to Defendants Corsicana and ECS) *with id.* at ¶¶ 268–71 (referring to Defendants Tempur Sealy and Leggett & Platt).

CVB also realleges that "Defendants" fraudulently claimed that dumping as alleged in the Second Petition caused a loss of thousands of jobs.[170] As evidence that this claim is false, CVB alleges that "as is evidenced by their own public press releases, Defendants' mergers and acquisitions during this time period led to 1,278 job losses…but created 1,215 new jobs."[171] Comparing a statement about job losses due to dumping with a statement about job losses due to mergers and acquisitions sheds no light on the truth of either statement; they are simply about different things, or at least about things with no specific connection.

Similarly, CVB alleges that "Defendants fraudulently presented testimony" that more than 40 U.S. mattress producers were forced to close.[172] CVB points specifically to testimony from a representative of Defendant Leggett & Platt that he was "personally aware of more than 40 US mattress manufacturers that have been forced to close down since 2017" and that many were family businesses "that could not compete with the absurdly low-priced imports."[173] As evidence that this was fraudulent, CVB summarily alleges that "the factories closed for other reasons, including mergers and acquisitions by Defendants and strategic business decisions."[174] This conclusory statement is neither sufficient to show how the statement was false nor is it accompanied by any supporting allegations actually suggesting the statement was false. And, as noted above, the statement of one Defendant cannot support an allegation that each Defendant misrepresented a fact. Furthermore, CVB has not sufficiently alleged that this would have changed the outcome of the proceeding.

---

[170] *Id.* at ¶ 283.
[171] *Id.* at ¶ 284.
[172] *Id.* at ¶ 285.
[173] *Id.*
[174] *Id.*

iii.    E-Commerce Listings

Next, CVB alleges misrepresentations related to the e-commerce listings of various Defendants.[175] CVB cites to testimony from the CEO of Defendant Serta Simmons indicating that his company's mattresses "were pushed down in search results in favor of cheaper, unfairly traded Chinese mattresses."[176] He also testified that Tuft & Needle's lost sales was driven by the "low prices of mattresses in China."[177] He further stated that Tuft & Needle's products were forced down Amazon's list "after having been very successful, and it was totally driven by price."[178]

CVB alleges those statements are false because the decline was due to "review score and review quantity."[179] Based on actions taken by Amazon, over 6,000 reviews were deleted, resulting in Tuft & Needle's drop.[180] These allegations are sufficient to make it plausible that low priced mattresses from China were not the only, maybe not even the primary, reason for Tuft & Needle's loss in e-commerce placement. But even CVB acknowledges that low price is a factor.[181] Additionally, the respondents to the Petition made this same argument to the ITC, which rejected it.[182] Instead of identifying fraud that changed the outcome of the hearing, CVB appears to be inviting the court to assume that the ITC, a subject matter expert, is unaware of how e-commerce works and then to undo the ITC's rejection of CVB's argument. This sounds in relitigation, not outcome-changing fraud.

---

[175] *Id.* at ¶¶ 200–12.
[176] *Id.* at ¶ 201.
[177] *Id.* at ¶ 202.
[178] *Id.* at ¶ 203.
[179] *Id.* at ¶¶ 204, 207.
[180] *Id.* at ¶¶ 205–06.
[181] *See id.* at ¶¶ 209–10.
[182] ITC First Petition Final Determination at 42 n.247.

iv.    Timing in the Market

CVB also alleges fraudulent testimony about the timing of Defendants' "interest and involvement in manufacturing and marketing" mattresses in a box.[183] The ITC determined that the "domestic industry has been producing and selling [Mattresses In A Box] since 2004 and selling Mattresses over the internet since before the period of investigation."[184] CVB alleges this is fraudulent because "it has been widely reported that Defendants are just now investing heavily in the Mattress In A Box market."[185] CVB's additional "proof" of the fraudulent claims admits that there were sales in 2004, but alleges that it was limited to one Defendant's sales.[186] In other words, CVB effectively concedes the accuracy of ITC's finding, but it thinks that it means little. And, of course, the ITC's finding included the "domestic industry" and was not limited to solely the actions of the Defendants.

Additionally, CVB's other allegations support the ITC's findings. As noted, the "period of investigation" began with the filing of the First Petition in 2018 and continued during the investigation.[187] The Amended Complaint alleges that Brooklyn Bedding claims it began selling mattresses-in-a-box in 2010.[188] CVB contends that Tempur Sealy "had minimal success entering" the relevant market prior to 2016.[189] Serta Simmons "mostly ignored" the market until 2017.[190] Corsicana "launched" its mattress-in-a-box brand in 2019.[191] In 2016, Leggett & Platt introduced a roll packed mattress.[192] In short, CVB's own allegations support that during the

---

[183] Amended Complaint at ¶ 227.
[184] *Id.* at ¶ 227.
[185] *Id.* at ¶ 228.
[186] *Id.*
[187] *Id.* at ¶ 172
[188] *Id.* at ¶ 138.
[189] *Id.* at ¶ 139.
[190] *Id.* at ¶ 140.
[191] *Id.* at ¶ 141.
[192] *Id.* at ¶ 142.

period of investigation, most of the Defendants had been "selling Mattresses over the internet" prior to 2018.

Similarly, CVB alleges Brooklyn Bedding "fraudulently testified that CVB and other importers did not introduce Mattresses In A Box to U.S. customers through E-commerce channels because [it] 'began selling to major E-commerce customers since at least 2010.'"[193] As "proof" that this statement was fraudulent, CVB alleges that it "provided Brooklyn Bedding with early model Mattress In A Box product so that Brooklyn Bedding could study the product and learn how to manufacture like products."[194] CVB makes similar allegations as to the Second Petition and points to testimony that Brooklyn Bedding had been producing and selling mattresses in a box since 2008 and selling on major E-commerce sites since 2010.[195] CVB alleges this is "demonstrably false as CVB" introduced Brooklyn Bedding to the technology.[196]

However, there is nothing inconsistent in the statements. There are no allegations about when CVB provided Brooklyn Bedding with the mattresses or how these statements necessarily conflict. And there are no allegations that this statement was material to the ITC's determination about whether the domestic market was materially injured by the dumping.

     v.    Overall Collective Pleading

Beyond the deficiencies identified above, the Amended Complaint is also flawed in that there are numerous instances of improper collective pleading. The court must be able to identify "which defendant is alleged to have done what" and "what the misconduct was."[197] A general reference to "Defendants" is insufficient.

