Jeffrey D. Steed, J.D., LL.M (Bar No. 11774)
**CVB, INC.**
1525 W 2960 S
Logan, UT 84321
Telephone: 800-517-7179
Email: jeff.steed@maloufcompanies.com

Stephen G. Larson (admitted *pro hac vice*)
Paul A. Rigali (admitted *pro hac vice*)
**LARSON LLP**
555 South Flower Street, 30th Floor
Los Angeles, California 90071
Telephone: (213) 436-4888
Facsimile: (213) 623-2000
Email: slarson@larsonllp.com; prigali@larsonllp.com

*Attorneys for Plaintiff CVB, Inc.*

## UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| CVB INC.,<br><br>    Plaintiff,<br>   v.<br><br>CORSICANA MATTRESS COMPANY, ELITE COMFORT SOLUTIONS, INC., FUTURE FOAM, INC., FXI HOLDINGS, INC., LEGGETT & PLATT, INC., SERTA SIMMONS BEDDING, LLC, TEMPUR SEALY INTERNATIONAL, INC., BROOKLYN BEDDING, INC., and INTERNATIONAL SLEEP PRODUCTS ASSOCIATION,<br><br>    Defendants. | **SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>CIVIL NO: 1:20-cv-00144-DBB-DAO<br><br>Judge David Barlow |

**COMPLAINT**

Plaintiff CVB, Inc. ("CVB") brings this action for damages and permanent injunctive relief against Defendants Corsicana Mattress Company ("Corsicana"); Elite Comfort Solutions, Inc. ("ECS"); Future Foam, Inc. ("Future Foam"); FXI Holdings, Inc. ("FXI"); Leggett & Platt, Inc. ("Leggett & Platt"); Serta Simmons Bedding, LLC ("Serta Simmons"); Tempur Sealy International, Inc. ("Tempur Sealy"); Brooklyn Bedding, Inc. ("Brooklyn Bedding"), and the International Sleep Products Association ("ISPA") (collectively, "Defendants"). CVB complains and alleges as follows:

## I.       INTRODUCTION

1.        This is a civil action against Defendants for conspiring to restrain trade and for conspiring to monopolize, attempting to monopolize, and monopolizing markets related to the sale of mattresses in the United States in violation of federal and state antitrust laws.  As set forth below, Defendants illegally conspired to use and preserve their dominant positions in markets related to the sale of mattresses and mattress components in the United States and violated federal and state antitrust laws.

2.        Defendants' conspiracy reflects a multi-prong strategy designed to injure CVB by repeatedly making fraudulent statements to the general public and public agencies, including consumers and suppliers with whom CVB does business, and other anticompetitive conduct unrelated to their petitioning activity.  To date, Defendants' misconduct is succeeding in thwarting competition. They have harmed CVB and competition in the Mattress market by stifling innovation and permitting Defendants to maintain supracompetitive prices for mattresses sold in the United States.

3.      Consumers in the United States spend approximately $15 billion per year on mattresses. A mattress ("Mattress") is most commonly a rectangular pad or mat with a supportive core made of metal springs, foam, and/or other resilient filling covered in fabric to provide support to a reclining body.

4.      Traditionally in the United States, Mattresses were sold on a made-to-order basis in an uncompressed form ("Flat-Pack Mattress(es)"). More recently, the growing trend is towards Mattresses that are sold compressed, rolled, and in a box ("Mattress(es) In A Box," "Bed(s) In A Box," or "Compressed Mattress(es)").

5.      This case involves unfair competition in the markets for Mattresses, generally, as well as in the markets for Flat-Pack Mattresses and Mattresses In A Box, respectively.

6.      Defendants dominate and control the markets for manufacture and sale of Flat-Pack Mattresses, specifically, and Mattresses, generally, in the United States, as well as the manufacture and sale of the component parts that are used in Flat-Pack Mattresses and Mattresses In A Box, respectively, that are sold in the United States.

7.      Collectively, Defendants sell over seventy percent of the Flat-Pack Mattresses sold in the United States, and constitute and control the country's largest trade association of mattress manufacturers and retailers.

8.      Defendants Serta Simmons, Tempur Sealy, and Corsicana collectively sell over seventy percent of the Mattresses manufactured in the United States.

9.      Mattresses contain either (a) metal innersprings covered by upholstery or padding materials; (b) various types of foams, including viscoelastic polyurethane foam, latex foam, low-resilience polyurethane foam, or gel-infused viscoelastic foam; or (c) a combination of metal springs, foam and other componentry.

10.     Defendant Leggett & Platt is the predominant seller of the metal innersprings that are used in Mattresses sold in the United States.

11.     Upon information and belief, Defendants Leggett & Platt, FXI, and Future Foam supply a large and dominant share of the foam used in Mattresses sold in the United States.

12.     CVB is a relative newcomer to the market for Mattresses in the United States. For over seventeen years, CVB has designed, manufactured, distributed, and sold sleep products, including Mattresses. CVB is family-owned and based in Utah. CVB also has locations in Ohio, North Carolina, California and Texas, and employs over 1,000 employees. CVB typically sells Mattresses In A Box to e- commerce retailers, such as Amazon, Wayfair, and Walmart. CVB also sells its Mattresses In A Box to big box stores like Walmart and Target and to thousands of specialty retailers throughout the United States.

13.     Consumer demand for Mattresses has increased in recent years. The U.S. Mattress Market has been characterized by a significant increase in consumer demand in channels that primarily sell Mattresses In A Box, such as E-commerce retailers, whereas consumer demand through channels that primarily sell Flat-Pack Mattresses, such as brick and mortar retailers, has stagnated.

14.     Mattresses In A Box are primarily, though not exclusively, sold through e-commerce channels, whereas Flat-Pack Mattresses are more commonly sold in brick and mortar retail stores.

15.     CVB purchases each Mattress In A Box that it sells from various manufacturers located both domestically and globally. CVB sells high-quality Mattresses that target a wide range of price points.

16.     CVB was one of the first companies to recognize the burgeoning demand for Mattresses In A Box and to develop the resources and expertise necessary to sell such Mattresses via E-commerce.

17.     CVB has made a substantial investment and developed resources in efficient manufacturing, production, and distribution technologies to compete successfully in selling Mattresses In A Box. These technologies are beneficial to consumers and give CVB a competitive advantage in the sale of Mattresses In A Box, both domestically and globally.

18.     Defendants, which historically sold their Mattresses in brick-and-mortar retail stores, were late to the game in developing the acumen and resources to effectively manufacture and sell Mattresses In A Box in the E-commerce marketplace. Consequently, Defendants lost market share to CVB and other sellers of Mattresses In A Box in the Mattress In A Box Market, specifically, and the Mattress Market, generally, as well as in the markets for components parts for Mattresses. Thus, while Defendants could have made some effort to manufacture and sell Mattresses In A Box in the E-commerce marketplace to meet rising consumer demand for Mattresses In A Box, Defendants' initial efforts to do so were minimal at best.

19.     Defendants did not make the necessary investments to meet competitive pressures, failed to incorporate technological innovations in their manufacturing processes and product designs, respectively, and were insensitive to changes in consumer tastes.

20.     Falling far behind CVB and other competitors and threatened by the loss of market share, Defendants conspired to cut off CVB's and other competitors' sources of supply by perpetuating false narratives and disseminating false information about CVB and CVB's suppliers.

21.     Defendants made fraudulent statements, including allegations of grossly exaggerated dumping margins that Defendants knew to be false. While prosecuting the fraudulent antidumping petitions, Defendants also doubled down on their strategy to mislead the International Trade Court ("ITC") with respect to key issues through demonstrably fraudulent submissions, including testimony that Defendants were the "first" to manufacture, market, and/or sell Mattresses In A Box in large numbers.

22.     Defendants also issued press releases concurrent with their fraudulent petitioning activity specifically for anticompetitive purposes.  In doing so, Defendants publicized their fraudulent petitions in order to immediately intimidate CVB and its suppliers and manipulate public sentiment notwithstanding the petitioning outcome.  This conduct was specifically designed to mislead consumers and suppliers in order to injure CVB and competition.

23.     These overt acts were part of Defendants' conspiracy to cause immediate uncertainty about the availability of future supply, future prices, future costs, and potential liabilities, and to cause industry participants to incur legal fees to comply with the investigations. To date, their conspiracy is working. Among other things, Defendants' misrepresentations to government agencies and their fraudulent petitions deceived the ITC, leading to antidumping restrictions affecting CVB's manufacturers.

24.     Therefore, Defendants' scheme to restrain trade raised prices and/or artificially maintained supracompetitive prices, and caused significant harm to competition and consumers. Defendants conspired to violate Sections 1 & 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and various state antitrust and unfair competition laws, as alleged in this Complaint. As a result of the conspiracy, CVB was injured and Defendants illegally profited as a result.

25.     CVB seeks treble damages and injunctive relief.

## II.    THE PARTIES

### A.    CVB

26.    CVB is a Utah benefit corporation with its principal place of business in Nibley, Utah. Since its inception in 2003, CVB supplies high-quality, innovative bedding products. In addition to offering cutting-edge Mattresses, CVB made inroads into the Mattress In A Box Market, specifically, and the Mattress Market, generally, due to exceptional customer service, proprietary logistics technologies and software, quick shipping in less than two days, and its investment in several million square feet of industrial warehousing. U.S. customers have benefited from these investments because CVB can hold more ready-to-ship Mattress inventory than Defendants.

27.    At present, CVB owns or leases-to-own over six million square feet of industrial warehousing in the United States by virtue of various strategically located distribution centers. CVB owns and operates locations in Utah, Ohio, North Carolina, California, and Texas, with over 1,000 employees, most of whom reside in Utah. CVB also operates a Section 509(a)(1) public charity with the mission to fight child exploitation and to end child sex trafficking. CVB is the largest Certified B Corporation located in Utah, receiving B Lab's coveted certification in 2019.

### B.    **Defendants**

#### 1.    Corsicana

28.    Corsicana is a corporation organized under the laws of the State of Delaware with a principal place of business in Corsicana, Texas.

29.    Corsicana was founded in 1971, and it operates ten factories across the country.

Corsicana claims that it is "one of the Mattress industry's largest manufacturers." Corsicana announced that it recently shipped its "100 millionth unit."

30.     Corsicana supplies Mattresses to consumers in the United States, including Flat-Pack Mattresses and Mattresses In A Box. On information and belief, Corsicana's Mattress In A Box sales were, at all relevant times, extremely small relative to its Flat-Pack Mattress sales in the United States.

31.     Corsicana claims that it has annual sales of roughly $460 million.

### 2.     ECS

32.     ECS is currently a business unit of Leggett & Platt based in Newman, Georgia. Leggett & Platt acquired ECS for $1.25 billion in cash in January 2019.

33.     ECS operates sixteen facilities across the United States. ECS claims that it is a leader in proprietary foam technology used in Mattresses and sells finished Mattresses and Mattress components.

34.     Leggett & Platt states that ECS sells finished Mattresses "through both traditional and online channels," and "has a diversified customer mix and a strong position in the high-growth compressed Mattress market segment."

35.     Leggett & Platt's acquisition of ECS in 2019 eliminated competition between the two former competitors.

### 3.     Future Foam

36.     Future Foam is a corporation organized under the laws of the State of Nebraska with a principal place of business in Council Bluffs, Iowa.

37.     Future Foam was incorporated in or around 1959 and operates thirty facilities in the United States.

38.     Future Foam is a major supplier of polyurethane foam that is used in Mattresses.

39.     Future Foam supplies memory foam and gel memory foam used in several different Mattress brands, including ComforPedic from Beautyrest, which is a brand owned by Serta Simmons.

### 4.     FXI

40.     FXI is a corporation organized under the laws of the State of Delaware with a principal place of business in Radnor, Pennsylvania.

41.     FXI is a major supplier of polyurethane foam that is used in Mattresses.

42.     On March 4, 2019, FXI agreed to acquire Innocor, Inc. ("Innocor") for $850 million. After an investigation by the U.S. Federal Trade Commission ("FTC"), the FTC approved a final order settling allegations that the merger of FXI and Innocor would substantially lessen competition in three regional markets for low-density conventional polyurethane foam that is used in home furnishings. The settlement required the merged entity to divest three polyurethane foam pouring and fabrication facilities to Future Foam.

### 5.     Leggett & Platt

43.     Leggett & Platt is a corporation organized under the laws of the State of Missouri with a principal place of business in Carthage, Missouri.

44.     Leggett & Platt was founded in 1883 and claims to have been "a pioneer of the steel coil bedspring." Leggett & Platt supplies "a variety of components and machinery used by bedding manufacturers in the production and assembly of their finished products, as well as produce[s] private-label finished Mattresses for bedding brands and retailers."

45.     Leggett & Platt believes that it is the "largest U.S.-based manufacturer, in terms of revenue, of the following: Bedding components, Specialty bedding foams and private-label finished Mattresses, and Bedding industry machinery," among other product lines.

46.     Leggett & Platt is a major supplier of Mattress components to a number of the Defendants, including Serta Simmons and Tempur Sealy.

47.     Leggett & Platt has been a defendant in numerous antitrust cases related to allegations of anticompetitive behavior related to Leggett & Platt's foam supply operations.

### 6.      Serta Simmons

48.     Serta Simmons is a corporation organized under the laws of the State of Delaware with a principal place of business in Doraville, Georgia.

49.     Serta Simmons claims to be the largest manufacturer, marketer, and supplier of Mattresses in North America, and it owns three of the dominant Mattress brands: Serta, Simmons and Beautyrest.

50.     In September 2018, Serta Simmons acquired Tuft & Needle, a direct-to-consumer Mattress In A Box brand.

51.     Serta Simmons's acquisition of Tuft & Needle eliminated competition between the former competitors.

52.     Serta Simmons operates more than thirty manufacturing plants throughout the United States and Canada.

### 7.      Tempur Sealy

53.     Tempur Sealy was formed in 2013, when leading U.S. Mattress supplier, Tempur-Pedic, purchased its rival, Sealy, for approximately $1.3 billion.