---

[193] *Id.* at ¶ 229.
[194] *Id.* at ¶ 230.
[195] *Id.* at ¶ 288.
[196] *Id.*
[197] *Burnett v. Mortg. Elec. Registration Sys. Inc.*, 706 F.3d 1231, 1240 (10th Cir. 2013) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).

Throughout the Amended Complaint, CVB makes many collective references to Defendants. The court provides an incomplete list to demonstrate this deficiency. For example, CVB alleges:

- "Defendants' products periodically failed to meet certain flammability tests."[198]

- "Defendants stated that the U.S. mattress industry 'has the geographic reach and capacity' to supply" mattresses.[199]

- "Defendants' mergers and acquisitions during this time period led to 1,278 job losses (nearly identical to the Second Fraudulent Petitioners' claimed injury by importers" but created 1,215 new jobs, for a total net loss of sixty-three jobs."[200]

- "Defendants knowingly misrepresented the similarities between" mattresses.[201]

- "Defendants also misled the ITC into believing that Defendants were all primarily manufacturers of a finished good, as opposed to manufacturers of components used to assemble finished products."[202]

- "Defendants have repeatedly offered brick and mortar retailers as much as $25,000 for store remodels on the condition that the retailer will stop selling CVB products."[203]

- "Defendants regularly misrepresent their products as being 'Made in America.'"[204]

---

[198] Amended Complaint at ¶ 224.
[199] *Id.* at ¶ 272.
[200] *Id.* at ¶ 284.
[201] *Id.* at ¶ 289.
[202] *Id.* at ¶ 290.
[203] *Id.* at ¶ 313.
[204] *Id.* at ¶ 318.

Similarly, CVB often imputes the action of one or two Defendants to all the Defendants, which is improper and cannot be the basis of a claim against all Defendants. Again, the court provides a few illustrative examples:

- CVB alleges that "Defendants also provided fraudulent information" regarding the loss of jobs and closure of factories but relies on supporting testimony from only two Defendants, Tempur Sealy and Corsicana.[205]

- CVB alleges that "Defendants also made fraudulent representations" about the impact on e-commerce listings but relies on supporting testimony from only two Defendants, Serta and Tuft & Needle.[206]

- CVB alleges that the ITC relied on "Defendants' fraudulent statements" but relies on testimony from only one Defendant, Leggett & Platt.[207]

- CVB alleges that "Defendants fraudulently presented testimony" but cites to the testimony of only one Defendant, Leggett & Platt.[208]

- CVB alleges that "Defendants have repeatedly offered brick and mortar retailers" money to not sell competing products but supports that statement with examples pertaining to only two Defendants, Sealy and Serta.[209]

Allegations such as those provided in these examples are insufficient and cannot be the basis of CVB's claims.

---

[205] *Id.* at ¶¶ 194–99.
[206] *Id.* at ¶¶ 200–04, 208.
[207] *Id.* at ¶¶ 218–22.
[208] *Id.* at ¶ 285.
[209] *Id.* at ¶¶ 313–15.

*E. Conclusion*

The Amended Complaint appears to be an attempt to simply relitigate the four final determinations made by the ITC and Commerce.[210] To warrant the application of a fraud-based exception to the broad *Noerr-Pennington* and Petition Clause immunities, CVB needed to plead sufficient facts to show that Defendants intentionally made false statements to Commerce and the ITC that changed the outcome of the proceedings before them. As shown above, some of the Amended Complaint's allegations lack sufficient well-pleaded facts to make it plausible that the statements are false. Other allegations lack sufficient facts to make it plausible that they would have changed the outcomes reached by Commerce and the ITC. Many of the allegations fail both prongs of the test. And others either rely on collective pleadings about "Defendants" or attempt to impute testimony given by one Defendant to another Defendant or to all Defendants. As noted earlier, this falls short of what a "narrow" exception to a "broad" immunity would require, and it does not meet the requirements of Rule 9.

Moreover, Commerce's finding that over fifty foreign entities engaged in dumping at rates of 2.2 to 1,731.75 percent is not truly in dispute. CVB alleges that Defendants made "false margin calculations" in the Petitions, but there are no well-pleaded facts that Commerce accepted those allegations. Quite to the contrary, the reports, and the Amended Complaint, make it plain that Commerce conducted its own investigation and came to its own conclusions, which often resulted in dumping margin findings different than those alleged by Defendants. CVB has provided no basis at all for concluding that the legitimacy of the proceedings was undermined by false statements that changed the outcome of Commerce's determinations.

---

[210] *See* Commerce Final Affirmative Determinations, ECF Nos. 36-3, 49-1–49-7, 49-9; ITC Final Determinations, ECF Nos. 36-7, 72-3.

Regarding the ITC investigation, what is clear is that in over 800 pages of analysis, data, and discussion, the ITC examined in substantial depth the issues CVB wishes to revisit here. In making a final determination on whether there is a material injury to the domestic industry, the ITC considers many factors as defined by statute.[211] The relevant standard means that the "subject imports are more than a minimal or tangential cause of injury and that there is a sufficient causal, not merely a temporal, nexus between subject imports and material injury."[212] But, the ITC "need not isolate the injury caused by other factors from injury caused by unfairly traded imports."[213] In fact, "the existence of injury caused by other factors does not compel a negative determination."[214] Therefore, even if CVB were correct that Defendants exaggerated or misrepresented the degree of injury to the domestic industry, that does not mean the outcome of the proceeding would be different. To state a plausible claim that Defendants' alleged fraud changed the outcome, CVB needed to plead sufficient facts suggesting that the fraud caused the ITC to wrongly conclude that the dumped mattresses were more than a "minimal or tangential cause of injury." It has not done so.

As to the First Petition, the ITC relied on data from twenty-eight domestic firms and data from forty-two import firms.[215] Similarly, as to the Second Petition, the ITC relied on domestic industry data from the 53 domestic producers."[216] Clearly, the ITC relied on data far beyond by what was provided by the eight Defendants here. The ITC found that imports increased by millions of mattresses during the relevant time period.[217] And the value of the subject imports is

---

[211] ITC Second Petition Final Determination at 24–25.
[212] *Id.* at 25.
[213] *Id.* at 26.
[214] *Id.*
[215] ITC First Petition Final Determination at I-4.
[216] ITC Second Petition Final Determination at 3.
[217] ITC First Petition Final Determination at 25–26; ITC Second Petition Final Determination at 37.

36

in the hundreds of millions of dollars.[218] In short, there is ample basis for the ITC to have found more than a "minimal" injury to domestic industry no matter the allegations and testimony from these eight Defendants.