54.     Tempur Sealy is a corporation organized under the laws of the State of Delaware with a principal place of business in Lexington, Kentucky.

55.     Tempur Sealy is a global bedding company that develops, manufactures and markets bedding products, including Mattresses.

56.     Tempur Sealy claims to be the world's largest bedding provider. Tempur Sealy states it has "strong brands," including Tempur, Tempur-Pedic, Cocoon by Sealy, Sealy, and Stearns & Foster.

57.     In January 2020, Tempur Sealy announced that it had acquired a majority ownership interest in an entity containing substantially all of the assets of Sherwood Acquisition Holdings, LLC ("Sherwood Bedding") for approximately forty million dollars. Sherwood Bedding claims it is the fifth largest bedding manufacturer, including Mattresses, in America.

58.     Tempur Sealy's acquisition of Sherwood Bedding eliminated competition between the former rivals.

### 8.     Brooklyn Bedding

59.     Brooklyn Bedding is a corporation organized under the laws of the State of Arizona with its principal place of business in Phoenix, Arizona.

60.     Brooklyn Bedding manufactures and sells Mattresses In A Box to consumers in the United States.

61.     Brooklyn Bedding claims to have been selling Mattresses in the United States since around 1995.

### 9.     ISPA

62.     The International Sleep Products Association, known as ISPA, is an unincorporated trade association with its principal place of business in Alexandria, Virginia.

63.     ISPA works to elevate the image of the industry for sleep products, and claims to fight for manufacturers' common interests and to disseminate "vital" information regarding the sleep products industry.

### III.   JURISDICTION AND VENUE

64.   This Court has subject-matter jurisdiction over the First through Fifth Claims for Relief, which seek relief pursuant to Section 3 of the Clayton Act (15 U.S.C. § 14), Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2), and Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)), pursuant to 15 U.S.C. § 15 and 28 U.S.C. §§ 1331, 1337.

65.   This Court has diversity jurisdiction over all CVB's claims for relief under 28 U.S.C. § 1332. CVB is a citizen of Utah, and, as explained above, none of the Defendants are citizens of the Utah. Accordingly, CVB's citizenship is completely diverse from all defendants in this action. Further, the amount in controversy exceeds $75,000 dollars.

66.   This Court also has jurisdiction over CVB's remaining state law claims pursuant to the doctrine of supplemental jurisdiction under 28 U.S.C. § 1367 because CVB's state law claims arise from the same transactions or occurrences and share a common nucleus of operative facts with the federal claims for relief.

67.   This Court has personal jurisdiction over Defendants pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22.

68.   Corsicana regularly does and solicits substantial business in Utah, either directly or through intermediaries, is continuously and systematically present in Utah, and has established minimum contacts with Utah, in particular by doing substantial business in Utah. In light of Corsicana's substantial contacts with Utah, the exercise of jurisdiction over Corsicana would not offend traditional notions of fair play and substantial justice. Furthermore, Corsicana's unlawful conduct alleged herein was directed at, and had the intended effect of, causing injury to CVB and consumers in this District.

69.     ECS regularly does and solicits substantial business in Utah, either directly or through intermediaries, is continuously and systematically present in Utah, and has established minimum contacts with Utah, in particular by doing substantial business in Utah. In light of ECS's substantial contacts with Utah, the exercise of jurisdiction over ECS would not offend traditional notions of fair play and substantial justice. Furthermore, ECS's unlawful conduct alleged herein was directed at, and had the intended effect of, causing injury to CVB and consumers in this District.

70.     Future Foam regularly does and solicits substantial business in Utah, either directly or through intermediaries, is continuously and systematically present in Utah, and has established minimum contacts with Utah, in particular by doing substantial business with third parties in Utah. In light of Future Foam's substantial contacts with Utah, the exercise of jurisdiction over Future Foam would not offend traditional notions of fair play and substantial justice. Furthermore, Future Foam's unlawful conduct alleged herein was directed at, and had the intended effect of, causing injury to CVB and consumers in this District.

71.     FXI regularly does and solicits substantial business in Utah, either directly or through intermediaries, is continuously and systematically present in Utah, and has established minimum contacts with Utah, in particular by doing substantial business in Utah. In light of FXI's substantial contacts with Utah, the exercise of jurisdiction over FXI would not offend traditional notions of fair play and substantial justice. Furthermore, FXI's unlawful conduct alleged herein was directed at, and had the intended effect of, causing injury to CVB and consumers in this District.

72.     Leggett & Platt regularly does and solicits substantial business in Utah, either directly or through intermediaries, is continuously and systematically present in Utah, and has

established minimum contacts with Utah, in particular by doing substantial business in Utah. In light of Leggett & Platt's substantial contacts with Utah, the exercise of jurisdiction over Leggett & Platt would not offend traditional notions of fair play and substantial justice. Furthermore, Leggett & Platt's unlawful conduct alleged herein was directed at, and had the intended effect of, causing injury to CVB and consumers in this District.

73.   Serta Simmons regularly does and solicits substantial business in Utah, either directly or through intermediaries, is continuously and systematically present in Utah, and has established minimum contacts with Utah, in particular by doing substantial business in Utah. In light of Serta Simmons's substantial contacts with Utah, the exercise of jurisdiction over Serta Simmons would not offend traditional notions of fair play and substantial justice. Furthermore, Serta Simmons's unlawful conduct alleged herein was directed at, and had the intended effect of, causing injury to CVB and consumers in this District.

74.   Tempur Sealy regularly does and solicits substantial business in Utah, either directly or through intermediaries, is continuously and systematically present in Utah, and has established minimum contacts with Utah, in particular by doing substantial business in Utah. In light of Tempur Sealy's substantial contacts with Utah, the exercise of jurisdiction over Tempur Sealy would not offend traditional notions of fair play and substantial justice. Furthermore, Tempur Sealy's unlawful conduct alleged herein was directed at, and had the intended effect of, causing injury to CVB and consumers in this District.

75.   Brooklyn Bedding regularly does and solicits substantial business in Utah, either directly or through intermediaries, is continuously and systematically present in Utah, and has established minimum contacts with Utah, in particular by doing substantial business in Utah. In light of Brooklyn Beddings' substantial contacts with Utah, the exercise of jurisdiction over

Brooklyn Bedding would not offend traditional notions of fair play and substantial justice. Furthermore, Brooklyn Beddings' unlawful conduct alleged herein was directed at, and had the intended effect of, causing injury to CVB and consumers in this District.

76.     ISPA regularly does and solicits substantial business in Utah, either directly or through intermediaries, including but not limited to its members, and is continuously and systematically present in Utah, and has established minimum contacts with Utah, in particular by doing substantial business in Utah. In light of ISPA's substantial contacts with Utah, the exercise of jurisdiction over ISPA would not offend traditional notions of fair play and substantial justice. Furthermore, ISPA's unlawful conduct alleged herein was directed at, and had the intended effect of, causing injury to CVB and consumers in this District.

77.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and venue is also proper under 28 U.S.C. § 1391 because Defendants transact a substantial amount of business in this District, conspired to exclude and restrain competition in this District, and continue to affect a substantial amount of trade and commerce in this District.

## IV.     FACTUAL ALLEGATIONS

### A.     <u>Relevant Product Markets and Submarkets</u>

78.     There are numerous relevant product markets related to the antitrust claims asserted in this case, including the market for the design, manufacture, and sale of Mattresses In A Box ("Mattress In A Box Market"), the market for the design, manufacture, and sale of Flat-Pack Mattresses ("Flat-Pack Mattress Market"), and the market for the design, manufacture, and sale of Mattresses ("Mattress Market").

### 1.    Mattress Market

79.    A Mattress is most commonly a rectangular pad or mat of fabric, filled with materials such as metal springs, cotton, foam, and latex, to provide support to a reclining body.

80.    Adult Mattresses typically have a width of at least 35 inches, a length of at least 72 inches, and a depth of at least 3 inches and come in various sizes. A single or twin Mattress typically has a width of 38 inches and a length of 75 inches ("Twin Mattress"). A double or full Mattress typically has a width of 54 inches and a length of 75 inches ("Full Mattress"). A queen Mattress typically has a width of 60 inches and a length of 80 inches ("Queen Mattress"). A king Mattress typically has a width of 76 inches and a length of 80 inches ("King Mattress").

81.    Mattresses are supplied for both at home use ("Residential Mattresses") and for use in hotels, resorts, and other lodges ("Commercial Mattresses"). According to published reports, on average, Residential Mattresses are replaced every eight to ten years, whereas Commercial Mattresses are replaced every five to six years.

82.    Innerspring Mattresses use steel coils covered by upholstery or padding materials, including various fibers, foams, and some additional layers of smaller steel springs, for body support ("Innerspring Mattresses").

83.    Non-Innerspring Mattresses do not use any innersprings but instead generally use foams, including viscoelastic polyurethane foam ("Memory Foam"), latex foam, low-resilience polyurethane foam, or gel-infused viscoelastic foam, for body support ("Non-Innerspring Mattresses").

84.    Hybrid Mattresses combine two or more support components, usually Innerspring and Non-Innerspring components ("Hybrid Mattresses").

85.     The four most commonly used coils in Innerspring and Hybrid Mattresses are the Bonnell, Offset, Continuous, and Pocket System.

86.     Traditionally in the United States, Mattresses were most commonly sold on a made-to-order basis in an uncompressed form as a Flat-Pack Mattress. More recently, the growing trend is towards the sale of Mattresses In A Box that are sold compressed, rolled, and in a box.

87.     Upon information and belief, the U.S. Mattress Market generated roughly $15 billion in revenue in 2019.

88.     According to various reports, by age of end consumer, millennials age eighteen to thirty-six are the major purchasers of Mattresses in the United States accounting for approximately thirty percent of sales, and adults age twenty-five to forty-four account for nearly fifty percent of Mattresses purchased in the United States. These age groups are credited with popularizing the -commerce sale of Mattresses in the United States.

89.     E-commerce involves the buying and selling of Mattresses via the internet as well as the transfer of money and data to execute online Mattress transactions and the supply chain management, internet marketing, inventory management systems, and other data systems required to support online Mattress sales ("E-commerce").

90.     Traditionally, brick-and-mortar Mattress specialty stores and furniture stores were the most popular distribution channels for selling Mattresses in the United States.

91.     Introduction of the direct-to-consumer model and the Mattress In A Box concept has resulted in increased sales of Mattresses through E-commerce.

92.     According to the Bureau of Economic Analysis, there has been a rise in disposable income in the United States in recent years. The rise in disposable income, growing

acceptance of E-commerce, the availability of high-quality, affordable Mattresses through the Mattress In A Box concept, and a decrease in the average replacement cycle of a Mattress from nine-to-twelve years to six-to-eight years in the United States have spurred growth in the Mattress Market.

93.     During the COVID-19 pandemic there has been rising demand for Mattresses for use in hospitals and quarantine centers across the United States as well as for Mattresses via E-commerce. Demand in the Mattress Market, generally, and in the Mattress In A Box Market, specifically, has increased in the last year due to COVID-19.

94.     The market for the design, manufacture and sale of Mattresses is a relevant product market.

### 2.     Flat-Pack Mattress Market

95.     Flat-Pack Mattresses are Mattresses that are uncompressed and typically made up of a foundation, a core system of Innersprings, Non-Innersprings, or both, and an upholstery layer on top.

96.     Flat-Pack Mattresses are sold for both residential and commercial use.

97.     Flat-Pack Mattresses are more commonly sold in brick-and-mortar retail stores than through E-commerce.

98.     Due to cost considerations, Flat-Pack Mattresses sold in the United States are typically manufactured in the United States.

99.     Flat-Pack Mattresses are typically made to order. Flat-Pack Mattresses are typically delivered to retailers weeks after purchase, if not later, and are thereafter shipped to consumers via dedicated truck and delivery teams.

100.    Flat-Pack Mattress sales comprise a majority of total Mattress sales in the U.S.

101.    The market for the design, manufacture and sale of Flat-Pack Mattresses is a relevant alternative product market or submarket.

### 3.    Mattress In A Box Market

102.    Mattresses In A Box can have core systems of Innerspring, Non-Innerspring, or both, and are typically compressed, rolled, vacuum sealed, placed in a box and shipped directly to a consumer's door via a common carrier like UPS or FedEx.

103.    Mattresses In A Box are more commonly sold through E-commerce channels than through brick and mortar retail stores.

104.    Because they can be compressed, Mattresses In A Box can be more easily and efficiently stored and carried in inventory by retailers and delivered to consumers within a matter of days after an order is placed.

105.    Because they can be compressed and more easily and efficiently shipped and stored, Mattresses In A Box sold in the United States can be imported by international Mattress manufacturers with better, more efficient cost structures than domestic Mattress manufacturers.

106.    Sales of Mattresses In A Box comprise approximately twenty to twenty-five percent of total Mattress sales in the U.S.

107.    Mattresses In A Box have changed the way Americans buy Mattresses. Flat-Pack Mattress suppliers like Serta Simmons, Tempur Sealy, and Corsicana have been slow to innovate in the Mattress In A Box Market.

108.    Mattress In A Box sales have been increasing substantially over the last ten years, rising from a very small percentage of total Mattress sales to current levels. E-commerce and direct-to-consumer Mattresses are driving increased demand in the United States for Mattresses In A Box.

109.    The direct-to-consumer model and Mattress In A Box concept also offer high-quality Mattresses at more affordable prices with quicker delivery times than traditional Flat-Pack Mattresses.

110.    Innovative sales promotions for Mattresses In A Box, along with the added convenience, accessibility, and affordability of Mattresses In A Box, have increased consumer demand and have incentivized customers to buy new Mattresses more frequently, which has both benefited the traditional Mattress Market, generally, and the Mattresses In A Box Market, specifically.

111.    The market for the design, manufacture and sale of Mattresses In A Box is a relevant alternative product market or submarket.