"Congress created a highly specialized system for resolving antidumping petitions, which recognizes and exploits each participant's area of expertise."[219] Congress has given the responsibility to the ITC to make a final determination of whether the domestic industry is materially injured or threatened with material injury.[220] The ITC did so in the underlying matter based on a significant record. While CVB disagrees with the positions adopted by the ITC, the purpose of a fraud-based exception to the petition immunities cannot be carte blanche for reconsidering the decisions made by congressionally-authorized bodies. Instead, it would have to be reserved for the rare occasions when a proceeding is so tainted by fraud that it is stripped of its legitimacy. The well-pleaded factual allegations of the Amended Complaint and the reasonable inferences therefrom simply do not rise to that standard.

Defendants are entitled to immunity on claims for relief one through six that arise from the Petitions.[221]

## II.    CVB'S SHERMAN ACT AND LANHAM ACT CLAIMS BASED ON CONDUCT OUTSIDE OF PETITIONING ACTIVITY FAIL.

In addition to the petitioning activity, CVB makes three arguments that Defendants violated the Sherman and Lanham Acts by (1) engaging in price fixing, (2) interfering with its

---

[218] ITC Second Petition Final Determination at IV-6.

[219] *Nippon Steel*, 458 F.3d at 1350.

[220] 19 U.S.C. § 1671d(b)(1).

[221] The Amended Complaint also contains numerous criticisms of the agencies' processes. *See, e.g.*, Amended Complaint at ¶¶ 159, 188, 248, 262. An allegation of fraud is not supported based on contentions that Plaintiff should have had additional opportunities to develop or present evidence.

business relations, and (3) false advertising through press releases and marketing products as "Made in America."[222]

### A. Price Fixing

A claim of horizontal price-fixing requires sufficient facts to support "(1) the existence of an agreement, combination or conspiracy, (2) among actual competitors (*i.e.,* at the same level of distribution), (3) with the purpose or effect of 'raising, depressing, fixing, pegging, or stabilizing the price of a commodity' (4) in interstate or foreign commerce."[223] The parties disagree whether CVB has alleged sufficient facts to make it plausible that there was a conspiracy or agreement between the Defendants.[224]

First, Defendants argue that CVB, as a competitor, lacks standing to bring a price-fixing claim.[225] CVB responds in a footnote that it alleges it was harmed by the price-fixing scheme, and that allegation must be accepted as true.[226] But CVB does not address the relevant case law. In *Matsushita Electric*,[227] the Supreme Court concluded that the respondents could not recover for damages for a conspiracy by the petitioners to charge higher than competitive prices. The Court noted the party's actions would violate the Sherman Act but "could not injure respondents: as petitioners' competitors, respondents stand to gain from any conspiracy to raise the market price."[228] The Tenth Circuit has further instructed that it is "important to remember 'the antitrust

---

[222] Amended Complaint at ¶¶ 313–19.

[223] *Cayman Expl. Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1361 (10th Cir. 1989).

[224] *See* Motion at 22–23; Opposition at 13.

[225] Motion at 22–23.

[226] Opposition at 15 n.18.

[227] 475 U.S. 574, 582–583 (1986).

[228] *Id.*; *see also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) ("The antitrust laws, however, were enacted for 'the protection of competition, not competitors.'"). CVB alleged that "the average price of mattress sales on Amazon increased by 17 percent in early 2021 while selection decreased by 10 percent." Amended Complaint at ¶ 317. A conclusory allegation that CVB was harmed by this increase is insufficient and contrary to binding precedent that a price-fixing claim is not meant as a protection for competitors as they stand to benefit from price increases.

38

laws, however, were enacted for the protection of competition, not competitors,' and courts must always be mindful lest these laws be invoked perversely in favor of those who seek protection against the rigors of competition."[229] CVB's reliance on conclusory allegations that "Defendants' anticompetitive conduct has harmed other competing Mattress suppliers" is insufficient to show how it, as a competitor who stands to benefit from a price increase, can bring a price-fixing claim against Defendants.[230]

Even if the court were to accept that CVB has standing to bring a Sherman Act claim based on price fixing, the Amended Complaint's allegations are insufficient to make such a claim plausible. In *Twombly*, the Supreme Court discussed a Sherman Act conspiracy claim at the motion to dismiss stage and determined the specific allegations there "came up short."[231] The Court stated that the relevant allegations relied on parallel conduct, not any allegation of an actual agreement.[232] It concluded that there must be enough facts "to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."[233] The Court further stated that "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice," and allegations of parallel conduct "must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."[234] The Court noted that in the relevant complaint there were a few "stray statements"

---

[229] *Rural Tel. Serv. Co., Inc. v. Feist Publ'ns, Inc.*, 957 F.2d 765, 768 n.6 (10th Cir. 1992) (quoting *Brunswick*, 429 U.S. at 488).

[230] *See* Amended Complaint at ¶ 320.

[231] *Twombly*, 550 U.S. at 564.

[232] *Id.*

[233] *Id.* at 556.

[234] *Id.* at 556–57.

that spoke "directly of agreement" but those allegations were "merely legal conclusions resting on prior allegations."[235]

Previous to the Court's decision in *Twombly*, the Tenth Circuit relied on similar principles in *Cayman* and indicated that "conscious parallel business behavior, standing alone, is insufficient to prove conspiracy."[236] Instead, a plaintiff "who relies on a theory of 'conscious parallelism' must establish that 'defendants engaged in consciously parallel action ... which was contrary to their economic self-interest so as not to amount to good faith business judgment.' Thus, the conspiracy allegation will fail if there is an independent business justification which explains the alleged conspirators' conduct.'"[237] The Tenth Circuit affirmed dismissal of a price-fixing claim when the complaint did not allege the nature and extent of the defendant's participation in the conspiracy and how the actions were contrary to the defendant's economic interests absent an agreement between the alleged conspirators.[238] And the Tenth Circuit has more recently noted, "The Supreme Court has long warned courts to be hesitant about inferring concerted action from evidence that is merely circumstantial."[239]

CVB attempts to distinguish the Tenth Circuit's decision in *Cayman* because the Amended Complaint identifies the conspirators by name, alleges the Defendants "worked together to charge supra-competitive prices" and identifies other facts such as the time period and percentages of the price increases.[240] As support that it has alleged an agreement or conspiracy, CVB points to allegations that "Defendants engaged in price fixing and deliberately

---

[235] *Id.* at 564 n.9 (referring to allegations that the parties "engaged in a 'contract, combination, or conspiracy' and agreed not to compete with one another").

[236] *Cayman*, 873 F.2d at 1361.