**B.**    **Relevant Geographic Market**

112.    The relevant geographic market is the United States.

113.    Mattresses, including Flat-Pack Mattresses and Mattresses In A Box, are sold by brick-and-mortar and E-commerce retailers throughout the United States.

114.    Mattress suppliers must have inventory, sales, and support capabilities for their U.S. Customers. Because of these considerations, the options of U.S. customers are limited to Mattress suppliers with a presence in the United States.

115.    Defendants distribute and sell Mattresses throughout the United States.

116.    CVB competes against Defendants in the Mattress Market throughout the United States.

**C.**    **Interstate Commerce**

117.    Defendants manufacture and sell Mattresses, Flat-Pack Mattresses, Mattresses In A Box, and component parts for Mattresses in the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this judicial district.

118.    Defendants' business activities substantially have affected and are affecting interstate commerce in the United States and have caused and continue to cause antitrust injury throughout the United States.

119.    Defendant Corsicana supplies Mattresses to consumers in the United States, including Flat-Pack Mattresses and Mattresses In A Box and has annual sales of roughly $300 million.

120.    Defendant Future Foam does business throughout the United States and claims to operate thirty domestic facilities in roughly eighteen different states within the United States.

121.    Defendant FXI does business throughout the United States and claims to operate thirty-five domestic facilities in roughly twenty-two different states.

122.    Defendant Serta Simmons has more than 10,000 stores through its retail partners throughout the United States and has numerous domestic manufacturing facilities and employs thousands of people in the United States.

123.    Defendant Leggett & Platt does business throughout the United States, and operates eighty-seven manufacturing sites located in the United States. Defendant ECS, one of Leggett & Platt's fifteen business units, claims to operate sixteen domestic facilities and does business and supplies Mattresses and Mattress components throughout the United States.

124.    Defendant Tempur Sealy does business throughout the United States and claims to operate at least twenty-nine domestic facilities.

125.    Defendant Brooklyn Bedding does business throughout the United States. Brooklyn Bedding operates numerous domestic locations in roughly eight different states.

126.    Defendant ISPA is an international trade association that does business in, and promotes the business of its members throughout the United States.

D.    **Defendants' Monopoly Power In The Flat Pack Mattress Market**

127.    Defendants maintain monopoly power in the Flat-Pack Mattress Market as is evident by supracompetitive prices and market dominance.

128.    Defendants Serta Simmons, Tempur Sealy, and Corsicana are the three dominant suppliers of Flat-Pack Mattresses in the United States.

129.    Defendants Serta Simmons, Tempur Sealy, and Corsicana mostly sell Flat-Pack Mattresses.

130.    Together, Defendants Serta Simmons, Tempur Sealy, and Corsicana control over seventy-one percent of the manufacture and sale of domestically manufactured Mattresses.

131.    Tempur Sealy was formed in 2013 when dominant U.S. Mattress manufacturers Tempur-Pedic and Sealy merged. The merger of former rivals eliminated the healthy competition between the two suppliers and led to supracompetitive prices and disincentivized innovation in the Mattress Market. Post-merger, Tempur Sealy now claims to be the "largest bedding provider" in the world and owner of the "most highly recognized brands in the industry: Tempur, Tempur-Pedic, Sealy, Cocoon by Sealy, and Stearns & Foster."

132.    Defendant Serta Simmons now claims to own "three of the largest, most influential bedding brands in the Mattress industry – National Bedding Company L.L.C., Simmons Bedding Company, LLC, and Tuft & Needle, LLC."

133.    Defendant Leggett & Platt dominates and controls the sale of innerspring coils used in Mattresses.

134.    Defendants FXI, ECS and Future Foam dominate the sale of poured polyurethane foam used in Mattresses.

135.    In 2019, when FXI agreed to acquire Innocor, Inc. for $850 million, the FTC challenged the merger on the ground that it would substantially lessen competition in three regional markets for polyurethane foam. FXI reached an agreement to sell three affected facilities to defendant Future Foam.

136.    After entering into a Consent Order with the parties, the FTC published an analysis discussing its concerns over consolidation and coordination in the industry:

> The proposed acquisition is also likely to increase the likelihood of coordination and parallel accommodating conduct among the remaining competitors in the relevant markets. There is a history of alleged anticompetitive conduct within the polyurethane foam industry, raising heightened concerns about further consolidation. The industry also shows an existing vulnerability to coordination, including significant awareness of interdependence among the suppliers, actions taken in recognition of that interdependence, and sufficient transparency among the producers to support coordination. Further consolidation is likely to increase the incentives and ability of the remaining firms to coordinate.

**E.    Defendants' Late Entry Into The Mattress In A Box Market**

137.    Defendants have dominated and controlled the Mattress Market and the Flat-Pack Mattress Market and, until recently, focused their efforts on selling Mattresses through brick and mortar retail stores, rather than through E-commerce and the direct-to-consumer channel of distribution.

138.    Over roughly the last decade, the internet and other technological innovations have significantly disrupted the U.S. Mattress Market through the introduction of two new channels of distribution: (i) via E-commerce retailers like Amazon and Wayfair; and (ii) via direct-to-consumer retailers like Casper and Purple. E-commerce allows customers to easily compare Mattresses in terms of price and features and offer a simplified buying process, high quality customer service, and free return periods.

23

139.     CVB and other companies that supply Mattresses In A Box, largely operate under a different business model compared to Flat-Pack Mattress suppliers. Mattress In A Box suppliers can ship from inventory or drop-ship directly to consumers within 24 hours, which significantly lowers freight costs. In contrast, Flat-Pack Mattress suppliers utilize a made-to-order manufacturing model characterized by much higher shipping costs and large mark-ups to cover the brick-and-mortar retailer's rent and overhead.

140.     Having benefited from their monopoly power in the Flat Pack Mattress Market, Defendants were insensitive to changes in consumer demand for Mattresses, generally, and Mattresses In A Box, specifically. Accordingly, Defendants failed to develop the acumen to effectively supply Mattresses In A Box, including by failing to make timely and necessary investments to successfully supply Mattresses In A Box via E-commerce, and failing to incorporate technological innovations in their manufacturing process and product design.

141.     Defendant Brooklyn Bedding claims it began to sell Mattresses In A Box on the internet as early as 2010, but the other Defendants were much later in attempting to meaningfully enter the Mattress In A Box Market.

142.     Defendant Tempur Sealy had minimal success entering the Mattress In A Box Market prior to 2016.

143.     Defendant Serta Simmons mostly ignored the Mattress In A Box market until 2017, when it launched its Tomorrow Sleep brand. Recognizing the size of the Mattress In A Box Market that it had previously ignored, Serta Simmons acquired Tuft & Needle in 2018 in order to "help drive the continued transformation of [Serta Simmons] into an omni-channel, consumer centric company." Tuft & Needle was a direct-to-consumer Mattress In A Box brand.

144.     Defendant Corsicana did not launch its Mattress In A Box brand, Early Bird, until 2019.

145.     Defendant Leggett & Platt waited until around 2016 to introduce a line of innerspring coil components that it marketed as components that could be compressed, folded and roll packed for Mattresses In A Box.

146.     In 2019, when Leggett & Platt acquired ECS, Karl G. Glassman, President and Chief Executive Officer of Leggett & Platt acknowledged that entry into Mattress In A Box Market was a primary reason for the acquisition. He stated: "Through the combination of Leggett & Platt and Elite Comfort Solutions, we will become the leading provider of differentiated products for the bedding industry and gain critical capabilities in proprietary foam technology, along with scale in the production of private-label finished Mattresses. [ECS] is uniquely qualified to provide E-commerce, retail and OEM customers the most advanced technology solutions in specialty foams today. With our best-in-class manufacturing capabilities and [ECS's] proprietary and patented technology, we plan to capitalize on current and future trends in the market. Those trends include growth of the E-commerce mattress channel, the emergence of boxed bed brands, and those brands' and traditional mattress manufacturers' increasing use of hybrid and specialty grade foam technology in compressed and conventional mattresses."

147.     Tempur Sealy launched a Mattress In A Box product, called Tempur Cloud, in 2020. In addition, in January of 2020, Tempur Sealy acquired a majority interest in Sherwood Bedding for about forty million dollars. Sherwood Bedding then announced the launch of several new Mattresses In A Box.

148.     CVB, on the other hand, started selling Mattresses In A Box in 2010 and has been an innovator who invested significantly in technology, expertise, and infrastructure necessary to compete in the E-commerce marketplace for Mattresses.

149.    Consequently, prior to Defendants engaging in the anticompetitive conduct detailed below, Defendants were losing sales to CVB and other sellers of Mattresses In A Box.

F.    **Defendant's Anticompetitive Misconduct**

150.    After falling far behind CVB and other competitors in the Mattress In A Box Market, specifically, and losing grip on the Mattress Market, generally, Defendants were threatened by the loss of their monopoly and market share in the Mattress and Mattress In A Box Markets. In the face of these threats, Defendants conspired to cut off their rivals' sources of supply, block competition, frustrate innovation, and keep prices artificially high.

151.    Defendants' conspiracy included a multi-prong strategy designed to injure CVB by repeatedly (1) engaging in fraudulent petitioning activity through fraudulent statements to government agencies; and (2) making fraudulent statements to the general public, including consumers and suppliers with whom CVB does business; and (3) anticompetitive conduct in the marketplace unrelated to the petitioning activity.

**1.    Defendants Conspired to Eliminate Competition by Providing Fraudulent Information to U.S. Government Agencies Conducting Antidumping Investigations**

152.    For the reasons described below, the simple filing of an antidumping petition creates uncertainty within affected U.S. markets and is likely to have a very substantial impact on competition in those markets, particularly where there are allegations that the dumping margin is substantial, regardless of the merits or the outcome of the antidumping petition.

153.    As discussed below, Defendants knew that antidumping petitions have a substantial impact on affected U.S. markets and conspired to use the petitioning process to harm competition in the Mattress Market, generally, and the Mattress In A Box Market, specifically.

26

154.    Under the Tariff Act of 1930, domestic industries are able to request that the government investigate and provide relief from imports that are sold in the United States at less than normal or fair value. Such an investigation is commonly referred to as an antidumping investigation.

155.    The major issues in an antidumping investigation are: (a) whether the foreign merchandise is sold at less than fair value; and (b) whether the sales materially injure a domestic industry.

156.    Two government agencies are involved in investigating an antidumping claim— the Department of Commerce ("Commerce") and the U.S. International Trade Commission ("ITC") (collectively, the "Agencies"). Commerce investigates whether the dumping exists, and if so, it sets the margin of dumping. ITC investigates whether there is material injury or threat of material injury to the domestic industry by reason of the dumped products.

157.    Dumping is defined as selling a product in the United States at a price which is lower than the price for which it is sold in the home market (the "normal value"), after adjustments for differences in the merchandise, quantities purchased, and circumstances of sale. In the absence of sufficient home market sales, the price for which the product is sold in a surrogate "third country" may be used. Finally, in the absence of sufficient home market and third country sales, "constructed value," which uses a cost-plus-profit approach to arrive at normal value, may be used.

158.    Relevant factors include (a) the volume of imports of the subject merchandise, (b) the effect of imports of that merchandise on prices in the United States for domestic like products, and (c) the impact of imports of such merchandise on domestic producers of domestic like products in the context of production operations within the United States.

159.   In these proceedings, Material Injury is defined as "harm which is not inconsequential, immaterial, or unimportant."

160.   In their investigations, the Agencies rely on confidential information provided by only the petitioning parties to determine whether to initiate a case. Once initiated, industry participants can submit information via responses to questionnaires from the Agencies. The responses to these questionnaires are confidential.

161.   Once information in an antidumping investigation is designated as confidential, it may only be reviewed by counsel for a party or a retained expert. It may not be shared with the respondents and is not available to non-parties or the public.

162.   Accordingly, the process is highly secretive and subject to potential manipulation and abuse.

163.   One of the factors that the ITC considers in analyzing potential injury is a pricing comparison between similarly situated products in the industry. These product categories are originally defined in coordination with domestic petitioners – here, the Defendants.

164.   In both antidumping proceedings detailed below, Defendants intentionally crafted the categories of products in such a way to inhibit and frustrate a true and accurate comparison. Despite the existence of thousands of Mattress configurations, the Defendants intentionally limited product categories and defined them as being excessively overbroad. For example, one Defendant offers forty-one Mattress lines in one price comparison category and wholesale costs between those Mattresses varied by over 400 percent. Another price comparison category created by Defendants included a range of Mattresses from entry-level, commoditized youth Mattresses to high-end, luxury Mattresses infused with crushed diamonds, thus rendering moot any

meaningful attempt to objectively analyze and price compare those Mattresses. These example constitute fraudulent statements to a U.S. tribunal.

165.    Domestic manufacturers initiate antidumping investigations against their competitors by filing a petition with the Agencies. Generally, a petition explains why the petitioners believe dumping and injury is occurring and includes data regarding the normal value of the product and the alleged dumping margin. The petition and provision of this data start the process. The Agencies then rely on data provided by petitioners to assess the allegations, particularly in cases involving differentiated products and a rapid adjudication timeline.

166.    There are several phases to an antidumping proceeding. The first occurs within forty-five days after the petition is filed when the ITC makes a preliminary determination based on the information available to it at the time of the determination. During this stage, the ITC assesses whether there is a *reasonable indication* that an industry is materially injured or is threatened with material injury by imports that are allegedly sold at less than fair value in the United States (the "Reasonable Indication Standard").

167.    The Reasonable Indication Standard is met when: (1) the record of a proceeding contains clear and convincing evidence of material injury or threat thereof; and (2) a likelihood exists that evidence demonstrating material injury or threat thereof will surface in the final investigation.