[237] *Id.* (citations omitted) (omission in original).

[238] *Id.*

[239] *Llacua v. Western Range Ass'n*, 930 F.3d 1161, 1179 (10th Cir. 2019) (determining that the plaintiffs did not allege facts that plausibly suggest individual ranches entered into any agreement with each other or the defendants).

[240] Opposition at 14 (citing Amended Complaint at ¶¶ 147, 316–17, 348–49, 359).

increased prices in *a coordinated fashion*…The sole exception to these increases was Corsicana, which, on information and belief, raised prices one month before its competitors in a coordinated attempt to conceal Defendants' price fixing scheme."[241] However, a single allegation that the Defendants acted in a "coordinated fashion" is conclusory.[242] It is not supported by facts that make the price-fixing conspiracy plausible. Beyond acting "in a coordinated fashion," there are no other allegations that the Defendants discussed or agreed on any prices or action or did more than take parallel action. Many of the Amended Complaint's other allegations regarding a conspiracy are conclusory.[243] While some of the allegations provide details of when and how much the prices increased[244] or the alleged harm,[245] they do not allege sufficient facts to make it plausible that there was a conspiracy or agreement between the Defendants.

CVB also cites to two district court cases[246] as support that conspiracies are usually clandestine and there is no requirement to plead "exactly how the conspiracy was achieved."[247] A Kansas court denied a motion to dismiss a civil conspiracy claim, concluding that the

---

[241] Amended Complaint at ¶ 316 (emphasis added). CVB also alleges that the fact that Defendants filed the Petitions on the same day demonstrates "a coordination and the conspiracy among them." *Id.* at ¶¶ 173, 240. These allegations relate to the filing of the Petitions and cannot support a conspiracy between the Defendants related to price-fixing. Furthermore, there are insufficient allegations linking this action to the alleged price-fixing conspiracy. And as discussed in *Twombly,* parallel conduct and a bare assertion of a conspiracy is insufficient. *Twombly,* 550 U.S. at 556.

[242] This allegation is improper collective pleading. It is unclear from the allegation which of the remaining seven Defendants took what action and when.

[243] *See* Amended Complaint at ¶¶ 147 (alleging that "Defendants conspired to cut off their rivals' sources of supply, block competition, frustrate innovation, and keep prices artificially high."), 348 (alleging that Defendants "engaged in price fixing, and carried out a conspiracy to mislead consumers").

[244] *See id.* at ¶¶ 316 (alleging acting in a "coordinated fashion" in or about March and April 2021), 317 (alleging a price increase of 17 percent on sales on Amazon).

[245] *Id.* at ¶¶ 349 (alleging that "this conduct harmed consumers"), 359 (alleging that consumers have been harmed by "supracompetitive prices" and "reduced output and availability of consumers' preferred Mattresses.").

[246] *Res. Ctr. for Independent Living, Inc. v. Ability Res., Inc.*, 534 F. Supp. 2d 1204 (D. Kan. 2008); *In re Commercial Explosives Litigation,* 945 F. Supp. 1489 (D. Utah 1996). It is worth noting that the Utah case was decided prior to the Supreme Court's *Iqbal/Twombly* standard.

[247] Opposition at 14.

complaint alleged a "meeting of the minds."[248] There, the plaintiff had alleged facts suggesting that the "defendants developed hidden and surreptitious plans to compete with [plaintiff] and to wrongfully appropriate [plaintiff's] opportunities and assets, confidential and proprietary information and equipment and resources, and that defendants conspired and took actions adverse to [plaintiff], including but not limited to forming a competing enterprise."[249] CVB has not made any similar allegations and relies instead on conclusory allegations of a conspiracy.[250]

A Utah court determined there were sufficient allegations of a price-fixing conspiracy.[251] There, the plaintiff had alleged that the defendants discussed and agreed to increase prices, discussed and agreed upon bids and price quotes, participated in meetings to set prices, discussed and agreed to allocate customers and territories, exchanged bidding and pricing information, and retaliated against another manufacturer for refusing to join their conspiracy.[252] The court also noted that "many of the facts to support a claim of conspiracy may be unknown to plaintiffs until they have an opportunity to conduct some discovery."[253] In contrast, other than conclusory statements that Defendants acted in a coordinated fashion, CVB has not alleged any meeting or discussions or other agreement between the Defendants. The allegations here do not make it plausible that Defendants had an agreement or other conspiracy.

### B.  Interference with CVB's Business Relations/Monopoly

CVB alleges various monopoly claims under Sections 1 and 2 of the Sherman Act.[254] A claim for monopoly under Section 2 of the Sherman Act requires sufficient facts to make it

---

[248] *Res. Ctr.*, 534 F. Supp. at 1213.
[249] *Id.* at 1213.
[250] *See, e.g.*, Amended Complaint at ¶¶ 147, 316, 348.
[251] *In re Commercial Explosives Litigation*, 945 F. Supp. at 1491.
[252] *Id.*
[253] *Id.* at 1492.
[254] Amended Complaint at 64–72.

plausible that Defendants had "(1) monopoly power in the relevant market; (2) willful acquisition or maintenance of this power through exclusionary conduct; and (3) harm to competition."[255] Monopoly power involves the power to control prices and exclude competition.[256] This type of power "can be proven through identification of 'a relevant product and geographic market,' with a showing that the defendant had a sufficient market share and that new competitors would face significant barriers to entry."[257] The Tenth Circuit has also noted that market-share percentages "bear on the existence of monopoly power" but they "are not ordinarily conclusive."[258]

CVB alleges that three of the Defendants (Serta Simmons, Tempur Sealy, and Corsicana) collectively sell over 70 percent of mattresses manufactured in the United States.[259] This allegation tends to make it plausible that at least those three Defendants may have had monopoly power in the mattress market, if they were acting together. But CVB has failed to allege sufficient facts regarding exclusionary conduct. CVB argues that it has alleged that "Defendants conspired to use their combined monopoly power to unlawfully maintain and acquire additional market share."[260] Yet CVB does not provide any supporting facts referencing any alleged conspiracy. CVB cites multiple paragraphs as evidence supporting Defendants' monopoly power.[261] But allegations about monopoly power are irrelevant to the issue of whether

[255] *Digital Ally, Inc. v. Utility Ass'n., Inc.*, 882 F.3d 974, 977 (10th Cir. 2018).
[256] *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1123 (10th Cir. 2014).
[257] *Id.* (citation omitted).
[258] *Id.*
[259] Amended Complaint at ¶ 8.
[260] Opposition at 16.
[261] Opposition at 16 (citing Amended Complaint at ¶¶ 124, 137, 242, 321, 354–55, 363–66, 368).