168.    If the ITC's preliminary determination is that the Reasonable Indication Standard has been met, Commerce then must make a preliminary determination within 140 days from initiation, which can be extend to 190 days after initiation under 19 U.S.C. §§ 1673(b)(1)(A) and (C), regarding whether there is a reasonable basis to believe or suspect that imported products are being sold at less than fair value. Commerce's preliminary determination is based on the

29

confidential information supplied by petitioners and others who respond to Commerce's questions. It involves an analysis of the U.S. price for the good relative to their normal value and the calculation of a dumping margin based on the confidential data and information provided to it.

169.    If Commerce makes a preliminary determination that there is a reasonable basis to believe or suspect that imported products are being sold at less than fair value, then the ITC conducts the final phase of the injury investigation. It is then that the ITC determines whether an industry in the United States is materially injured or threatened with material injury, predicated on the information supplied to it.

170.    If the ITC finds that an industry is materially injured or threatened with material injury, then the Secretary of Commerce issues an antidumping order that is enforced by U.S. Customs and Border Protection ("Customs").

171.    Generally, antidumping duties are imposed on entries of merchandise made on or after the date on which Commerce publishes its notice of an affirmative preliminary determination of dumping. After there is a preliminary determination of dumping, Commerce estimates the amount of the duty and directs Customs to collect cash deposits from importers of the dumped product in the amount of the estimated duty during the pendency of the investigation.

172.    If Commerce finds that "critical circumstances" exist, additional duties may be imposed retroactively on imports of the dumped product that entered the United States up to ninety days prior to the preliminary determination of dumping by Commerce.

173.    For the reasons described above, the filing of an antidumping petition alone creates uncertainty within affected U.S. markets and is likely to have a very substantial impact

on competition in those markets, particularly where there are allegations that the dumping

margin is substantial, regardless of the merits of the antidumping petition. Specifically, the filing

of an antidumping petition causes immediate uncertainty about the availability of future supply,

future prices, future costs, and potential liabilities, and it requires impacted industry participants

to incur legal fees to comply with the investigation.

174.    Additionally, parties who enjoy monopolies and file antidumping petitions enjoy

potentially unchecked opportunities to manipulate the process and injure the respondent. Unlike

in litigation, antidumping proceedings do not involve the robust discovery mechanisms

contemplated by the Federal Rules of Civil Procedure. Accordingly, respondents cannot test the

veracity of a petitioner's statements or otherwise compel the production of evidence supporting a

petitioner's allegations and representations. Such was the case for CVB when countering

Defendants' fraudulent petitions.

        a.    <u>Defendants Used Fraudulent Margin Calculations In The First</u>
               <u>Antidumping Petition</u>

175.    Rather than innovate and invest in Mattress In A Box and e-commerce

technologies, supply chains, and product lines to disrupt their rivals' supply chains, on or around

September 18, 2018, Defendants Corsicana, Leggett & Platt, ECS, Future Foam, FXI, Serta

Simmons, and Tempur Sealy, as well as by Kolcraft Enterprises, Inc., a seller of Tempur Sealy

Mattresses for babies and children ("Kolcraft"), and Innocor (collectively, the "First Fraudulent

Petitioners") filed a petition with the Agencies alleging that imports of mattresses from China

were being, or were likely to be, sold in the United States at less than fair market value, and that

such imports were materially injuring, or threatening material injury to, the domestic industry

producing mattresses in the United States (the "First Fraudulent Petition").  After the First

Fraudulent Petition was filed, Leggett & Platt acquired ECS, and FXI merged with Innocor.

176.     Here, all of Defendants filed their First Fraudulent Petitions on the same day, reflecting the coordination and conspiracy among them.

177.     Defendants' First Fraudulent Petition alleged that the margin of dumping on mattresses imported from China was as high as 1,700 percent and requested that the Agencies investigate and impose duties on all such products. One of the suppliers of allegedly dumped mattresses was Healthcare Co., Ltd. ("Healthcare"), which Defendants knew was CVB's primary Mattress supplier.

178.     The First Fraudulent Petition alleged that there were "significant and rapidly increasing volumes of low-priced, dumped imports from China" and that imports from China "surged by an astonishing 218 percent from 2015 to 2017," and would continue to increase throughout 2018.

179.     The First Fraudulent Petition also alleged that Chinese manufacturers were injuring the U.S. mattress industry by selling mattresses at dumped prices that consistently undercut the prices of domestic industry.  The First Fraudulent Petition claimed that "surging volumes" of dumped Chinese imports caused U.S. mattress manufacturers to cut jobs and to lose sales, profitability, production, and investments.

180.     In doing so, Defendants constructed fraudulent values for the products identified in the First Fraudulent Petition based on the alleged costs of manufacturing *a Flat-Pack Innerspring Queen Mattress* and skewed data to appear favorable to domestic Mattress manufacturers.

181.     Specifically, the First Fraudulent Petition misleadingly based its calculations of a 1,700 percent dumping margin upon an allegation that it cost $337.86 to manufacture a Flat-Pack Innerspring Queen Mattress in China.

182.     As described above, because of how they are designed, constructed, manufactured and shipped, Flat-Pack Mattresses typically have different cost structures than Mattresses In A Box.

183.     In addition, as detailed above, there are many different sizes and types of Mattresses. Each has a different cost structure than the Flat-Pack Innerspring Queen Mattress referenced in Defendants' First Fraudulent Petition.

184.     Nevertheless, Defendants based all their allegations regarding dumping on calculations regarding the alleged cost of manufacturing a Flat-Pack Innerspring Queen Mattress. They did not even mention or discuss Mattresses In A Box, which is the most common type of Mattress manufactured in and imported from China to the United States.

185.     Defendants manipulated the calculation of the alleged dumping margin in the petition to over 1,700 percent by using a single invoice from one Chinese manufacturer for the sale of Flat-Pack Innerspring Queen Mattresses at a price of 18 dollars to establish a margin for the sale of all mattresses to the United States by *all* manufacturers in China.

186.     Defendants also designated much of the specific information and data in the First Fraudulent Petition, including critical cost information and margin calculations, as confidential. In doing so, Defendants deprived respondents, industry participants, and the general public of an opportunity to corroborate the information. The fact that this critical information was designated as confidential allowed Defendants to hide fraudulent cost data and other important information presented to the Agencies from scrutiny and verification.

187.     By merely filing the First Fraudulent Petition, Defendants harmed CVB and competition in several ways.  First, it put CVB and other importers at risk of having to pay duties

of over 1,700 percent on any mattress that it had imported from China during the investigation, which lasted over fifteen months—notwithstanding the size and type of mattress imported.

188.    Facing the simple threat that the Agencies could impose millions of dollars of duties on Mattresses purchased during the investigation, and that importers would be required to post cash deposits for such duties before any future Mattresses imported from China would be released by Customs during the pendency of the investigation, CVB and other importers were forced to stop purchasing Mattresses from China and to devote important competitive resources to identifying other sources of supply.

189.    Defendants knew that the First Fraudulent Petition would have an anticompetitive effect on the Mattress and Mattress In A Box Markets. Defendants knew that the filing of the First Fraudulent Petition would allow them to substantially lessen the supply of U.S. Mattress seller, maintain supracompetitive prices and frustrate innovation by disrupting the supply chains and damaging the reputations of their more efficient and innovative rivals, including CVB.

190.    The First Fraudulent Petition also harmed CVB and other importers  by requesting that duties be imposed retroactively on all mattresses imported from China due to alleged "critical circumstances."

191.    Defendants knew that respondents to the First Fraudulent Petition would have to wait a period of time before getting an opportunity, albeit a very limited one, to attempt to correct the record.  Creating this window of uncertainty materially impacts supply chains and substantially impacts the ability of U.S. Mattress sellers to import Mattresses at less than artificially high costs.  This supply chain disruption allows Defendants to maintain supracompetitive prices on U.S. Mattresses before any respondent can be heard and well before any U.S. trade agency has the ability to test the First Fraudulent Petition's allegations.  Even if

the U.S. trade agencies were to completely reject the allegations in the First Fraudulent Petition, Defendants would have achieved their desired anticompetitive result by harming competition in the interim.

192.    When evaluating whether the Reasonable Indication Standard was met and making the preliminary determination, the Agencies relied upon Defendants' fraudulent information and determined it was necessary to continue its investigation.  If Defendants had not submitted the fraudulent margin calculations, the Agencies would have found that the imports were negligible and concluded its investigation.

b.    Defendants Made Fraudulent Statements During The Final Phase Investigation Arising From The First Fraudulent Petition

193.    Defendants falsely stated that domestic manufacturers of Mattresses In A Box had "available excess capacity" to supply demand.

194.    On October 19, 2019, Eric Rhea, Vice President of Defendant Leggett & Platt, testified "I strongly disagree … that the mattress industry is not willing or capable to supply mattress-in-a-box." He continued "we know that there is more than enough packaging capacity available domestically." This statement was fraudulent.

195.    Defendants, through their counsel speaking under oath, represented to the ITC that "[t]he domestic industry has plenty of capacity to make [Mattresses In A Box] if market price supports it." This statement was fraudulent.

196.    In truth, U.S. Mattress In A Box manufacturers did not have the facilities, expertise, equipment or other resources necessary to fulfill the demand for Mattresses In A Box because Defendants had failed to purchase and install the necessary compression and rolling capacity to produce sufficient Mattresses In A Box to meet demand.

197.    Defendants also provided fraudulent information to the Agencies by claiming that the import of Mattresses In A Box from China was the primary cause of the loss of jobs and closure of factories related to the manufacture of Mattresses in the United States.

198.    Richard Anderson, President of Tempur Sealy, testified "[w]e were forced to cut shifts, reduce hours and even close plants as dumped Chinese imports used rock bottom pricing to gain market share" and attributed the closure of a plant in St. Paul, Minnesota to "lower volumes due to Chinese imports."

199.    However, on August 5, 2018, when the company announced that it was closing the Minnesota plant, it stated "This business decision is driven by the closure of a large customer's nearby distribution center, and their business will now be serviced by other Tempur Sealy facilities."

200.    Stuart Fallen, Vice President of Corsicana, testified under oath on October 19, 2019 that the company closed a plant in Haleyville, Alabama in 2018 because "there just wasn't enough value to efficiently and profitably run the facility."

201.    However, when it closed the plant, Corsicana announced that the closure "was a business decision predicated on what the company deemed to be in the best interest of our employees, customers and owners. Production at the Haleyville plant had been in decline for a variety of reasons and the company felt transitioning that production to our facilities in Tennessee and Florida would provide transportation, logistic and scheduling efficiencies along with improved overall service to our customers."

202.    In truth, it was Defendants' delay in entering, and being competitive in, the Mattress In A Box Market and Defendants' acquisitions and consolidations that led to the closing of factories and the loss of jobs.

203.    Defendants also made fraudulent representations to the Agencies that the low prices from rivals offering Mattresses imported from China prevented them from successfully obtaining top listings and marketing their products on E-commerce sites, such as Amazon.

204.    In sworn testimony before the ITC on October 11, 2019, David Swift, Chairman and CEO of Defendant Serta Simmons testified under oath that his company's Mattresses "were pushed down in search results in favor of cheaper, unfairly traded Chinese Mattresses" and that "our inability to match dumped Chinese prices, especially at opening price points, meant we had fewer floor slots and unfavorable locations on e-commerce sites."

205.    In addition, Swift testified that Tuft & Needle experienced lost sales "through its website *and for other customers*…[and that] what was driving all of this were the low prices of mattresses from China." (emphasis added).

206.    Swift also testified under oath that Tuft & Needle "is a very big participant on Amazon. And during this period of investigation, the Tuft & Needle brand was forced significantly down the list after having been very successful, and it was totally driven by price." (emphasis added).

207.    In truth, Tuft & Needle experienced a major decline on Amazon.com both in review score and review quantity. Both are factors that affect product placement and therefore sales.

208.    In 2015 and culminating in October of 2016, Amazon made a series of changes to highlight trustworthy reviews on their platform. These changes had a large and direct effect on reviews for Tuft & Needle's main line of Mattresses. These changes included:

- Reducing the weight of "unverified reviews" compared to "verified reviews" in calculating review scores. A "verified review" comes from a customer that Amazon can verify that they actually have the product while an "unverified

37

review" could be written by anyone including a friend or family member of the seller.

- Prohibiting sellers and suppliers from incentivizing reviews on Amazon.com.
- Deleting reviews that were deemed suspicious or untrustworthy.

209.    In March of 2018, as a result of the above-described changes in policy, Amazon deleted over 6,000 of 12,000 Tuft & Needle reviews. In addition to cutting the review quantity in half, this had an impact on Tuft & Needle's average star rating, which dropped from a roughly4.9 star rating to a star rating of roughly 4.1.

210.    The changes to Tuft & Needle's reviews on Amazon had a massive negative impact on its sales. As such, the assertion that all of Tuft & Needle's lost sales were driven by competition from imports was a false statement. Tuft & Needle's loss of business was due from their noncompliance with Amazon's policies and not because of other, competing low-priced mattresses as Swift testified under oath to the ITC.

211.    Mr. Merwin made similar statements to the ITC, going further to state that his company got pressure from Amazon to lower prices on product sold to Amazon for storing and fulfillment in Amazon's distribution centers.

212.    At all relevant times, Defendants knew that e-commerce placement involves more than prices and that, unlike in brick and mortar stores, placement is determined by an algorithm.

213.    Low prices have less to do with the order of product offerings on E-commerce sites than other factors. Defendants' own business practices, not their prices, frustrated Defendants' ability to penetrate such sites. Moreover, the fact that Flat-Pack Mattresses cannot be compressed and shipped by common carrier meant that they were not eligible to be part of or listed on Amazon's Prime service, a very popular paid subscription program that offers overnight or second day delivery.

214.     Neither Tuft & Needle nor Brooklyn Bedding identified these factors to the ITC and the ITC relied on their fraudulent allegation that prices were the reason for the change in rankings.

215.     Nevertheless, the ITC cited and relied upon these false, misleading, and inaccurate testimony from Defendants that low prices were the reason why they could not obtain top listings on e-commerce sites. The ITC stated: "Tuft & Needle and Brooklyn Bedding sold domestically produced [Mattresses In A Box] to Amazon throughout the period of investigation, but saw their ranking in search results and among Amazon's top selling mattresses decline as low-priced subject imports increasingly dominated such rankings during the period."