Defendants maintained this power through exclusionary conduct.[262] This is insufficient to state a claim.

CVB also brings a claim based on conspiracy to monopolize under Section 2 of the Sherman Act. The elements of such a claim are "conspiracy, specific intent to monopolize, and overt acts done in furtherance of the conspiracy."[263] As already noted, CVB fails to allege any conspiracy or agreement between the Defendants. CVB relies on conclusory statements regarding conspiracies.[264] CVB first points to an allegation that refers generally to "Defendants' anticompetitive behavior," but includes no well-pleaded facts for any agreement or conspiracy between Defendants.[265] CVB then turns to a second allegation that similarly contains no supporting facts to make it plausible there was any kind of conspiracy between the Defendants. This allegation summarizes Defendants' alleged actions that "have effectively restrained" competition but does not provide any support for any specific intent to monopolize or any plausible conspiracy between the Defendants.[266]

CVB further argues that it has met the standard for a violation of Section 1 of the Sherman Act.[267] Section 1 "outlaws only unreasonable restraints of trade."[268] A plaintiff alleging a violation of Section 1 "must establish: (1) concerted action in the form of a contract, combination, or conspiracy, and (2) an unreasonable restraint of trade."[269] Thus, by definition, a

---

[262] Amended Complaint at ¶¶ 137 (alleging that "Defendants were insensitive to changes in consumer demand" and failed to take certain actions), 242 (alleging that certain non-parties who were petitioners in the Second Petition were acting on behalf of Tempur Sealy and Serta Simmons).

[263] *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1231 (10th Cir. 2017).

[264] *See* Opposition at 16 (citing Amended Complaint at ¶¶ 313, 356); *see also* Amended Complaint at ¶¶ 369–70.

[265] *See* Amended Complaint at ¶ 313.

[266] *See id.* at ¶ 356.

[267] Opposition at 16.

[268] *United States v. Kemp & Assocs., Inc.*, 907 F.3d 1264, 1272 (10th Cir. 2018) (cleaned up) (citing *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007)).

[269] *Systemcare, Inc. v. Wang Labs. Corp.*, 117 F.3d 1137, 1139 (10th Cir. 1997).

Section 1 claim requires allegations of joint action between two or more parties.[270] In fact, "the essence of a claim of violation of Section 1 of the Sherman Act is the agreement itself."[271] Yet, the Amended Complaint does not contain well-pleaded facts that make it plausible that there was any concerted action to engage in an unreasonable restraint of trade.

CVB alleges that "Defendants have repeatedly offered brick and mortar retailers" money for store remodels "on the condition that the retailer will stop selling CVB products."[272] However, as previously noted, CVB has not alleged sufficient facts to make a conspiracy between the Defendants plausible. This collective reference does not make it plausible that Defendants had any kind of agreement or conspiracy to enter into agreements with retailers to exclude CVB's products.

At best, CVB has alleged two examples of an agreement between a Defendant and a retailer. First, CVB alleges that Defendant Sealy "provided" retailer Bedding Plus "$2 million in exchange for a commitment that Sealy will receive 85% of Bedding Plus's mattress flooring so that the retailer would not feature CVB products."[273] Next, CVB alleges that Defendant Serta paid retailer Reasoner Enterprises "at least $25,000 in exchange" for a commitment that it "would not sell competitor's products priced higher than $499."[274] There are no well-pleaded facts connecting these two events. Without more, these allegations do not make it plausible that there was any kind of agreement to unreasonably restrain trade.[275] Because the allegations do not

---

[270] *Abraham v. Intermountain Health Care Inc.*, 461 F.3d 1249, 1256 (10th Cir. 2006) ("On the other hand, 'unilateral conduct, regardless of its anti-competitive effects, is not prohibited' by § 1 of the Sherman Act" (citation omitted)).

[271] *Llacua*, 930 F.3d at 1174 (cleaned up) (citation omitted).

[272] Opposition at 16–17 n.19; Amended Complaint at ¶ 313.

[273] Amended Complaint at ¶ 314.

[274] *Id.* at ¶ 315.

[275] *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984) ("A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently.").

support a concerted action, the court need not address whether the Amended Complaint properly alleged an unreasonable restraint of trade.

### C.  False Advertising

CVB makes two arguments regarding Lanham Act violations by Defendants. CVB alleges that various press releases and marketing materials conveyed false and/or misleading statements.[276] To assert a false advertising claim under the Lanham Act, CVB must allege facts to make it plausible that "(1) [the] defendant made material false or misleading representations of fact in connection with the commercial advertising or promotion of its product; (2) in commerce; (3) that are either likely to cause confusion or mistake as to (a) the origin, association or approval of the product with or by another, or (b) the characteristics of the goods or services; and (4) injure the plaintiff."[277]

### i.    Defendants' Press Releases

CVB argues that the allegedly defamatory press releases and media campaign are not entitled to immunity because they are not incidental to the petitioning activity.[278] The Supreme Court has stated that "where, independent of any government action, the anticompetitive restraint results directly from private action, the restraint cannot form the basis for antitrust liability if it is '*incidental*' *to a valid effort to influence governmental action*.[279] A publicity campaign "directed at the general public, seeking legislation or executive action, enjoys antitrust immunity even when the campaign employs unethical or deceptive methods. But in less political arenas, unethical and deceptive practices can constitute abuses of administrative or judicial processes

---

[276] Amended Complaint at ¶ 373.
[277] *Intermountain Stroke Ctr., Inc. v. Intermountain Health Care, Inc.*, 638 Fed. App'x 778, 784 (10th Cir. 2016) (unpublished).
[278] Opposition at 4–6.
[279] *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499 (1988) (citing *Noerr*, 365 U.S. at 143) (emphasis added).

that may result in antitrust violations."[280] Some circuit courts have addressed issues relating to whether activity was incidental to the petitioning activity.[281] The Tenth Circuit has not directly addressed the issue but has extended the immunity to individuals who used a media campaign to persuade local officials of their position regarding an issue before those bodies.[282]

At the motion to dismiss stage, all reasonable inferences are made in favor of CVB. CVB alleges that "Defendants engaged in a massive, coordinated public relations campaign designed to smear" CVB[283] and conveyed "false and misleading statements to millions of consumers."[284] This is sufficient at this stage to allege that the press releases were more than a valid effort to influence government action. Accordingly, the court will assume for the purposes of this motion only that the press releases were not incidental to the petitioning activity and therefore not immunized conduct.