216.     On June 14, 2019, after it had the opportunity to review accurate information and data from other parties, Commerce preliminarily ruled that critical circumstances did not exist with respect to mattresses Healthcare had sold to CVB.

217.     On October 19, 2019, based on the fraudulent information and representations made by defendants, Commerce found that Mattresses from China had been sold at less than fair value. However, the estimated weighted average dumping margin on imports from CVB's primary supplier, Healthcare, was set by Commerce at 57.03 percent, far less than the 1,700 percent margin claimed by Defendants in the First Fraudulent Petition and related press releases, described below. In any event, the damage to competition from the baseless alleged 1,700 percent margin had already been done.

218.     Commerce also rejected Defendants' claim that "critical circumstances" existed with respect to Healthcare and found that there were not massive imports (i.e., an increase greater than or equal to fifteen percent between the base and comparison periods).

219.    Regardless of the findings of Commerce, the false allegations raised in the First Fraudulent Petition had forced CVB to shift its supply chain out of China and to attempt to find alternative Mattress suppliers in other countries.

220.    On December 9, 2019, the ITC issued its final report related to the First Fraudulent Petition.

221.    The ITC's report found that the domestic Mattress industry had been materially injured by the dumping of Mattresses from China. In reaching this conclusion, the ITC relied upon Defendants' fraudulent statements which were cited as evidence that the industry had been materially injured in the final determination.

222.    For example, on October 11, 2019, Eric Rhea, Vice President of Leggett & Platt, told the ITC that "Chinese imports limited our ability to invest back into our operations and forced us to reduce our head count in 2018."

223.    Mr. Rhea's testimony on October 11, 2019, was demonstrably untrue.  On December 13, 2018, Leggett & Platt Co. informed employees that it was eliminating between 158 and 172 jobs at its Linwood production facility, confirming that the workforce reduction was about the firm's fashion bed and home furniture businesses that produced upholstered headboards and other furniture products.  Indeed, an article in *Furniture Today* reported that Leggett & Platt's closing was the result of the company's decision to "exit product categories that are no longer strategic to its longtime focus."

224.    Further, approximately 5,000 of Leggett & Platt's 7,000 employees are located in China.

225.    Nevertheless, the ITC relied on this and other false information from Leggett & Platt, holding:

Sixteen of 28 responding domestic producers reported that subject imports had negative effects on their investment, with ten reporting that the returns on specific investments were negatively impacted. For example, Brooklyn Bedding reported that subject imports adversely impacted the returns on its investments as sales lost to subject imports resulted in significantly lower capacity utilization levels. Serta Simmons reported that much of the capital and production equipment acquired in anticipation of growing demand for [Mattresses In A Box] remains unused due to increased volumes of subject imports. Tempur Sealy reported that it did not achieve its anticipated sales following investments in foam technology and compression equipment due to low-priced subject import competition. Kolcraft reported that its investments in factory automation in 2017 did not achieve the anticipated returns and that expansions planned for 2017 and 2018 were put on hold due to low- priced subject import competition. Corsicana reported that investments in roll-packing equipment to tap the growing [Mattress In A Box] market were "barely used" as subject imported mattresses were priced below Corsicana's cost of production. [ECS] reported that its investments to expand its capacity to meet growing demand for foam mattresses remained underutilized, and the returns on its investments in R&D and engineering inadequate, due to large volumes of low-priced subject imports. (Pages 35-36)

226.    Defendants also made fraudulent statements regarding their excess capacity to produce Mattresses In A Box that could meet growing consumer demand within the Mattress In A Box market specifically, and the Mattress market generally.

227.    These statements are contradicted by the fact that Defendants' products periodically failed to meet certain flammability tests that are conducted at Consumer Product Safety Commission accredited labs, causing importer and ITC respondent, Ashley Furniture, significant delays in their product launches and sales.

228.    The ITC further accepted Defendants' fraudulent statements regarding their excess capacity to produce Mattresses In A Box that could meet demand. It stated:

> [W]e are unpersuaded by respondents' argument that subject imports increased to satisfy demand for [Mattresses In A Box] that the domestic industry was incapable of supplying due to a 'structural deficit' in [Mattress In A Box] capacity. The domestic industry had excess capacity for mattress production throughout the period of investigation and increased its capacity for the compression and rolling of mattresses to package them as [Mattresses In A Box] from*** units in 2016 to *** units in 2017, and to *** units in 2018, a level *** percent higher than in 2016.

41

229.     The ITC also noted:

> We recognize that U.S. producers' reported compression and rolling capacity was a fraction of total U.S. apparent consumption of [Mattresses In A Box], but as discussed above, we find that U.S. producers had available capacity to produce [Mattresses In A Box] and could have produced significantly more [Mattresses In A Box] than they did during the period of investigation. Furthermore, the domestic industry could have increased its capacity to produce [Mattresses In A Box] further during the period of investigation by adding shifts of production workers and equipment, had it been economical to do so. *** reported that they could increase their capacity to produce [Mattresses In A Box] by adding shifts. *** reported that they could increase their capacity to produce [Mattresses In A Box] by upgrading or adding equipment. (Page 42).

230.     The ITC further cited and relied on Defendants' fraudulent testimony regarding the timing of their interest in and involvement in manufacturing and marketing Mattresses In A Box in concluding as follows: "We are also unpersuaded by respondents' argument that the domestic industry was somehow 'late to the party' with respect to [Mattresses In A Box]. The domestic industry has been producing and selling [Mattresses In A Box] since 2004 and selling Mattresses over the internet since before the period of investigation."

231.     However, it has been widely reported that Defendants are just now investing heavily in the Mattress In A Box market and moving to direct-to-consumer platforms, and that the alleged early innovation of Mattress In A Box technology Defendants' claim to have undertaken in 2004 was, in fact, limited to Kolcraft's sale of much smaller toddler beds and crib mattresses.

232.     What's more is that John Merwin of Brooklyn Bedding fraudulently testified that CVB and other importers did not introduce Mattresses In A Box to U.S. customers through E-commerce channels because he "began selling to major E-commerce customers since at least 2010." Mr. Merwin also testified that Brooklyn Bedding has been producing and selling Mattresses In A Box since 2008.

233.     In reality, however, CVB provided Brooklyn Bedding with early model Mattress In A Box product so that Brooklyn Bedding could study the product and learn how to manufacture like products.

234.     Since the ITC issued its determinations, Defendant Leggett has acquired Irish bedding and foam producer Kayfoam Woolfson and taken action to secure a total of 135 production facilities located in 18 countries despite Defendants' allegations that cheap imports were stifling its ability to use existing production capacity domestically.

c.     Defendants Used Fraudulent Margin Calculations In The Second Antidumping Petition

235.     Due to the threat to its business created by the filing of the First Fraudulent Petition, CVB and other rivals were forced to realign their supply chains and to attempt to identify alternative, high-quality, and cost-effective Mattress suppliers in other parts of the world because U.S. manufacturers still did not have sufficient capacity to meet demand for Mattresses In A Box.

236.     CVB purchases a significant volume of Mattresses each year and was willing to do business with U.S. manufacturers if they had sufficient capacity and capabilities to meet that demand. Despite Defendants fraudulent claim that they had excess sufficient capacity to produce Mattresses In A Box for companies like CVB, not a single Defendant has solicited CVB's Mattress business since the conclusion of the First Fraudulent Petition.

237.     Defendants Corsicana, Future Foam, FXI, Serta Simmons, Tempur Sealy and Brooklyn Bedding have not solicited CVB's Mattress business. Although CVB had a prior business relationship with ECS, that relationship was ended after their acquisition by Leggett & Platt. Leggett & Platt has indicated that it would be unlikely to produce Mattresses for CVB as it considers CVB a competitor to its own direct business.

43

238.    Upon information and belief, Defendants did not immediately make any meaningful attempts to gain share in the Mattress In A Box Market via E-commerce channels, such as Amazon Wayfair and Overstock. Furthermore, upon information and belief, certain Defendants were actively deprioritizing and choosing not to supply or participate in certain E-commerce retail channels.

239.    In 2018, CVB was able to identify and develop a relationship with a Mattress manufacturer in Turkey that had been a producer of Mattresses for the European and African markets since 2006. CVB taught the manufacturer how to efficiently build and manufacture Mattresses In A Box to its high-quality and innovative specifications. This required a significant investment by CVB.

240.    After several months of effort and investment, CVB also was able to form relationships with alternative high-quality, cost efficient Mattress In A Box manufacturers in Serbia, Cambodia, Vietnam, Indonesia and Thailand.

241.    Rather than compete with CVB and other rivals in the Mattress and Mattress In A Box Markets, respectively, Defendants responded to the competitive actions of CVB and others by filing a second antidumping petition against these new foreign suppliers (the "Second Fraudulent Petition") (collectively, with the First Fraudulent Petition, the "Fraudulent Antidumping Petitions").

242.    On March 31, 2020, Defendants filed the Second Fraudulent Petition with the Agencies claiming that the U.S. Mattress manufacturing industry was and is being materially harmed by reason of imports of Mattresses from Cambodia, Indonesia, Malaysia, Serbia, Thailand, Turkey, Vietnam, and China.

44

243.    Again, all of the Defendants filed their Second Fraudulent Petitions on the same day, demonstrating a coordination and the conspiracy among them.

244.    Petitioners in the Second Fraudulent Petition included Defendants Brooklyn Bedding; Corsicana; and Leggett & Platt, as well as Elite, which is now owned by Defendant Leggett & Platt; Innocor, Inc., owned by Defendant FXI; Kolcraft, a seller of Tempur Sealy Mattresses for babies and children; the International Brotherhood of Teamsters (the "Teamsters"); and Unite Steel, Paper, and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("AFL-CIO") (collectively, the "Second Fraudulent Petitioners").

245.    Upon information and belief, the Teamsters, and AFL-CIO are advancing the interests of Tempur Sealy and Serta Simmons, not on their own account, but because of the power Tempur Sealy and Serta Simmons wield in the domestic industry.

246.    On April 7, 2020, the ITC provided notice of the institution of investigations and commencement of the preliminary phase of antidumping and countervailing duty investigation in the Second Fraudulent Petition.

247.    The Second Fraudulent Petition attempted to impose exaggerated duties of up to 1,008 percent upon mattress suppliers in seven countries and again alleges "critical circumstances," purporting to justify the retroactive imposition of such duties to the date of the filing of the petition.

248.    As with the First Fraudulent Petition, Defendants exaggerated and manipulated the calculation of a dumping margin to maximize the potential duty and exploited permissive injury and causation standards to support fraudulent claims.

249.    Defendants intended the filing of the Second Fraudulent Petition to have the same anticompetitive harm as the First Fraudulent Petition, i.e., to maintain supracompetitive prices and frustrate innovation by raising its rivals' costs, injecting additional uncertainty into the Mattress and Mattress In A Box Markets, and materially interfering with supply chains and contractual commitments of its rivals.

250.    The simple filing of the Second Fraudulent Petition put CVB and other Mattress importers at risk of having to pay duties of up to 1,008 percent on any Mattresses that they imported from these countries during the pendency of the proceeding.

251.    Here again, Defendants' intent and anti-competitive misconduct is born out by the vast discrepancies between Defendants' claims and the ITC's tainted determinations relying on the false allegations, and show that, in some instances, ITC's determinations were more than 60 percent (and has high as 800 percent) less than Defendants' baseless claims.

252.    The simple filing of the Second Fraudulent Petition weakened CVB and other importers as competitors because it forced the importers to stop buying Mattresses from these countries, to incur substantial legal fees, and to be required to devote significant resources to again realign its supply chain.

253.    In the Second Fraudulent Petition, Defendants repeated their practice of making numerous fraudulent representations regarding the cost to manufacture a 12-inch, Flat-Pack Innerspring Queen Mattress in these seven countries.

254.    In Vietnam, specifically, Defendants falsely claim the actual costs to manufacture a 12-inch, Flat-Pack Innerspring Queen Mattress is $1,124.36, but that these factories sell them for $101.45. Meaning that, according to Defendants, each factory in Vietnam loses $1,022.92 per Mattress that it sells.

255.     With respect to Indonesia, Defendants make the fraudulent claim that the cost to manufacture a 12-inch, Flat-Pack Innerspring Queen Mattress is $880.30, but that these factories sell them for $109.18. According to Defendants, each factory in Indonesia loses $771.12 per such mattress that it sells.

256.     In Cambodia, Defendants make the fraudulent claim that it costs factories $528.00 dollars to make a 12-inch, Flat-Pack Innerspring Queen Mattress, but that these factories sell them for $65.00. According to Defendants, each factory in Cambodia loses $463.00 dollars per such mattress that it sells.

257.     In Thailand, Defendants make the fraudulent claim that the cost to manufacture a 12-inch, Flat-Pack Innerspring Queen Mattress is $843.28 dollars, but that these factories sell them for $96.54. According to Defendants, each factory in Thailand loses $746.74 per such mattress it sells.

258.     In Turkey, Defendants make the fraudulent claim the actual costs to manufacture a 12-inch, Flat-Pack Innerspring Queen Mattress is $528.25, but that these factories sell them for $80.86. According to Defendants, each factory in Turkey loses $447.39 per such mattress that it sells.

259.     Defendants know, or reasonably should know, that it does not cost over $500 dollars to make the type of Flat-Pack Innerspring Queen Mattress at issue, especially in countries with efficient factories and a willing workforce.

260.     Defendants' own prices for Flat-Pack Innerspring Queen Mattresses, which are below the cost of manufacturing that they allege for these countries, demonstrate that they know, or reasonably should know, that they are misrepresenting the cost to manufacture the type of mattress that they allege is "dumped."