As just noted, there are four elements to a Lanham Act violation. The parties disagree on whether the press releases can meet the "commercial advertising or promotion" requirement.[285] However, the parties do not discuss the other three elements of the claim. Even assuming for the purposes of this motion only that the press releases qualify as commercial advertising or

---

[280] *Id.* at 499–500 (citation omitted).

[281] *See Zendano v. Basta, Inc.*, 804 Fed. App'x 803, 804 (9th Cir. 2020) (unpublished) (discussing Ninth Circuit precedent that conduct incidental to prosecution of a lawsuit is immunized if it is "sufficiently related to petitioning activity" (quoting *Sosa v. DIRECTV, Inc.*, 437 F.3d 923 (9th Cir. 2006)); *Venetian Casino Resort, L.L.C. v. N.L.R.B.*, 484 F.3d 601, 611–13 (D.C. Cir. 2007) (relying on *Allied Tube* and analyzing the "context and nature of the activity" to determine whether the pre-litigation activities were protected as "incidental" conduct; *A.D. Bedell Wholesale Co., Inc. v. Philip Morris Inc.*, 263 F.3d 239, 252–53 (3rd Cir. 2001) (noting that "other courts have extended *Noerr-Pennington* immunity to include efforts to influence governmental action incidental to litigation such as prelitigation threat letters" and settlement agreements); *TEC Cogeneration Inc. v. Florida Power & Light Co.*, 76 F.3d 1560, 1571–73 (11th Cir. 1996) (discussing *Allied* and determining the defendant's conduct was immunized under *Noerr-Pennington* and not any exception).

[282] *See Hallco Envtl. Inc. v. Comanche Cnty. Bd. of Cnty. Comm'rs*, 149 F.3d 1190 (Table) *5 (10th Cir. 1998).

[283] Amended Complaint at ¶ 291.

[284] *Id.* at ¶ 373.

[285] *Compare* Motion at 23–24 *with* Opposition at 17–18.

promotion, CVB has not alleged sufficient facts to make it plausible that the press releases "are either likely to cause confusion or mistake as to (a) the origin, association or approval of the product with or by another, or (b) the characteristics of the goods or services."[286]

CVB alleges that Defendants directly made five statements that violated the Lanham Act.[287] Yet none of these statements plausibly allege there was any confusion or mistake about the Defendants' products, which is the third element of a Lanham Act claim. Each of the Defendants' press releases or statements are either summaries of the petitions, opinions on the dumping duties, or summaries of the impact of dumped mattresses on the domestic industry.[288] None of the five statements plausibly cause any confusion or mistake about such goods. Therefore, CVB has not alleged facts to plausibly allege a Lanham Act violation based on the press releases.

CVB also alleges that non-party ISPA published statements about the Petitions.[289] Yet these statements cannot serve as the basis of a Lanham Act violation by Defendants. A Lanham Act violation requires that the "*defendant* made material false or misleading representations."[290] ISPA is not a party to this case. Furthermore, ISPA's press releases were not made by a "defendant who is in commercial competition with plaintiff."[291] ISPA is not a commercial competitor with CVB. Instead ISPA is an association for "innovation and growth across the sleep products industry" and "claims to be 'committed to servicing members through public policy, research, public affairs, education initiatives and more.'"[292] As CVB alleges, ISPA's "mission"

---

[286] *Intermountain Stroke Ctr.*, 638 Fed. App'x at 784.
[287] *See* Amended Complaint at ¶¶ 293, 301–03, 306.
[288] *Id.*
[289] *See id.* at ¶¶ 298, 304–05, 307.
[290] *Intermountain Stroke Ctr.*, 638 Fed. App'x at 784 (emphasis added).
[291] *Strauss*, 951 F.3d at 1267.
[292] Amended Complaint at ¶ 296.

is to "[l]ead and advance the interests of the sleep products industry."[293] Therefore, any press release issued by ISPA cannot support a claim against Defendants, at least not on the facts alleged by the Amended Complaint.

ii.   Defendants' Marketing Claims

CVB also alleges "Defendants regularly misrepresent their products as being 'Made in America' despite the fact that they contain significant componentry and finished products that are imported."[294] It further alleges that Defendants have "misleading[ly] characterized their products as Made in America" even though import records show that "Defendants import goods and components" from various countries.[295] And lastly, CVB alleges that "Defendants are aware that 'Made in the USA' is a term of art constructed by the Federal Trade Commission and various state laws."[296]

Like many other allegations in the Amended Complaint, the supporting allegations are improper collective pleading. CVB alleges that "Defendants" regularly misrepresent their products without identifying any supporting facts.[297] CVB does not specify which "Defendants" import goods and components from other countries. Nor is any specific product identified. And as CVB acknowledges, there are specific definitions and meanings associated with the claim of a product being "Made in the United States."[298] The Federal Trade Commission determined that it is an unfair or deceptive practice, "to label any product as Made in the United States unless the final assembly of the product occurs in the United States, all significant processing that goes into

---

[293] *Id.*
[294] *Id.* at ¶ 318.
[295] *Id.* at ¶ 336.
[296] *Id.* at ¶ 337.
[297] *Id.* at ¶ 318
[298] *Id.* at ¶ 337.

the product occurs in the United States, and all or virtually all ingredients or components of the product are made and sourced in the United States."[299]

CVB makes general references to "significant componentry and finished products that are imported."[300] CVB also generally alleges that "import records show that Defendants import goods and components from China, Vietnam, Turkey, Malaysia, Indonesia, and Thailand."[301] In essence, CVB alleges some facts about imports and Defendants' unidentified products but does not link them together in a way that make it plausible that unspecified Defendants are falsely advertising the unidentified products as "Made in America." CVB's allegations amount to an oblique assertion that "Defendants" sell "products" that should not be designated as "Made in America." Such collective pleading is improper. And while extensive specific facts are not required under Rule 8, some supporting facts are.

### III.   CVB'S STATE LAW CLAIMS FAIL.

#### A.   *Intentional Interference with Prospective Business Relations*[302]

To establish a claim of intentional interference with prospective business relations, CVB must plead facts to make it plausible that: (1) Defendants intentionally interfered with its existing or potential economic relations, (2) for an improper purpose or by improper means, (3) causing injury to CVB.[303] The parties' dispute is whether CVB has alleged sufficient facts to make it plausible that Defendants' actions were improper means.[304] CVB incorrectly argues that it can

---

[299] 16 C.F.R. § 323.2.

[300] Amended Complaint at ¶ 318.

[301] *Id.* at ¶ 336.