261.     Defendants also misrepresented the import data in the Second Fraudulent Petition. Defendants asserted that a Flat-Pack Innerspring Queen Mattress is representative of average imports, but the prices set forth in the Second Fraudulent Petition for each country are based on total imports, not specific to size. For example, Queen Mattresses constitute a small percentage of CVB's Mattress shipments. Most of CVB's imports in 2019 were a less expensive size than a Queen Mattress, and the overwhelming majority of CVB's imports were less than twelve inches in depth—which also signifies a substantially lower cost.

262.     Defendants' Second Fraudulent Petition further makes fraudulent claims that the only way the respondent foreign Mattress manufacturers could increase their capacity by such a high percentage is if they were acting as a front for Chinese manufacturers trying to evade the steep tariffs imposed as a result of the First Fraudulent Petition.

263.     The truth is that many foreign Mattress manufacturers in many of these countries have been making Mattresses for decades with no ties to China. These manufacturers had existing business in their domestic and other non-U.S. export markets.

264.     Tipping their hand as to the nefarious anticompetitive intent behind the Second Fraudulent Petition, Defendants specifically targeted only the countries from which their rivals import Mattresses, have alleged extremely high and misleading constructed costs so that any tariffs will be impossible to surmount, and then conspired to publish press releases and news articles designed to harm the Mattress Market, the Mattress In A Box Market, and consequently, U.S. consumers.

265.     Defendants knew that respondents to the Second Fraudulent Petition would have to wait a period of time before getting an opportunity, albeit a very limited one, to attempt to correct the record.  Creating this window of uncertainty materially impacts supply chains and

substantially impacts the ability of U.S. Mattress sellers to import Mattresses at less than artificially high costs.  This supply chain disruption allows Defendants to maintain supracompetitive prices on U.S. Mattresses before any respondent can be heard and well before any U.S. trade agency has the ability to test the Second Fraudulent Petition's allegations.  Even if the U.S. trade agencies were to completely reject the allegations in the Second Fraudulent Petition, Defendants would have achieved their desired anticompetitive result by harming competition in the interim.

> d.  Defendants Made Fraudulent Statements To The Agencies To Influence The Agencies' Preliminary And Final Determinations Arising From The Second Fraudulent Petition

266.   As part of the conspiracy, Defendants once again misled and deceived the Agencies by making numerous false and misleading statements in the Second Fraudulent Petition and in filings and testimony offered in connection with the related investigation.

267.   Defendants' Second Fraudulent Petition alleges that, notwithstanding the substantial dumping liability placed on imports of Mattresses from China starting in mid-2019, the domestic industry was unable to capitalize on this relief because imports from the other seven countries provided sufficient capacity that Defendants could not provide. Defendants presented testimony that the improvements to performance they expected in late 2019 did not materialize, and that their condition is as dire now as it was in 2018.

268.   Corsicana testified that "[w]ith the antidumping order on China, we were positioned to benefit from our existing capacity and our investments in products such as rolled mattresses. Instead, we are closing plants and losing sales because of the continued influx of unfairly low-priced imports from even more countries."

49

269.    ECS claimed that "[a]fter we filed the [China] case, we received a flurry of RFQs. We quoted the business, but we didn't get it. Purchasers were able to get lower prices because importers kept bringing in and stockpiling large volumes of low-priced Chinese mattresses. . . Almost as quickly as we started adding new production lines, we had to reverse course as imports from these seven countries flooded the US market in 2019."

270.    At the same time that Defendants were coordinating and conspiring in making these fraudulent statements to the Agencies about the negative impact that the alleged dumping had upon their business, they were taking an entirely different position with investors and analysts.

271.    In Tempur Sealy's 2020 earnings call, Scott Thompson, President and CEO, was unambiguous: "The fourth quarter of 2019 was outstanding, the best fourth quarter in the company's history." Specifically, as to North America, Mr. Thompson stated "North American net sales grew 36% versus prior year. We experienced strong growth rates for both TempurPedic and Sealy in North America across both wholesale and the direct channel. We experienced strong growth rates for both TempurPedic and Sealy in North America across both wholesale and the direct channel. In fact, not only are we growing faster than most of the digital native direct-to-consumer mattress brands, but we are doing it profitably."

272.    Contrary to the allegations in the Second Fraudulent Petition, Mr. Thompson also directly dismissed any impacts from import competition: "As far as how it might impact dumping, I don't see any impact on dumping. The tariffs pretty well blocked China from that. And anything that's being imported is generally coming from Vietnam or Mexico, Indonesia or somewhere else. And give or take, I'd say those imports were . . . generally flat…"

273.     Karl Glassman, Chairman and Chief Executive Officer of Leggett & Platt, was very positive in the Leggett annual earnings call in 2020. He stated: "The bedding industry feels pretty optimistic in terms of that there's relative stability in that industry, which is kind of a change compared to the last five years, and advertising investments seemed to be in place, new product launches, so there's excitement around there. We feel pretty good."

274.     J. Mitchell Dolloff, President and Chief Operating Officer and President of Bedding Products of Leggett & Platt, struck a similar tone: "We did have stronger Q3 than Q4 as we expected, right? We know earlier in the year it was tough to have confidence in us, but we think we came through with what we expected. And I think we continue to see that same kind of optimism in 2020. Right now, I think we'd see somewhere mid-single-digit improvement year-over-year for 2020 with the market right now flat to down 0.5% or 1%, who knows, I think that will continue to move around a bit. But we continue to have strong gains, content and new products. So, I think we remain very positive on that business."

275.     In the Second Fraudulent Petition and in sworn statements provided to the ITC, Defendants stated that the U.S. mattress industry "has the geographic reach and capacity" to supply all Mattress types, including Mattresses In A Box: "They are able to build and deliver a mattress anywhere in the United States within days of receiving an order, and thus have shorter lead times than importers."

276.     As set forth above, Defendants knew or reasonably should have known that these statements about sufficient capacity were fraudulent and omitted material information regarding extensive delays that their customers were experiencing in receiving Mattresses from Defendants. The misleading character of Defendants' representations regarding capacity is

underscored by their failures to expand Mattress In A Box production before filing the Second Fraudulent Petition.

277.     In May 2021, the ITC relied on Defendants' fraudulent statements regarding its domestic capacity in its final views and determinations arising from the Second Fraudulent Petition, stating: "Certain domestic producers also reported capacity expansions during the period of investigation; the domestic industry made substantial investments to expand its capacity to produce MiBs during the period of investigations…[.]"

278.     The ITC also concluded: "Given the magnitude of the unused capacity possessed by domestic MiB producers throughout the period of investigation, domestic producers of MiBs could have increased their U.S. shipments and market share more than they did during the period but for subject import competition."

279.     Defendants' representations were demonstrably fraudulent for several reasons, including Defendants' own actions with respect to pricing, product delays, and availability of raw materials.

280.     In May, 2020, Defendant Corsicana announced to its customers that it was experiencing delivery delays of five or more weeks because it was struggling to procure components at that time.

281.     On September 29, 2020, Defendant Corsicana announced to its customers that it was raising prices by an average of five-to-seven percent due to supply chain constraints and raw material cost increases. Corsicana stated "our industry is faced with significant raw material supply shortages stemming from the COVID-19 pandemic, most recently compounded by the interruption of TDI resin needed to produce polyurethane foam."

282.    In June 2020, Defendant Leggett & Platt announced a 15.5 percent price increase on all fabric encased coil systems due to short supply.

283.    On information and belief, Defendant Serta Simmons and Tempur Sealy are experiencing delays of two to three weeks, or more, in producing and delivering Mattresses.

284.    On April 22, 2020, the Department of Justice filed a Statement of Interest in the proceedings regarding the Second Fraudulent Petition, urging the ITC to consider that, because of COVID-10, demand may outpace domestic supply and noting that imposing equivalent duties "could potentially affect the supply of mattresses needed in hospitals and other health care facilities."

285.    The Department of Justice's Statement of Interest establishes that the Department of Justice recognized the lack of domestic mattress production and that Defendants falsely claimed that excess capacity existed. But for the fraudulent claims regarding capacity, the ITC would not have concluded that such capacity existed, as alleged above.

286.    Defendants also fraudulently claimed in the Second Fraudulent Petition that dumping caused the loss of "thousands of jobs" in domestic Mattress factories.

287.    In truth, as is evidenced by their own public press releases, Defendants' mergers and acquisitions during this time period led to 1,278 job losses (nearly identical to the Second Fraudulent Petitioners' claimed injury by importers) but created 1,215 new jobs, for a total net loss of sixty-three jobs.

288.    Defendants fraudulently presented testimony that due to the dumping of Mattresses "more than 40 US Mattress producers have been forced to close." Eric Rhea, Vice President of Defendant Leggett & Platt, testified under oath that "I am personally aware of more than 40 US mattress manufacturers that have been forced to close down since 2017. Many of

these were multigenerational family businesses that could not compete with the absurdly low-priced imports. You will not be getting questionnaire responses from these companies because, sadly, they no longer exist." In truth, the factories closed for other reasons, including mergers and acquisitions by Defendants and strategic business decisions they made to consolidate production and were otherwise unrelated to the import of Mattresses In A Box.

289.    On May 14, 2020, the ITC issued its preliminary determination regarding the Second Fraudulent Petition determining that Second Fraudulent Petitioners had met the Reasonable Indication Standard only because it accepted as true Defendants' allegations regarding capacity and material injury from the alleged dumping. But for Defendants' fraudulent claims, information, and testimony, the Second Fraudulent Petition would not have met the Reasonable Indication Standard.

290.    At the hearing before the ITC on March 18, 2021, Defendants advanced many of the same false narratives regarding domestic capacity, prices, and product qualities that it advanced to mislead the ITC during the First Fraudulent Petition.

291.    For example, Mr. Merwin again gave testimony that Brooklyn Bedding has been "producing and selling mattresses that are compressed and shipped in a box" since 2008 and selling to major E-commerce customers since 2010. As alleged above, this is demonstrably false as CVB introduced Mr. Merwin to imported Mattress In A Box technologies.

292.    Additionally, Defendants knowingly misrepresented the similarities between Mattresses In A Box and Flat Pack Mattresses, ignoring that the different users have different expectations for their mattresses and ignoring the distinctions between Mattresses In A Box, on the one hand, and box-shipped Flat Pack Mattresses and hybrid mattresses, on the other hand.

293.    Defendants also misled the ITC into believing that Defendants were all primarily manufacturers of a finished good, as opposed to manufacturers of components used to assemble finished products.  Indeed, there exists a single supply chain of foam producers, spring producers, and finished good producers.

> **2.    Defendants Conspired To Make False And Misleading Public Statements To Disrupt Competition And Engaged In Anti-Competitive Conduct Unrelated To The Petitioning Activity**

294.    As part of the conspiracy, Defendants engaged in a massive, coordinated public relations campaign designed to smear Mattress In A Box importers, including CVB, and their foreign Mattress suppliers, to interfere with the supply chain and relationships of Mattress In A Box importers, and to harm competition and consumers.

295.    It was not enough for Defendants to file the First and Second Fraudulent Petitions and pursue their claims before the Agencies. Defendants wanted to ensure that consumers were aware of the petitions and to disseminate the fraudulent margin calculations created by Defendants, in order to manipulate consumer and public sentiments regardless of the outcome of the petitions.

296.    On the same day they filed the First Fraudulent Petition, Defendants issued a press release regarding the First Filed Petition. The press release expressly stated that the "Mattress Petitioners" alleged dumping margins of over 1,777 percent.

297.    The timing of the press release (and the filing of the First Fraudulent Petition) was significant and intentional. They came the day after President Donald J. Trump announced that the U.S. would impose additional tariffs on roughly $200 billion of Chinese goods, and only hours after President Trump accused China of using a trade war to sway the midterm elections,

in a highly-publicized tweet. This timing reflects Defendants' conspiracy to use the petitions to use the manipulated margins to taint consumer sentiment for CVB and other importers.

298.    Trying to channel favorable sentiments for President Trump's public comments about trade disputes with China, Defendants' representatives consistently and repeatedly referred to importers, including CVB, as "Chinese respondents" during the ITC proceedings arising from the First Fraudulent Petition. This xenophobic mislabeling of CVB and other respondents to the First Fraudulent Petition is further evidence that Defendants were acting in a coordinated fashion to implement their conspiracy.

299.    ISPA stands for "International Sleep Products Association."  Founded over 100 years ago, ISPA purports to support "innovation and growth across the sleep products industry" and claims to be "committed to serving members through public policy, research, public affairs, education initiatives and more in order to create a more valuable future."  It's mission is to "Lead and advance the interests of the sleep products industry" and to be "home for collaborative industry interaction."

300.    ISPA holds itself out as a *de facto* gatekeeper for data and statistics related to the sleep products industry. Its website, www.sleepproducts.org, includes an entire page dedicated to statistics, consumer research, and industry links.  In reality, ISPA is controlled by Defendants and functions to protect the dominance of legacy manufacturers.  Defendants conspired with ISPA to restrain competition from CVB and other importers of Mattresses In A Box.

301.    As part of a coordinated strategy, Defendants also conspired to have ISPA issue a press release expressing its support for the First Fraudulent Petition. Defendants wrongfully used ISPA's press release to send a message to the industry and to potential Mattress purchasers to stop importing Mattresses and doing business with CVB and other rivals. The press release

repeated the false information in the petition regarding alleged dumping margins "ranging from 267 percent to over 1,777 percent" and stated:

> On behalf of the entire industry, we have closely monitored the exponential growth of imported Mattresses from China. …. ISPA's members support thousands of manufacturing and related jobs in nearly every state of the United States and in countries around the world. U.S. sleep products manufacturers invest heavily in research, technology and marketing to develop, manufacture and sell world-class products in the United States and globally that provide consumers a safe and restful night's sleep. They have the right under U.S. law and global trade rules to compete on a level playing field.