[302] The Amended Complaint refers to this as "intentional interference with prospective economic advantage." *Id.* at 74. But in briefing, CVB refers to this as "intentional interference with prospective business relations." *See* Opposition at 20. The court uses the term as acknowledged by the parties in the briefing and identified in the case law.

[303] *Giusti v. Sterling Wentworth Corp.*, 201 P.3d 966, 979 (Utah 2009).

[304] *See* Opposition at 20–22.

satisfy the element by pleading only improper purpose, relying on *Anderson Development Company v. Tobias*.[305] The Utah Supreme Court has made clear that the improper purpose test should be abandoned.[306] It determined that "improper purpose, *in the absence of any improper means*, should not be a basis for tortious interference liability."[307]

Improper means exist where the "defendant's means of interference was contrary to statutory, regulatory, or common law or violated an established standard of a trade or profession."[308] CVB argues that Defendants did not have "the right to file sham petitions or to fraudulent statements made outside of the petitioning activity, and bribery and defamatory statements are unquestionably improper."[309] As discussed above, the sham petition exception does not apply here as the petitioning was not objectively baseless. Defendants are entitled to immunity for engaging in the petitioning activity. And, as detailed above, even if a fraud exception to immunity exists, CVB has not alleged facts invoking such an exception. Therefore, these actions cannot be the basis for "improper means." As will be discussed below, CVB has not alleged sufficient facts to show any defamation, so those actions cannot be improper means. The last unexplored possibility is alleged "bribery" or paying retailers not to carry CVB's products; this was discussed above in the context of a Sherman Act violation.[310] CVB must allege facts that this was contrary to statutory, regulatory, or common law.

Regarding the alleged "bribery," CVB must allege facts making it plausible that this was something more than an exclusivity agreement between two specific Defendants and the two

---

[305] 116 P.3d 323 (Utah 2005).

[306] *Eldridge v. Johndrow*, 345 P.3d 553, 561 (Utah 2015); *see also SCO Group, Inc. v. Int'l Bus. Machs. Corp.*, 879 F.3d 1062, 1081 n.18 (10th Cir. 2018) (noting that *Eldridge* "changed the law by repudiating the improper-purpose alternative and requiring improper means to establish a claim for tortious interference.").

[307] *Eldridge*, 345 P.3d at 561 (emphasis added).

[308] *Harvey v. Ute Indian Tribe of Uintah & Ouray Reservation*, 416 P.3d 401, 425 (Utah 2017).

[309] Opposition at 21.

[310] Amended Complaint at ¶¶ 313–15.

retailers. CVB alleges that Defendant Sealy provided a Louisiana retailer $2 million "in exchange for a commitment that Sealy will receive 85% of Bedding Plus's mattress flooring so that the retailer would not feature CVB products."[311] CVB also alleges that Defendant Serta paid a retailer "at least $25,000" in exchange for the retailer's commitment "that it would not sell competitor's [sic] products price higher than $499."[312] Without more, these facts do not make it plausible that this was bribery or anything other than a legitimate exclusivity agreement.[313] As the Tenth Circuit has long noted, "as a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'"[314] Therefore, exclusivity agreements are "not deemed per se illegal."[315]

So, to show the two agreements with the two retailers were contrary to law and can be "improper means," CVB must allege facts that make it plausible that the "particular arrangement unreasonably restricts the opportunities" for competition.[316] This requires the same analysis addressed above regarding a violation of Section 1 of the Sherman Act. For the same reasons already stated, CVB has not plead sufficient facts to make it plausible that the agreements were improper or otherwise violated Section 1 of the Sherman Act. CVB has not alleged facts to make it plausible that these actions were "improper means" required to support a tortious interference claim, so the claim fails.

---

[311] *Id.* at ¶ 314.

[312] *Id.* at ¶ 315.

[313] *See Monsanto*, 465 U.S. at 761 ("A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently.").

[314] *Verizon Commc'ns Inc. v. Law Offices. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) (citation omitted) (alteration in original).

[315] *Perington Wholesale, Inc. v. Burger King Corp.*, 631 F.2d 1369, 1374 (10th Cir. 1979); *see also ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 271 (3rd Cir. 2012) ("Due to the potentially procompetitive benefits of exclusive dealing agreements, their legality is judged under the rule of reason.").

[316] *Perington Wholesale, Inc. v. Burger King Corp.*, 631 F.2d 1369, 1374 (10th Cir. 1979).

### B.  Defamation

Defamation requires allegations making it plausible that (1) Defendants published statements; (2) the statements were false; (3) the statements were not subject to any kind of privilege; (4) the statements were published with the requisite degree of fault; and (5) the statements resulted in damages.[317] As addressed above, Defendants' alleged false statements to Commerce and the ITC during the investigations of the Petitions are subject to immunity.[318] Other allegations in the Amended Complaint refer to statements made by a non-party to the case, ISPA.[319] Those statements fail at the first step as they are not published or made by the Defendants.[320] So, the court addresses the other allegedly defamatory statements related to press releases and other statements by Defendants.[321]

The Amended Complaint alleges the press releases "amplified the false information" made during the investigations.[322] CVB does not dispute that the statements and press releases do not name CVB directly.[323] Instead, CVB argues that it is identifiable as a particular "class," and the statements directly targeted CVB.[324] The Utah Supreme Court has determined that "a party must show that the statements 'refer to some ascertained or ascertainable person.'"[325] A party can do so "by directly being named or so intended from the extrinsic facts and

---

[317] *Jacob v. Bezzant*, 212 P.3d 535, 543 (Utah 2009).

[318] *See, e.g.*, Amended Complaint at ¶¶ 295, 301, 302.

[319] *See id.* at ¶¶ 298, 304, 305, 307.

[320] CVB alleges that "ISPA is controlled by Defendants." This is supported only by conclusory allegations. *See, e.g.*, Amended Complaint at ¶ 297 ("In reality, ISPA is controlled by Defendants and functions to protect the dominance of legacy manufacturers."). CVB also alleges that Defendants "had ISPA publish an article." *Id.* at ¶ 305. But as the Amended Complaint alleges, ISPA, not Defendants, published the statements. *See, e.g., id.* at ¶¶ 298, 305, 307.

[321] As noted early, accepting all reasonable inferences in CVB's favor, and for the purposes of this motion only, the court assumes the press releases are not incidental to the petitioning activity and not subject to *Noerr-Pennington* or Petition Clause immunities.

[322] Amended Complaint at ¶¶ 390, 393.

[323] *See* Opposition at 22–23.