302.    On March 13-14, 2019, ISPA hosted the 2019 ISPA Industry Conference at the Vinoy Renaissance Resort & Golf Club in St. Petersburg, Florida. At the event, ISPA's President Ryan Trainer led a panel discussion on the regulatory and business environment for the sleep products industry. According to ISPA's publications regarding the event, the topics of Mr. Trainer's panel included "shifting dynamic at retail, the status of antidumping petition on mattresses from China and an update on activities at the state level that could affect mattress flammability standards."

303.    Although ISPA purports to be an unbiased organization, the panelists who participated in Mr. Trainer's discussion in March 2019—while the First Fraudulent Petition was still pending—included Yohai Baisburd of Cassidy Levy Kent LLP, counsel for Defendants in the ITC proceedings. Upon learning that Mr. Baisburd would be a panelist, CVB asked ISPA to include a panelist to speak about the importers' perspective. Mr. Trainer refused to do so and refused to allow CVB to participate.

304.    Additionally, on September 19, 2018, ISPA issued a press release entitled "ISPA Supports Antidumping Petition on Mattresses from China."  This press release concedes, "ISPA supports the petition filed today *by several of our members* requesting an antidumping investigation on unfairly traded finished mattresses from the People's Republic of China."

ISPA, *ISPA Supports Antidumping Petition on Mattresses from China*,

https://sleepproducts.org/2018/09/ispa-supports-antidumping-petition-on-mattresses-from-china/

(emphasis added).

305.    On May 29, 2019, while the investigation into the First Fraudulent Petition was

pending, Defendants issued a press release warning the industry about the duties that were going

to be collected: "We are thrilled that Commerce has confirmed that Chinese producers are

relying on significant dumping margins to unfairly compete in the US market with margins as

high as 1,731.75 percent … The preliminary determination will be published in the Federal

Register within a week or so at which time [Customs] will commence collecting cash deposits of

dumping duties based on these margins. These dumping duties are in addition to the 25 percent

'Section 301' duties the United States has imposed on a variety of Chinese goods, including

mattresses."

306.    Christos Chrisafides, President of Defendant ECS, commented "Today's

announcement and the collection of dumping duties are necessary steps to allow us and the

whole US mattress industry to compete on a level playing field with Chinese producers."

307.    In furtherance of the conspiracy, and to further disrupt the competitive supply

chain, on March 31, 2020, Defendants issued a press release regarding the Second Fraudulent

Petition. The press release references the false allegations regarding dumping margins "ranging

from 48% to 1,008%" and states "[t]he petitions establish the negative impact surging volumes

of low- priced dumped and subsidized imports from these countries have caused to US mattress

manufacturing jobs and the sales, profitability, production, and investments of the US industry."

308.    As with First Fraudulent Petition, Defendants conspired to have ISPA issue a

public statement expressing support for the Second Fraudulent Petition, on March 31, 2020. This

statement was intended to warn the entire industry that importing Mattresses from these countries could result in the retroactive imposition of excessive duties. ISPA stated: "It is not unusual for U.S. industries to file antidumping and countervailing duty petitions against multiple countries or to file new petitions after the successful conclusion of other trade cases, such as the recent mattress antidumping case against China." ISPA's statement continued: "Broad and repeated actions like this are sometimes necessary to protect affected U.S. industries from the contagion of material injury caused by unfairly traded imports."

309.    On March 31, 2020, Defendants also had ISPA publish an article on its online publication entitled "BedTimes."  "BedTimes" purports to be "The Business Journal for the Sleep Products Industry."  The publication's post stated that "[a]s part of its injury investigation, the ITC will send questionnaires to all US producers of mattresses," included a link to a questionnaire, and stated deadlines to provide responses to the ITC. The post was nothing short of a plea to ISPA members to participate in Defendants' conspiracy: "For ISPA members who have been injured by the influx of unfairly traded mattresses from the targeted countries, providing complete answers to these questionnaires will help the ITC perform its analysis."

310.    On April 15, 2020, Defendants issued another press release that repeated the fraudulent allegations about job losses and factory closures being caused by alleged dumping. The press release stated: "Since 2017, more than 40 American mattress manufacturers have been forced to close their doors due to these massive increases in the volume of unfairly traded imports – negatively impacting thousands of American workers across the entire country. Those thousands of American workers were thrown out of work by these unfair trade practices, even before the remaining American mattress producers reported another 1,300 jobs lost due to the huge increases in dumped imports between 2017 and mid-2019."

311.    In June 2020, Defendants caused ISPA to issue another press release citing domestic producers claims that the growth in the market was the result of Defendants' antidumping conduct, notwithstanding that ISPA is, by its own mission, supposed to provide unbiased statistics. Upon information and belief, Defendants are responsible for coordinating ISPA's attacks against CVB.

312.    Defendants' press releases and statements were intended to smear competitors and harm competition in the Mattress Market, generally, and the Mattress In A Box Market, specifically, to maintain supracompetitive prices, to frustrate innovation, to inject uncertainty into the affected markets, to damage their rivals' reputations and supply chains, and to harm consumers.

313.    It is plainly apparent that Defendants' public relations campaign was motivated to increase its market share.  For example, the first ISPA press release promotes that its "members manufacture and sell world-class products in the United States and globally that provide customers a safe and restful night's sleep," and the imports of "Chinese mattresses . . . have caused material injury or threaten material injury to the entire U.S. mattress industry."  ISPA, *ISPA Supports Antidumping Petition on Mattresses from China*, https://sleepproducts.org/2018/09/ispa-supports-antidumping-petition-on-mattresses-from-china/. The statements contained within the ISPA press releases originated with Defendants and were made for the purpose of promoting their products.  Defendants are responsible for their material false or misleading representations of fact publicized by ISPA because Defendants intentionally or negligently communicated the defamatory matter to ISPA.

314.    Defendants' coordinated smear campaign of press statements and ISPA events is only one example of their anticompetitive conspiracy to injure CVB and mattress importers.

Defendants' statements were part of Defendants' conspiracy to use the First and Second Fraudulent Petitions as tools to disseminate misinformation to consumers.

315.    On April 22, 2020, Leggett & Platt's Chairman and Chief Executive Officer, Karl G. Glassman, wrote a letter to United States Senator Mike Lee, on behalf of Defendants. Therein, Mr. Glassman cited the fraudulent statistics that Defendants advanced in the First Fraudulent Petition and the Second Fraudulent Petition. Leggett & Platt was the largest of the petitioners in the ITC proceedings and his letter to Senator Lee reflects the coordination among Defendants.

316.    On information and belief, Mr. Glassman's letter, which misrepresents Defendants' ability to meet increasing demand for mattresses at the outset of the COVID-19 pandemic, was part of Defendants' conspiracy to have unprecedented tariffs imposed on imports from the eight countries that were the subject of the Second Fraudulent Petition.

317.    By seeking tariffs based on the fraudulent margin numbers presented to the ITC, Defendants further sought to injure CVB and consumers and maintain their supracompetitive prices.

318.    Defendants' anticompetitive behavior also included efforts to interfere with CVB's relationships with suppliers and brick and mortar retailers. Upon information and belief, CVB alleges that Defendants have repeatedly offered brick and mortar retailers as much as $25,000 for store remodels on the condition that the retailer will stop selling CVB products. Additionally, these agreements include terms stating that the retailer cannot remove Defendants' products from their floors for a set period of time.

319.    On information and belief, Sealy provided Bedding Plus, a Louisiana-based brick and mortar mattress retailer, $2 million in exchange for a commitment that Sealy will receive 85% of Bedding Plus's mattress flooring so that the retailer would not feature CVB products.

320.    On information and belief, Serta paid retailer Reasoner Enterprises at least $25,000, in exchange for Reasoner Enterprises' commitment that it would not sell competitor's products priced higher than $499.

321.    Following the First and Second Fraudulent Petitions, Defendants engaged in price fixing and deliberately increased prices in a coordinated fashion in or about late March 2021 and early April 2021.  The sole exception to these increases was Corsicana, which, on information and belief, raised prices one month before its competitors in a coordinated attempt to conceal Defendants' price fixing scheme.

322.    On information and belief, Serta entered into agreements with mattress retailers that prevent the retailers from selling competitors' products below a certain price set by Serta.

323.    On information and belief, Sealy entered into agreements with mattress retailers that prevent the retailers from selling competitors' products below a certain price set by Sealy.

324.    Sealy has even taken further steps to cement this relationship with retailers. "On May 9, 2023, Tempur Sealy signed a definitive agreement to acquire Mattress Firm. Founded in 1986, Mattress Firm is *the largest mattress specialty retailer in the U.S.*, operating over 2,300 brick-and-mortar retail locations and a growing e-commerce platform." Tempur+Sealy, *Agreement to Acquire Mattress Firm*, https://investor.tempursealy.com/Acquisition (emphasis added).

325.    As a result of Defendants' price fixing the average price of mattress sales on Amazon increased by 17 percent in early 2021 while selection decreased by 10 percent.

326.    Additionally, as alleged above, Defendants regularly misrepresent their products as being "Made in America" despite the fact that they contain significant componentry and

finished products that are imported, including from the source countries that are the subjects of the First and Second Fraudulent Petitions.

327.    On information and belief, Defendants' false advertising and labeling of products as "Made in America" is coordinated and part of their conspiracy to deceive consumers into supporting Defendants and underscore the false narratives that they advanced in the First and Second Fraudulent Petitions.

## V.    HARM CAUSED BY DEFENDANTS' ANTICOMPETITIVE CONDUCT

328.    Defendants' anticompetitive acts identified above have had serious anticompetitive effects on competition in the Mattress Market, Mattress In A Box Market, and Flat-Pack Mattress Market. In addition to CVB, Defendants' anticompetitive conduct has harmed other competing Mattress suppliers, potential entrants into the Mattress Market, Mattress In A Box, and Flat-Pack Markets, respectively, as well as distributors, retailers, and, most importantly, consumers of Mattresses.

329.    Defendants' anticompetitive conduct coupled with their combined monopoly power in the Flat-Pack Mattress Market, as well as Leggett & Platt's position as the predominant seller of Innersprings for Flat-Pack Mattresses, has made it exceedingly difficult for rivals, including CVB, to compete. Specifically, Defendants' objectively and subjectively baseless petitions to the ITC have made it virtually impossible for CVB and other suppliers to operate efficiently and to innovate in the Mattress Market and the Mattress-In-A-Box Market.

330.    CVB has been injured by Defendants' fraudulent claims in the Fraudulent Antidumping Petitions and the marketing and advertising to distributors, retailers, and consumers based on those same claims. CVB's actual and potential customers are concerned about the impact of the Fraudulent Antidumping Petitions. The simple filing of antidumping petitions and

the dissemination of the fraudulent claims therein have had a chilling effect on CVB's Mattress In A Box sales and on technological innovations in development at CVB. Customers have, in fact, reduced or postponed their orders of CVB Mattresses In A Box or stopped purchasing CVB Mattresses In A Box altogether because of the fear created by the filing of Fraudulent Antidumping Petitions.

331.   Numerous customers and potential customers were either concerned about or outright refused to purchase CVB Mattresses In A Box due to the simple filing of the Fraudulent Antidumping Petitions. CVB's Mattress In A Box sales are being suppressed by Defendants' fraudulent claims.

332.   Amazon is the predominant seller of Mattresses In A Box via the E-commerce channel with over thirty percent share of that channel. Amazon has expressed concern and has refused to purchase Mattresses In A Box from CVB and other competitors impacted by the antidumping petitions.

333.   Target is another leading seller of Mattresses In A Box through both the brick-and-mortar and E-commerce channels, respectively, that has expressed concern and has refused to purchase Mattresses In A Box from CVB and other competitors impacted by the antidumping petitions.

334.   Mattress Firm is a leading seller of Mattresses In A Box that has refused to purchase imported Mattresses In A Box as a result of the antidumping petitions.

335.   Walmart is another leading seller of Mattresses In A Box through both the brick-and-mortar and E-commerce channels, respectively, that has expressed concern and has refused to purchase Mattresses In A Box from CVB and other competitors impacted by the antidumping petitions.

336.    Mattress distributors and retailers have expressed frustration with Defendants' inability to compete on the merits in the Mattress In A Box Market.

337.    Walmart and another retailer have noted that Defendants have been unable or unwilling to innovate in the Mattress In A Box Market.

338.    Due to changes in consumer demand related to COVID-19, E-commerce Mattress In A Box sales grew significantly. CVB preliminarily estimates that, due to the filing of the Fraudulent Antidumping Petitions, it needed to redevelop scores of Mattress product families and has been forced to abandon dozens of potential Mattress and other related product lines and related marketing and sales promotions that has cost it roughly $200 million in revenue in 2020.

339.    Defendants' actions harm consumers by maintaining the artificially high price of Mattresses and Mattresses In A Box sold in the United States, by frustrating efficiency in the sale of Mattresses and Mattresses in a Box, by slowing technological innovation with respect to the sale of Mattresses and Mattresses In A Box, by reducing output and by eliminating consumer choice.

340.    Defendants' anticompetitive conduct has severely limited consumers' access to Mattresses. This restricted access has been especially harmful to consumers who prefer the convenience, price, features, and quality of Mattresses In A Box over Flat Pack Mattresses.

341.    Defendants also perpetrate a false narrative and misrepresentations directed at consumers, whereby they have misleading characterized their products as Made In America, in order to manipulate the ITC and public support.  Available import records show that Defendants import goods and components from China, Vietnam, Turkey, Malaysia, Indonesia, and Thailand.

342.    Defendants are aware that "Made in the USA" is a term of art constructed by the Federal Trade Commission and various state laws.  Nevertheless, Defendants have misrepresented that they qualify for this status as part of its conspiracy against CVB.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Violation of Section 1 of the Sherman Act, 15 U.S.C § 1

343.    CVB repeats and re-alleges every preceding allegation as if fully set forth herein.

344.    On information and belief, Defendants engaged in price fixing, and carried out a conspiracy to mislead consumers, to harm CVB's ability to compete with Defendants' business also by creating confusion and doubt among CVB's potential and existing customers about the commercial viability of CVB's Mattress business, and by delaying CVB's ability to grow its Mattress business. On information and belief, this conduct included a public relations smear campaign regarding the Fraudulent Petitions, whereby Defendants sought to manipulate public sentiment and consumer sentiment against CVB, using press releases, public statements, and ISPA; paying suppliers and retailers not to carry CVB's products; misrepresenting CVB as a Chinese company as opposed to a domestic business; misrepresenting their products as Made In USA, coordinating price increases in conjunction with the Fraud Petitions, and using ISPA to thwart and undermine CVB's attempts to compete in the marketplace.