[324] *Id.*

[325] *Pratt v. Nelson*, 164 P.3d 366, 382 (Utah 2007) (citation omitted).

circumstances.'"[326] Furthermore, where the statements "appear to apply 'to a particular class of individuals, and are not specifically defamatory of any particular member of the class, an action can still be maintained by any individual of the class who *may be able to show the words referred to himself*."[327] The party must "satisfy the jury that the *words referred especially to himself*."[328] However, if "the defamatory matter has no special application and is so general that no individual damages can be presumed, and the class referred to is so numerous that great vexation and oppression might grow out of a multiplicity of suits, no private suit can be maintained."[329]

CVB argues that as "the respondent in Defendants' petitioning activity, CVB is the intended subject of statements."[330] However, CVB was not a foreign mattress producer accused of dumping.[331] Nor is CVB even listed as a participating respondent in the First Petition's proceedings.[332] Yet CVB alleges it was defamed because the press releases "alleged dumping margins of over 1,777 percent."[333] But there is no reference to any group other than the petitioners (including seven of the Defendants)[334] who filed the First Petition. CVB has not explained or alleged how this statement plausibly refers to CVB.

---

[326] *Id.* (citation omitted).

[327] *Id.* (citation omitted) (emphasis added).

[328] *Id.* (citation omitted) (emphasis added).

[329] *Id.* (citation omitted).

[330] Opposition at 23.

[331] *See* Amended Complaint at ¶ 172 (alleging the First Petition alleged "imports of mattresses from China were being, or were likely to be sold" at less than fair market value).

[332] ITC First Petition Final Determination at 3–4. CVB's own allegations support this. It alleged that one of its suppliers was alleged to be dumping mattresses. *See* Amended Complaint at ¶ 174. The Amended Complaint also makes it clear that the petition was about the imports of mattresses from China, not against CVB specifically. *See* Amended Complaint at ¶¶ 172, 175, 184–185.

[333] Amended Complaint at ¶ 293.

[334] *Id.* at ¶ 172 (listing the petitioners as Corsicana, Leggett & Platt, ECS, Future Foam, FXI, Serta Simmons, Tempur Sealy, Kolcraft ("a seller of Tempur Sealy Mattresses for babies and children"), and Innocor); *see also id.* (noting that FXI merged with Innocor after filing the First Petition).

The other allegations about statements relating to the First Petition also lack a reference to CVB. CVB alleges the Defendants issued a press release stating, in part, that they were "thrilled that Commerce has confirmed that Chinese Producers are relying on significant dumping margins to unfairly compete in the US market with margins as high as 1,731.75 percent" and references Commerce's preliminary determination.[335] CVB argues that it is included in the reference as a "Chinese Producer."[336] CVB makes a similar argument as to another allegation which refers to a statement by the President of Defendant ECS that "Today's announcement and the collection of dumping duties are necessary steps to allow us and the whole US mattress industry to compete on a level playing field with Chinese Producers."[337] Yet, according the facts alleged in the Amended Complaint, CVB is not a Chinese Producer.[338] Simply put, CVB has supplied no facts making it plausible that the term "Chinese Producer" referred to it. CVB makes no arguments that plausibly support a conclusion that when the press releases mentioned Chinese Producers, they really referred to CVB. This is insufficient to make it plausible that any press release about the First Petition referred to CVB.

Furthermore, CVB has not alleged sufficient facts to make it plausible that the statement in the press release on the First Petition was false. Commerce's Final Determination on the First Petition did find dumping margins as high as 1,731,75 for the "China-wide entity."[339] And CVB does not argue or otherwise support that the statement by Defendant ECS was false, only that it referred to CVB.[340]

---

[335] *Id.* at ¶ 301.
[336] Opposition at 23.
[337] Amended Complaint at ¶ 302.
[338] *See, e.g.*, Amended Complaint at ¶¶ 12 ("CVB is family-owned and based in Utah. CVB has locations in Ohio, North Carolina, California[,] and Texas, and employs over 1,000 employees."), 15 ("CVB purchases each Mattress In A Box that it sells from various manufacturers located both domestically and globally.").
[339] Commerce First Petition Final Affirmative Determination at 4.
[340] Opposition at 23.

The allegations regarding the press releases on the Second Petition are deficient in similar ways. However, unlike with the First Petition, CVB was a participating respondent in the Second Petition. The ITC noted that "[s]everal respondent entities participated" in the investigation process, including Ashley Furniture, Classic Brands, CVB, Night & Day Furniture, and Cozy Comfort.[341] So, CVB is listed as a respondent entity but was not an entity accused of dumping.[342] Again, as already noted, CVB is not a foreign mattress producer, but does, or did, import mattresses from one or more of the countries at issue in the Second Petition.[343]

CVB alleges that after filing the Second Petition, the Defendants issued a press release referencing "the false allegations regarding dumping margins" and stating that the two Petitions "establish the negative impact surging volumes of low-priced dumped and subsidized imports from these countries have caused" to the domestic industry.[344] But this allegation does not mention any identifiable group and only summarizes the petitions. CVB makes the conclusory argument that the statement is about it, but there is no support to link this statement directly or indirectly to any false statement about CVB.[345]

Similarly, CVB alleges Defendants issued a second press release about the Second Petition. That statement said, in part, "Since 2017, more than 40 American mattress manufacturers have been forced to close their doors due to these massive increases in the volume of unfairly traded imports-negatively impacting thousands of American workers across the entire country."[346] The statement contains no reference, direct or indirect, to CVB. Nor has CVB provided any argument for how that statement relates to it. CVB's only argument is the

---

[341] ITC Second Petition Final Determination at 3.
[342] Amended Complaint at ¶ 239.
[343] *See id.* at ¶¶ 12, 15, 236–37.
[344] *Id.* at ¶ 303.
[345] Opposition at 23.
[346] Amended Complaint at ¶ 306.

conclusory statement that it is "the intended subject" of this statement.[347] The statement is a summary of the harm allegedly suffered by the domestic industry, but it does not reference the Second Petition or any entity. This is insufficient to show the statement plausibly referred especially to CVB.

## CONCLUSION

Based on the foregoing, the Motion is granted. Defendants are entitled to immunity on CVB's claims for relief one through six that are based on the petitioning activity. These claims are dismissed with prejudice. The Sherman Act and Lanham Act claims based on actions outside the petitioning activity: the claims based on interference with CVB's business relations, price fixing, and false advertising are dismissed without prejudice. Lastly, CVB's claims for intentional interference with prospective business relations and defamation are also dismissed without prejudice.

Signed May 23, 2022.

BY THE COURT

David Barlow
United States District Judge

---

[347] Opposition at 23.