345.    On information and belief, this conduct harmed consumers of Mattresses and Mattresses In A Box by allowing Defendants to charge supracompetitive prices for and to delay innovation related to the sale of Mattresses and Mattresses In A Box and reducing the number of alternative suppliers of Mattresses and Mattresses In A Box.

346.    The conspiracies substantially affected and still affect interstate commerce.

66

347.     The agreements between Defendants to pursue sham petitions and to provide false and misleading information to Commerce and ITC constitute unreasonable restraints of trade that are per se illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.

348.     As a direct and proximate result, CVB, other competitors, and consumers have been injured in their business or property.

<div align="center">

**SECOND CLAIM FOR RELIEF**

**Monopolization**

**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**

</div>

349.     CVB repeats and reasserts each of the preceding allegations as if fully set forth herein.

350.     As detailed above, Defendants have monopoly power in the Mattress Market and the Flat-Pack Mattress Market, including the power to control prices and exclude competition.

351.     As explained above, Defendants have willfully and intentionally engaged in anticompetitive conduct in order to unlawfully maintain its monopoly power in these markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

352.     Defendants have effectively restrained, and threaten to restrain further, competition in the Mattress Market and the Flat-Pack Mattress Market by:

a.     interfering with competitors', including CVB's, business relationships by making fraudulent comments to customers and potential customers regarding CVB's and other

competitors' products and attempting to dissuade retailers and distributors from doing business with CVB and other importers of Mattresses;

b.      raising competitors' costs above those that would exist under competitive conditions by forcing competitors to participate in fraudulent antidumping petitioning activity; and

c.      making material misrepresentations to retailers, distributors, and consumers regarding the quality and price of imported Mattresses as compared to domestically-manufactured Mattresses in order to perpetuate its Mattress Market and Flat-Pack Mattress Market monopolies by deterring retailers, distributors, and consumers from doing business with importers of Mattresses and thereby also dissuading other potential competitors from entering the markets.

353.    Each of these anticompetitive acts is sufficient to constitute an antitrust violation, and, taken together, they clearly establish illegal monopolization in violation of the federal antitrust laws.

354.    As a direct, foreseeable, and proximate result of Defendants' anticompetitive and monopolistic conduct, CVB and other importers of Mattresses have been injured in their business with damages in amounts to be proven at trial. In particular, CVB has been substantially foreclosed from competing in the Mattress Market; and CVB has lost business as a result of Defendants' interference with its relationships with retailers and distributors, its claims that imported Mattress will be more expensive than domestically-produced Mattresses, and other deceptive and disparaging conduct. Absent Defendants' anticompetitive acts, CVB would have made substantially more sales of Mattresses.

355.     As a direct, foreseeable, and proximate result of Defendants' anticompetitive and monopolistic conduct, competition, suppliers, retailers, distributors, and consumers in the Mattress Market, Flat-Pack Mattress Market, and Mattress In A Box Market have been harmed, by among other things: (1) Defendants' ability to charge supracompetitive prices for Mattresses; and (2) the reduced output and availability of consumers' preferred Mattresses.

356.     Unless Defendants are enjoined from making false and disparaging statements about CVB and its products and from filing baseless antidumping petitions, CVB will suffer irreparable injury in the form of a loss of a significant percentage of its business and goodwill, which would be lost not as a result of fair competition but rather as a result of Defendants' anticompetitive conduct. Given the nature of the irreparable harm to CVB in the form of lost business and goodwill, this harm will be difficult to quantify.

357.     Upon information and belief, other corporations, partnerships, or business entities, currently unknown to CVB, are co-conspirators with Defendants in their unlawful activities.

### THIRD CLAIM FOR RELIEF

**Monopoly Leveraging**

**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**

358.     CVB repeats and reasserts each of the preceding allegations as if fully set forth herein.

359.     As detailed above, Defendants have monopoly power in the Flat-Pack Mattress Market, including the power to control prices and exclude competition.

360.     Defendants have willfully and intentionally used its monopoly power in the Flat-Pack Mattress Market to maintain or attempt to obtain monopoly power in the Mattress Market and Mattress In A Box Market. Specifically, Defendants have conspired and used their collective

monopoly power in the Flat-Pack Mattress Market to engage in a strategy of filing objectively and subjectively baseless antidumping petitions and then using the fraudulent information promulgated by Defendants in those fraudulent petition proceedings to dissuade retailers and distributors from doing business with CVB and other importers of Mattresses In A Box and to raise competitors' costs above those that would exist under competitive conditions.

361.    Defendants willfully acquired, maintained, and attempted to obtain monopoly power by the exclusionary conduct detailed above, rather than through efficiency or innovation. CVB has been injured by Defendants' anticompetitive conduct through, among other things, lost sales and profits.  This intent can be observed in their decision to exclude CVB from ISPA. Defendants' exclusionary conduct has been intended, in part, to allow Defendants to establish Mattress In A Box production capabilities while not competing with CVB and other competitors in the market for such goods.

362.    Unless Defendants are enjoined from engaging their misconduct, including but not limited to the dissemination of fraudulent information regarding CVB and Mattresss In A Box competitors, CVB will suffer irreparable injury in the form of a loss of a significant percentage of its business, which would be lost not as a result of fair competition but rather as a result of Defendants' anticompetitive leveraging of its monopoly power in the Flat-Pack Mattress Market in an attempt to monopolize the Mattress Market and Mattress In A Box Market. Given the nature of the irreparable harm to CVB, this harm will be difficult to quantify.

## FOURTH CLAIM FOR RELIEF

### Conspiracy to Monopolize

### Violation of Sections 1 & 2 of the Sherman Act, 15 U.S.C. §§ 1, 2

363. CVB repeats and reasserts each of the preceding allegations as if fully set forth herein.

364. As detailed above, Defendants have monopoly power in the Flat-Pack Mattress Market, including the power to control prices and exclude competition.

365. Defendants willfully and intentionally conspired to monopolize the Mattress Market and the Mattress In A Box Market.

366. Defendants accomplished this by promulgating the fraudulent information regarding CVB's products and imports in the fraudulent antidumping petitions to distributors, retailers, and customers of Mattresses that dissuade retailers, distributors, and consumers from doing business with CVB and other importers of Mattresses In A Box and that raise rivals' costs above those that would exist under competitive conditions.

367. Defendants' conduct alleged herein has been directed at accomplishing the unlawful objective of restraining competition from Mattress In A Box competitors in order to frustrate efficiency and restrain innovation competition in the Mattress Market and Mattress In A Box Market.

## FIFTH CLAIM FOR RELIEF

### Violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)

368. CVB repeats and reasserts each of the preceding allegations as if fully set forth herein.

369.    Defendants' statements in press releases, its own marketing materials and labels, and campaigning through ISPA and via other trade press has conveyed false and/or misleading statements to millions of consumers.

370.    Defendants' campaign, which has been amplified through ISPA, has made false and/or misleading statements directly to virtually all of CVB's actual and potential customers.

371.    Defendants' false and misleading statements were made in interstate commerce.

372.    These material statements are likely to deceive and/or mislead CVB's potential customers as to CVB's commercial activities as stated above, and in fact, have misled certain of CVB's potential customers and thereby negatively influenced their purchasing decisions with regard to CVB's products.

373.    Through these materially false and misleading statements, Defendants have caused injury to CVB both through decreased sales and a loss of goodwill associated with CVB's products. Injury to CVB is likely to continue and mount as Defendants' false and misleading claims before Commerce and the ITC continue.

<u>**SIXTH CLAIM FOR RELIEF**</u>

**Violation of the Utah Antitrust Act, Utah Code Annotated § 76-10-3109**

374.    CVB repeats and reasserts each of the preceding allegations as if fully set forth herein.

375.    As detailed above, CVB resides in the State of Utah.

376.    Defendants have willfully and intentionally conspired to assert meritless petitions against CVB, among other competitors, alleging in bad faith, with no objective or subjective basis, that CVB's Mattresses were allegedly "dumped." Defendants' claims were brought with

the intention to harm CVB, specifically, and to limit competition, generally, and to harm consumers.

377.    Defendants' agreements and conspiracy to assert the meritless petitions against CVB and other rivals were and are illegal restraints of trade or commerce in the U.S. Mattress Market and U.S. Mattress In A Box Market. As a direct and proximate result, as detailed above, CVB has been injured in its business or property.

<div align="center">

**SEVENTH CLAIM FOR RELIEF**

**Intentional Interference with Prospective Economic Advantage**

</div>

378.    CVB repeats and reasserts each of the preceding allegations as if fully set forth herein.

379.    Defendants knew that their distributor, retailer, and end-consumer customers also were the customers or potential customers of the sellers of imported Mattresses, including CVB. Indeed, Defendants know that certain of these customers are also CVB's customers.

380.    With this knowledge, Defendants have intentionally undertaken at least the following acts, contrary to law, with malice and with the intent of disrupting CVB's business relationship with these customers and potential customers by, for example, inducing them to refrain from doing business with CVB as follows:

      a.    Defendants made intentionally false and disparaging statements to CVB's customers and potential customers hoping to harm their business and interfere with their contractual relationships; and

      b.    Defendants vigorously promoted a public campaign, through press releases and other statements, wherein they falsely asserted that:

i.    Defendants had ample capacity to supply entirely demand in the Mattress In A Box Market;

ii.   Defendants were relegated to flex capacity for E-commerce retailers;

iii.  Defendants lost E-commerce business and lost market share due only to lower-priced imports;

iv.   Any growth of production in the countries named in the Second Fraudulent Petition were only proxies for Chinese entities or the Chinese government;

v.    Certain Defendants independently developed Mattress In A Box capabilities;

vi.   The capabilities of the Defendants to develop Mattresses In A Box prior to 2016;

vii.  Defendants sustained factory closures and harm related to those closures that was caused only by lower-priced imports;

viii. Defendants pioneered and developed the Mattress In A Box Market and e- commerce sales channel; and

ix.   Additional misrepresentations to be established at trial.

381.   Such actions have disrupted CVB's relationships with both customers and potential customers by causing them to refrain from making purchases or to purchase fewer of CVB's Mattresses and by causing a loss of goodwill with regard to CVB and its Mattresses.

382.   As a result of Defendants' conduct, CVB has suffered damages in an amount to be proven at trial.

## EIGHTH CLAIM FOR RELIEF

### Defamation

383.    CVB repeats and reasserts each of the preceding allegations as if fully set forth

herein.

384.    Defendants amplified the false information and statements it made to Commerce

and the ITC by publishing and communicating the false information through press releases and

trade press.

385.    Defendants made public statements to consumers and press outlets regarding the

First and Second Fraudulent Petitions and CVB and is products with the knowledge that they

were false or with reckless disregard of whether they were false or not.

386.    Defendants' conduct has damaged CVB's reputation, and has caused injury to

CVB both through decreased sales and a loss of goodwill associated with CVB's products.

387.    As a result of Defendants' conduct, as detailed above, CVB has suffered damages

in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, CVB demands a trial by jury and hereby respectively requests:

I.    Pursuant to 28 U.S.C. § 2201, a declaration that Defendants have monopolized,

or in the alternative, attempted to monopolize; created unreasonable and

unenforceable restraints of trade in violation of Sections 1 and 2 of the Sherman

Act, 15 U.S.C. §§ 1, 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14;

II.    Pursuant to 15 U.S.C. § 26, Defendants, their subsidiaries, affiliates, successors,

transferees, assignees, and the respective officers, directors, partners, agents,

and employees thereof, and all other persons acting or claiming to act on their

behalf, shall be permanently enjoined and restrained from continuing the unlawful acts in violation of the Sherman Act, the Lanham Act, and the Utah Antitrust Act.

III.     Damages sustained to CVB, as provided by the federal antitrust and unfair competition laws, and a joint and several judgment in favor of CVB shall be entered against Defendants in an amount to be trebled in accordance with such laws, including Section 4 of the Clayton Act;

IV.     Damages sustained to CVB, as provided by the Utah Antitrust Act, and a joint and several judgment in favor of CVB shall be entered against Defendants in an amount to be trebled in accordance with the Utah Antitrust Act.

V.     Pre-judgment and post-judgment interest at the maximum legal rate;

VI.     CVB's costs, expenses, and reasonable attorneys' fees in bringing this action;

VII.     An award of punitive damages; and

VIII.     Such other relief as this Court may deem just and proper.

///

///

///

///

//

//

///

///

///

**JURY TRIAL DEMANDED**

CVB hereby demands a trial by jury on all issues triable by jury.

Dated: May 2, 2024

<div style="margin-left: 40%;">

Respectfully submitted,

By: /s/ Stephen G. Larson

Stephen G. Larson (admitted *pro hac vice*)
Paul A. Rigali (admitted *pro hac vice*)
**LARSON LLP**
555 South Flower Street, 30th Floor
Los Angeles, California 90071
Telephone: (213) 436-4888
Facsimile: (213) 623-2000
Email: slarson@larsonllp.com;
prigali@larsonllp.com;

Jeffrey D. Steed (Bar No. 11774)
Chief Legal Officer
**CVB, Inc.**
1525 W 2960 S
Logan, UT 84321
Telephone: 800-517-7179
Email: jeff.steed@maloufcompanies.com

Attorneys for Plaintiff CVB, Inc.

</div>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 2, 2024, a copy of the foregoing was filed electronically

with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to counsel

of record for all parties via the Court's electronic filing system.

<p style="text-align:right">/s/ Stephen G. Larson                 <br>Stephen G. Larson</p>